No. 25-1105

# In the United States Court of Appeals for the Tenth Circuit

Kristen Crookshanks, as parent and next of friend of a minor on behalf of C.C.; Mindy Smith, as parent and next of friend of a minor on behalf of E.S.; NAACP–Colorado–Montana–Wyoming State Area Conferences; and The Authors Guild,

*Plaintiffs-Appellees*,

v.

Elizabeth School District,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Colorado
Hon. Charlotte N. Sweeney
Case No. 1:24-cv-03512-CNS-STV

## APPELLANT'S OPENING BRIEF

Christopher O. Murray
Laura J. Ellis
Julian R. Ellis Jr.
First & Fourteenth PLLC
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
(719) 286-2475 (phone)
chris@first-fourteenth.com
laura@first-fourteenth.com
julian@first-fourteenth.com

Michael Francisco
First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 784-0522
michael@first-fourteenth.com

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Bryce D. Carlson
Miller Farmer Carlson Law LLC
5665 Vessey Road
Colorado Springs, Colorado 80908
(970) 744-0247 (phone)
bryce@millerfarmercarlson.com

**Oral Argument Requested**
*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

Table of contents ........................................................................................ i

Table of authorities .................................................................................. iii

Statement of related cases ....................................................................... vi

Statement of jurisdiction .......................................................................... 2

Statement of the issues............................................................................. 2

Statement of the case ............................................................................... 3

    I.    The plaintiffs' lawsuit....................................................... 11

    II.   The school district makes the removed books available to the plaintiffs and their members ...............................13

    III.  The district court's ruling ............................................. 14

Summary of argument............................................................................. 17

Standard of review .................................................................................. 20

Argument ................................................................................................. 20

    I.    None of the plaintiffs have standing to challenge the removals of *#Pride*, *Crown*, or *It's Your World* ...................... 20

    II.   A school library's curation decisions are government speech............ 23

    III.  A school district does not "abridge" or "impair" the freedom of speech by removing books from its libraries ................................. 32

    IV.  The school district cannot be violating the plaintiffs' First Amendment rights when the disputed titles remain available to the plaintiffs in the school district's libraries ..................................... 38

    V.   The district court erred in holding that the Speech Clause forbids "viewpoint" discrimination and "content" discrimination in school-library curation decisions............................ 43

    VI.  The district court violated the Federal Rules of Evidence by admitting hearsay declarations........................................... 48

Conclusion ............................................................................................... 49

Statement regarding oral argument ........................................................ 50

i

Certificate of service ........................................................... 51

Certificate of compliance ..................................................... 52

Certificate of electronic compliance...................................... 53

District Court's opinion and order...........................................

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) .................................................22

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) .......................... 41

*Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990)....................................................38

*Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997)...............................................33

*Board of Education v. Pico*, 457 U.S. 853 (1982) ........................... 2, 12, 45, 46, 47, 48

*C.K.-W. by & through T.K. v. Wentzville R-IV School District*,
619 F. Supp. 3d 906 (E.D. Mo. 2022) .......................................................... 45, 46

*Califano* v. *Yamasaki*, 442 U.S. 682 (1979) ................................................................42

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995)....................................................................................46

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ............................................................44

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................23

*Counts v. Cedarville School District*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ..................................................................42

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008) .............................................22

*Dep't of Education v. Brown*, 600 U.S. 551 (2023) ......................................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................................34

*DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263 (10th Cir. 2018) .....................20

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ...............................................................18

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024)................................................................... 29, 30, 31

*Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) ......................................2

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003).............................48

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................22

*Marks v. United States*, 430 U.S. 188 (1977)...............................................................46

*Matal v. Tam*, 582 U.S. 218 (2017).......................................................................30, 31

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003) ...................................... 22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................... 34

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)................................. 17, 27, 28, 29, 31

*Muir v. Alabama Educational Television Comm'n*,
    688 F.2d 1033 (5th Cir. 1982) ............................................................................. 46

*NAACP v. State of Albama ex rel. Patterson*, 357 U.S. 449 (1958)...................... 40, 42

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................................... 24

*PEN American Center, Inc. v. Escambia County School Board*,
    711 F. Supp. 3d 1325 (N.D. Fla. 2024) ......................................................29, 30, 31

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)................................................ 24

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) ............................................................................................. 18

*Rosenberger v. Rector and Visitors of the University of Virginia*,
    515 U.S. 819 (1995) ............................................................................................. 25

*Rust v. Sullivan*, 500 U.S. 173 (1991)................................................................... 24, 33

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022)........................................................ 25

*Stanley v. Georgia*, 394 U.S. 557 (1969) .........................................................17, 19, 37

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009)............................................ 42

*Tuffendsam v. Dearborn County Board of Health*,
    385 F.3d 1124 (7th Cir. 2004) ............................................................................. 18

*United States v. American Library Ass'n, Inc.*,
    539 U.S. 194 (2003) ...........................................................26, 28, 39, 40, 43, 44

*United States v. National Treasury Employees Union*, 513 U.S. 454 (1995)............... 42

*Valley Forge Christian College v. Americans United for Separation of
    Church and State, Inc.*, 454 U.S. 464 (1982)....................................................... 21

*Virden v. Crawford County Arkansas*,
    No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) .............29, 31

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ............................................................................................. 24

*Walls v. Sanders*, --- F. Supp. 3d ----, No. 4:24-CV-00270-LPR, 2024 WL 5192031 (E.D. Ark. Dec. 20, 2024) ............................................................ 46

*Webster v. Reproductive Health Services*, 492 U.S. 490 (1989) .................................. 34

*Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353 (2009) ..................... 18, 33, 34, 35

**Statutes**

28 U.S.C. § 1292(a)(1) ............................................................................................ 2

42 U.S.C. § 1983 .................................................................................................... 39

**Constitutional Provisions**

Colo. Const. art. 9, § 2 ......................................................................................... 18

Colo. Const. art. II, § 10 ....................................................................................... 33

U.S. Const. amend. I ........................................................................................ 17, 32

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41......................... 38

David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986)............................................................................... 19

Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002)............................................................................... 35

## STATEMENT OF RELATED CASES

There are no prior appeals of this case, and there are no appeals related to this case.

The Elizabeth School District removed 19 titles from its libraries after concluding that the books were sexually explicit, excessively vulgar, or otherwise age-inappropriate for a library used by schoolchildren. *See* App. Vol. 1 at 165–281; *see also* App. Vol. 2 at 332–444 (book ratings and reviews that document the sexually explicit, excessively vulgar, and age-inappropriate content in these books). The plaintiffs have sued the school district in response to these book removals, and they are falsely accusing school officials of removing them because they "disagree[] with the ideas or views contained in those books." App. Vol. 1 at 56 (¶ 190).

The district court granted a preliminary injunction that orders the school district to return the 19 disputed titles to the library shelves. *See* App. Vol. 2 at 520–564. The district court awarded this relief after fashioning a constitutional standard for library-book removals that has never been adopted by this Court or by any majority opinion of the Supreme Court. This appeal therefore requires the Court to decide an issue of first impression in this circuit: Whether the Speech Clause limits a school district's authority to remove books from its libraries, and (if so) what standard should distinguish the constitutionally permissible book removals from the constitutionally forbidden ones.

The school district respectfully asks this Court to hold that its library-book removals did not violate the Speech Clause because: (1) The school district's library-curation decisions are government speech; and (2) A school district does not and cannot "abridge" anyone's freedom of speech by ex-

cluding books from a library that it has no obligation to provide in the first place. If the Court rejects these arguments, then it must announce a constitutional standard to govern library-book removals in this circuit, perhaps derived from decisions such as *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), or *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). Any such standard will forever mire the courts in library-curation decisions, but the school district insists (as it did below) that its book-removal decisions would survive scrutiny under any test derived from *Hazelwood* or *Pico*.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the case arises under federal law. This Court's appellate jurisdiction rests on 28 U.S.C. § 1292(a)(1) because the defendants have appealed a preliminary injunction. The district court issued the injunction on March 19, 2025, App. Vol. 2 at 520–564, and the school district appealed on March 20, 2025, App. Vol. 2 at 565–566.

## STATEMENT OF THE ISSUES

1. Do the plaintiffs have Article III standing to challenge the removal of books from the Elizabeth Middle School library when: (a) None of the plaintiffs attend Elizabeth Middle School; (b) None of the organizational plaintiffs have members (or children of members) who attend Elizabeth Middle School; and (c) None of the authors of books removed from the middle-school library are members of The Authors Guild.

2. Are a school district's decisions to add or remove books from its libraries government speech?

3. Does a school district "abridge" the freedom of speech by removing books from its libraries?

4. Is the Elizabeth School District violating the plaintiffs' First Amendment rights when it has returned the formerly removed books to its libraries and made them available to the plaintiffs and their members upon request?

5. Did the district court err in holding that the First Amendment forbids "viewpoint" discrimination and "content" discrimination in school-library weeding decisions?

## STATEMENT OF THE CASE

The Elizabeth School District, located approximately 45 miles southeast of Denver, consists of two elementary schools (Running Creek and Singing Hills), a middle school, and a high school. App. Vol. 1 at 166 (¶ 5). It is governed by the five elected directors on its Board of Education, who appoint the school district's superintendent.

Each of the four schools in the Elizabeth School District has its own library. Students may access and check out library books only at the school that they attend, as the libraries are open only during school hours and students cannot access other schools in the district during the school day. App. Vol. 1 at 177 (¶ 25). The school district regards its library collections as a component of its instructional materials and curriculum. *Id.* at 168 (¶ 9); *id.* at 282. So the school district seeks to reserve the limited shelf space in its li-

braries for materials that are most "aligned with the district's academic standards" and "support the district's educational objectives." *Id.* at 282.

Until recently the school district did not have a uniform policy to govern the purchase, review, and weeding of library materials. App. Vol. 1 at 170 (¶ 12). Purchases were made on an ad hoc basis, often without considering the book's educational suitability or age-appropriateness. *Id.* Publishers would offer discount rates for bulk purchases and the school district would accept large book donations from a variety of sources, which led the school district to accept new materials in bunches without considering the individual merits of each book. *Id.* The upshot is that books of little or no educational value have found their way into the school district's libraries, and other books with sexually explicit or otherwise age-inappropriate content are currently sitting on its library shelves.

The Board became aware of these problems in the fall of 2023, when Board director Mike Calahan learned that his then-11-year-old daughter had checked out *The Sun is Also a Star* from the Elizabeth Middle School library. App. Vol. 1 at 169 (¶ 11). The publisher had recommended this book for "age 14+" on account of its profanity and explicit sexual content, which includes:

- passionate kissing that almost leads to sex;

- a description of the chemical released during orgasm;

- penis-size and masturbation jokes;

- profanity such as "a--hole," "sh-t," "f--k," "f--ked up," "f--king," "dick," "douche," "Jesus Christ," "bastards," "damn," "bag of dicks," and "motherf--ker."

App. Vol. 1 at 169 (¶ 11 & n.4). The Board responded by establishing a Curriculum Review Committee to evaluate the school district's library collection and propose a policy to govern student access to inappropriate library content. *Id.* at 169 (¶ 11). The committee was co-chaired by Kimberly Moore, the district's chief academic officer, and Mary Powell, a board director. *Id.* at 189 (¶ 5), 216 (¶ 6). Board director Heather Booth also served on the committee alongside parents, teachers, administrators, and community members. *Id.* at 270 (¶ 7).

The committee drafted written protocols for reviewing and weeding library books and controlling student access to books containing "sensitive" topics. App. Vol. 1 at 283–287. The committee also issued a list of approximately 100 library books containing sensitive topics, as well as a separate list of 19 books from the sensitive-topics list that were recommended for temporary suspension pending review by the Board. *See id.* at 288 (the "suspended list"); *id.* at 289–291 (the draft "sensitive-topics list"). The 19 titles on the suspended list were:

- *The Hate U Give* by Angie Thomas;
- *Thirteen Reasons Why* by Jay Asher;
- *#Pride: Championing LGBTQ Rights* by Rebecca Felix;
- *You Should See Me in a Crown* by Leah Johnson;
- *It's Your World—If You Don't Like It, Change It* by Mikki Halpin;
- *The Kite Runner* by Khaled Hosseini;
- *Beloved* by Toni Morrison;

- *The Bluest Eye* by Toni Morrison;
- *The Perks of Being a Wallflower* by Stephen Chbosky;
- *Looking for Alaska* by John Green;
- *Nineteen Minutes* by Jodi Picoult;
- *Speak* by Laurie Anderson;
- *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke*, all by Ellen Hopkins
- *Melissa/George* by Alex Gino;

*Id.* at 288.

The Board approved the library protocols, as well as the suspended list and sensitive-topics list, on August 12, 2024, by a 4-0 vote.[1] *See* App. Vol. 2 at 301; App. Vol. 1 at 171 (¶ 14). Four days later, on August 16, 2024, superintendent Dan Snowberger sent a letter to the community inviting them to review the suspended books and provide written feedback on whether they should remain in the school district's libraries. App. Vol. 1 at 172 (¶ 16); App. Vol. 2 at 445–446. The superintendent's letter also listed the days and times that the suspended books would be available to members of the community. *Id.* at 445–446. Only 18 of the 19 suspended books were actually made available for community review because one of the books (*Speak* by Laurie Anderson) was checked out and had not been returned. *See* App. Vol. 1 at 172 n.6.

On August 26, 2024, the Board held a working session at which it discussed the books on the suspended list and heard feedback from parents and

---

1. Director Calahan was not present at this meeting and did not vote, but he supported the Board's decision. *See* App. Vol. 1 at 254 (¶ 9).

community members. *See* App. Vol. 2 at 314–316; App. Vol. 1 at 219 (¶ 11).
All five Board members read aloud excerpts from certain titles on the suspended list, including this passage from *The Bluest Eye* by Toni Morrison:

> She might wonder again, for the six hundredth time, what it would be like to have that feeling while her husband's penis is inside her. The closest thing to it was the time she was walking down the street and her napkin slipped free of her sanitary belt. It moved gently between her legs as she walked. Gently, ever so gently. And then a slight and distinctly delicious sensation collected in her crotch. As the delight grew, she had to stop in the street, hold her thighs together to contain it. That must be what it is like, she thinks, but it never happens while he is inside her. When he withdraws, she pulls her nightgown down, slips out of the bed and into the bathroom with relief. . . . Or as she sits reading the uplifting thoughts of the Liberty Magazine, the cat will jump into her lap. She will fondle that soft hill of hair and let the warmth of the animal's body seep over and into the deeply private areas of her lap. Sometimes the magazine drops as she opens her legs.

App. Vol. 1 at 175 (¶ 19); *see also id.* at 173–175 (excerpts from other books read aloud at the meeting). No formal Board action or decision-making occurred at the working session on August 26, 2024. *See* App. Vol. 2 at 314–316.

The Board held its next regular business meeting on September 9, 2024, where it voted 4-0[2] to permanently remove the 18 titles from the Suspended List that had been made available for community review. *See* App. Vol. 2 at

---

2. Director Heather Booth was not present and did not vote on the book removals. *See* App. Vol. 2 at 304, 309; App. Vol. 1 at 272 (¶ 9).

309.[3] The directors who voted to remove the books stated that they did so for each of the following three reasons:

1. The books contain sexually explicit, violent, or age-inappropriate content, as well as filthy and profane language, that does not belong in a library used by schoolchildren. This includes including graphic sexual passages such as the excerpt quoted from *The Bluest Eye*, detailed descriptions of drug use, school shootings, and suicide ideation, and repeated uses of words such as "f-ck," "sh-t," "n-gger," "f-ggot," and "p-ssy";[4]

2. Many parents, voters, and taxpayers in Elizabeth expressed opposition to the continued inclusion of the suspended books in the school district's libraries;[5]

3. The directors did not regard the educational value of the suspended books as sufficient to outweigh their problematic and age-inappropriate content, or the fact that so many parents, voters, and taxpayers opposed their continued presence in the school district's libraries.[6]

Each of the directors has insisted that their decisions to suspend or remove the 19 titles had nothing to do with the viewpoints or ideas expressed in those

---

3. *Speak* by Laurie Anderson was not made available for community review, so it was not removed by the Board even though it remains on the suspended list.

4. *See* App. Vol. 1 at 209 (¶ 28) (Olsen); *id.* at 229 (¶ 31) (Powell); *id.* at 246 (¶ 23) (Waller); *id.* at 262 (¶ 24) (Calahan); App. Vol. 2 at 332–444 (reviews from booklooks.org describing age-inappropriate content and providing relevant excerpts from the suspended books).

5. *See* App. Vol. 1 at 210 (¶ 30) (Olsen); *id.* at 231 (¶ 35) (Powell); *id.* at 246–47 (¶ 24) (Waller); *id.* at 263 (¶ 25) (Calahan).

6. *See* App. Vol. 1 at 210–211 (¶ 31) (Olsen); *id.* at 231–232 (¶ 36) (Powell); *id.* at 247 (¶ 25) (Waller); *id.* at 263–264 (¶ 26) (Calahan).

books.[7] Instead, the directors based their decisions on the *content* of the books, which they regard as incompatible with the school district's educational mission.[8] The directors also stated that they did not adopt or endorse the particular reasons offered by community members who supported removing the books.[9]

---

7. *See* App. Vol. 1 at 204 (¶ 14) (Olsen) ("I did not vote to remove any of the 19 disputed titles from the school district's libraries because of the 'ideas,' 'viewpoints,' or 'worldviews' contained or expressed in any of those books."); *id.* at 223 (¶ 14) (Powell) (same); *id.* at 242 (¶ 11) (Waller) (same); *id.* at 258 (¶ 12) (Calahan) (same); *id.* at 275 (¶ 12) (Booth) (same).

8. *See* App. Vol. 1 at 209 (¶ 28) (Olsen) ("My objections are based on the age-inappropriate *content* that appears in these books, and they have nothing to do with the 'viewpoints,' 'ideas,' or 'worldviews' expressed by the authors, or the fact that some of the books 'discussed LGBTQ+ and race-related topics.' I would oppose the inclusion of books with this type of content in our school libraries even if those books supported conservative viewpoints, ideas, or worldviews, and even if they discussed topics other than LGBTQ or race-related issues."); *id.* at 229–230 (¶ 31) (Powell) (same); *id.* at 246 (¶ 23) (Waller) (same); *id.* at 262–263 (¶ 24) (Calahan) (same); *id.* at 278 (¶ 22) (Booth) (same).

9. *See* App. Vol. 1 at 210 (¶ 30) (Olsen) ("I did not adopt or endorse any particular community member's *reasons* for supporting exclusion of the books . . . . But I did consider and give weight to the *fact* that so many of my constituents—and a clear majority of those who reviewed the books and filled out the forms—supported the removal of these 19 titles from the school district's libraries. That is my duty as an elected official, because I work for and answer to the people who elected me and the taxpayers who fund our school district and its activities."); *id.* at 231 (¶ 35) (Powell) (similar); *id.* at 247 (¶ 24) (Waller) (same); *id.* at 263 (¶ 25) (Calahan) (same); *id.* at 279 (¶ 23) (Booth) (same).

After the Board voted to remove the 18 titles, a parent complained to Board President Rhonda Olsen about *Redwood and Ponytail*, a book about two lesbian seventh graders who fall in love with each other. *See* App. Vol. 1 at 211 (¶ 32). The parent complained after his elementary-school child had checked out *Redwood and Ponytail* from Running Creek Elementary School Library. *See id.*[10] In response to the parent's complaint, Ms. Olsen removed *Redwood and Ponytail* from Running Creek's library, but she later returned to the book to the shelves and it will remain there pending the Board's review. *See id.* at 211 (¶ 32); *id.* at 213 (¶ 36). The Board has not yet voted on whether to remove *Redwood and Ponytail*, nor has it decided on the reasons (if any) for removing it. *See id.* at 213 (¶ 36).

Of the 18 titles that the Board voted to remove, one was removed from Running Creek Elementary School (*Melissa/George*). *See* App. Vol. 1 at 178 (¶ 27). Five more were removed from the middle school's library: *The Hate U Give*; *Thirteen Reasons Why*; *#Pride: Championing LGBTQ Rights*; *You Should See Me in a Crown*; and *It's Your World—If You Don't Like It, Change It. See id.* Fourteen titles were removed from the high school's library: *The Hate U Give*; *Thirteen Reasons Why*; *The Kite Runner*; *Beloved*; *The Bluest Eye*; *The Perks of Being a Wallflower*; *Looking for Alaska*; *Nineteen Minutes*; *Identical*; *Fallout*; *Glass*; *Crank*; *Smoke*; and *Burned*). *See id.* One of the books (*It's Your World*) was in both the middle-school and high-school libraries, but was

---

10.  *Redwood and Ponytail* was not included on the curriculum committee's suspended list or sensitive-topics list.

removed only from the middle-school library because the Board thought its content appropriate for high schoolers but not middle schoolers. *See id.* Eight of the titles had never been checked out by anyone. *See* App. Vol. 1 at 178 (¶ 28).[11]

## I.   THE PLAINTIFFS' LAWSUIT

On December 19, 2024, the plaintiffs sued and accused the school district of violating their constitutional rights by removing the 18 suspended titles, as well as *Redwood & Ponytail*, from its libraries. We will refer to these 19 books collectively as the "disputed" titles or books.[12] *See* App. Vol. 1 at 15–62. The next day, the plaintiffs moved for a preliminary injunction that would require the return of those 19 titles and prohibit the school district from removing library materials "because of the ideas contained in the books." Pls.' Mot. for Prelim. Inj., ECF No. 9, at 30.

The plaintiffs consist of two individuals and two organizations. The individual plaintiffs are C.C., a high-school junior at Elizabeth High School, and E.S., a preschooler at Running Creek Elementary. *See* App. Vol. 1 at 18. One

---

11.   The eight titles that had never been checked out are: *#Pride: Championing LGBTQ Rights*; *You Should See Me in a Crown*; *It's Your World—If You Don't Like It, Change It*; *Beloved*; *The Bluest Eye*; *Nineteen Minutes*; *Identical*; and *Fallout*. *See* App. Vol. 1 at 178 (¶ 28).

12.   The 19 disputed titles to do not include *Speak*, which the school board never voted to remove although it remains on the suspended list. They include *Redwood & Ponytail*, even though the school board has never voted to remove it and it has been restored to the library shelves at Running Creek Elementary.

of the organizational plaintiffs is the NAACP—Colorado–Montana–Wyoming State Conference (NAACP), whose membership includes parents of children in the Elizabeth public schools. *See id.* at 84 (¶ 7). The other organizational plaintiff is The Authors Guild, whose members include Alex Gino, the author of *Melissa/George*, and Ellen Hopkins, the author of *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke*. *See id.* at 89–100.

The plaintiffs claim that the three-justice plurality opinion in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), prohibits school officials from removing school-library books in "a narrowly partisan or political manner." App. Vol. 1 at 56 (¶¶ 189–190); *see also Pico*, 457 U.S. at 870 (plurality opinion of Brennan, J.) (opining that school officials "rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner."). The plaintiffs further claim that the school district violated the three-justice plurality opinion in *Pico* because (according to the plaintiffs) the officials who decided to remove the disputed titles did so because they "disagree[] with the ideas or views contained in those books." App. Vol. 1 at 56 (¶ 190); *see also id.* ("[T]he Elizabeth School District, acting through its Board, removed at least nineteen books from ESD libraries in a narrowly partisan or political manner because the Board disagrees with the ideas or views contained in those books.").

The plaintiffs also claim that the school district is violating the First Amendment rights of the Guild members by limiting student access to the 19

disputed titles. *See* App. Vol. 1 at 57–58 (¶¶ 204–207). According to the plaintiffs, the First Amendment "protects authors' ability to communicate their ideas to students without undue government interference," and prohibits school officials from removing library books based on their "viewpoints" or "topics." *Id.* at 57–58 (¶¶ 205–207); *see also id.* at 58 (¶ 206) ("The Board removed Guild members' books because of its distaste for the viewpoints and topics expressed therein."); *id.* at 58 (¶ 207) ("The Board's removal of Guild members' books from ESD libraries violates the First Amendment because it interferes with members' ability to share their constitutionally protected books free from viewpoint-based discrimination.").

Finally, the plaintiffs claim that the school district is violating the students' and authors' state constitutional rights under article II, section 10 of the Colorado Constitution, which (according to the plaintiffs) provides "more expansive" protections than those afforded by the First Amendment. *See* App. Vol. 1 at 57 (¶¶ 199–203); *id.* at 58 (¶¶ 208–211).[13]

## II.  THE SCHOOL DISTRICT MAKES THE REMOVED BOOKS AVAILABLE TO THE PLAINTIFFS AND THEIR MEMBERS

On January 27, 2025, the school district decided to make the 19 disputed titles available to the plaintiffs and their members, which eliminates any "irreparable harm" that might have been inflicted on the plaintiffs and obviates

---

13.  The plaintiffs are raising other claims that were not presented in their motion for preliminary injunction and are not at issue in this appeal. *See* App. Vol. 1 at 58–59 (¶¶ 212–219).

the need for a preliminary injunction. *See* App. Vol. 1 at 183 (¶ 38).[14] Each of the 18 removed titles is now available in the library from which it was previously taken, and a copy of *Speak* (which the Board never voted to remove) has also been made available at the high-school library. *See id.* These books are being kept behind the library desk, and are available upon request to any of the following individuals:

- C.C.
- E.S.
- Any student who is member of the NAACP—Colorado–Montana–Wyoming State Area Conference.
- Any student who has a parent with membership in the NAACP—Colorado–Montana–Wyoming State Area Conference.

*Id.* Any of these individuals may read, browse, or check out copies of the disputed books that have been made available at their school libraries, and those books will remain available to them for the duration of this litigation. *See id.* So the plaintiffs have the same ability to access the 19 disputed titles that they had before their removal. *See id.* at 184 (¶ 40).

## III.  THE DISTRICT COURT'S RULING

On March 19, 2025, the district court granted the plaintiffs' motion for preliminary injunction. *See* App. Vol. 2 at 520–564. The district court grant-

---

14.  *Redwood & Ponytail* had already been returned to the library shelves at Running Creek Elementary and remains available for students to read or check out. *See* App. Vol. 1 at 184 (¶ 39). A copy of *Speak*, which the Board never voted to remove, has also been made available to the plaintiffs and their members at the high-school library.

ed the motion without an evidentiary hearing, relying on hearsay declarations submitted by the parties. *See id.* at 529–532.

The district court held that the student plaintiffs and the NAACP were likely to succeed on their First Amendment claims. The district court acknowledged that three-justice plurality opinion in *Pico* is "not binding,"[15] yet declared that it "remains a useful starting point" in the First Amendment analysis. App. Vol. 2 at 543. The district court also observed that the *Pico* plurality opinion "looks to the District's stated motivations behind removing the 19 books." *Id.* at 544. And it held that the school district's stated motivations were unconstitutional under the three-justice *Pico* plurality opinion, because (according to the district court) "the District's decisive factor in voting to permanently banish the Removed Books was because the District disagreed with the views expressed in the books and to further their preferred political orthodoxy." *Id.*

The district court rejected the board members' claims that they voted to remove the 19 disputed titles because they contained "sexually explicit and vulgar content." App. Vol. 2 at 548. The district court also refused to accept the board members' insistence that their decisions to remove the titles were based on the age-inappropriate *content* that appeared in the books, rather than disagreement with or disapproval of the "ideas," "viewpoints," or "world-

---

15.  App. Vol. 2 at 540; *see also id.* ("It is well-established that a plurality opinion is not binding on this Court.").

views" contained or expressed in those books. *See id.* at 549. Each of the five directors had declared, under penalty of perjury, that:

> My objections are based on the age-inappropriate *content* that appears in these books, and they have nothing to do with the "viewpoints," "ideas," or "worldviews" expressed by the authors, or the fact that some of the books "discussed LGBTQ+ and race-related topics." I would oppose the inclusion of books with this type of content in our school libraries even if those books supported conservative viewpoints, ideas, or worldviews, and even if they discussed topics other than LGBTQ or race-related issues.

App. Vol. 1 at 209 (¶ 28) (Olsen); *id.* at 229–230 (¶ 31) (Powell) (same); *id.* at 246 (¶ 23) (Waller) (same); *id.* at 262–263 (¶ 24) (Calahan) (same); *id.* at 278 (¶ 22) (Booth) (same). But the district court dismissed these statements as "*post hoc* justifications" that "plainly are pretextual"—essentially accusing the board members of lying in their declarations. App. Vol. 2 at 549.

The district court also held that The Authors Guild was likely to succeed on its First Amendment claims. *See* App. Vol. 2 at 555. The district court held that the school libraries are (at the very least) a "nonpublic forum," and that any exclusion of materials from a school library must therefore be viewpoint neutral. *Id.* It also held that the evidence "strongly suggest[s]" that the school district's removal of the 19 disputed titles was "viewpoint-based." *Id.* Finally, the district court held that the plaintiffs would suffer irreparable harm absent a preliminary injunction, even though plaintiffs and their members can access the disputed titles at their school libraries. *See* App. Vol. 2 at 558–560.

## SUMMARY OF ARGUMENT

The Court should vacate the preliminary injunction for multiple independent reasons.

1. None of the plaintiffs have standing to challenge the removal of books from the Elizabeth Middle School library. Neither C.C. nor E.S. attends the middle school, and neither can access or check out books from its library. The NAACP's declaration fails to identify any member who attends Elizabeth Middle School or has children who attend the middle school. And none of the books removed from Elizabeth Middle School were written by members of The Authors Guild. So the Court must, at the very least, vacate the preliminary injunction as applied to the middle-school library.

2. A government-owned library is engaged in government speech when it adds or removes books from its collection. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), holds that curation decisions are speech of the curator—even when the curator is compiling works created by others. So a library engages in speech of its own whenever it culls or weeds materials from its collections, and a government-owned library is engaged in government speech when it decides to add or exclude a book.

3. The Speech Clause prohibits only laws that "abridge" the freedom of speech. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech"). The Supreme Court has interpreted the "freedom of speech" to encompass the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But the Speech Clause does not re-

quire the government to subsidize or assist other people's efforts to access information and ideas. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government . . . mechanisms for the purpose of obtaining funds for expression."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The First Amendment does not require the Elizabeth School District to provide libraries, nor does it require a school library to include any particular book in its collection. That is because the Constitution (as a general matter) protects only negative rights and not positive rights.[16] *See Ysursa*, 555 U.S. at 358 ("[T]he government . . . is not required to assist others in funding the expression of particular ideas, including political ones."); *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties. . . . It limits the powers of government but does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the gov-

---

16.  One notable exception to this rule is *Gideon v. Wainwright*, 372 U.S. 335 (1963), but *Gideon* has never been extended to the First Amendment. Some state constitutions also establish positive rights, such as requirements that the government provide public schools at taxpayer expense. *See, e.g.*, Colo. Const. art. 9, § 2 ("The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state").

ernment fails to provide them."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986). The Speech Clause prevents the government from punishing or penalizing a person for accessing information or ideas, *see Stanley*, 394 U.S. at 564, but it does not require the government to help a person access information or ideas by offering the sought-after materials in a school library. And the Speech Clause does not prevent the government from withdrawing previously provided assistance by weeding or removing books from a government-owned library or closing the library entirely.

4. The plaintiffs cannot be suffering a violation of their First Amendment rights, nor can they be suffering "irreparable harm" that warrants a preliminary injunction, when all of the disputed titles have been made available to them at the libraries from which they were taken. The plaintiffs do not claim that they are incapable or unwilling to obtain those books by asking for them at the library desk, and a student does not suffer a violation of constitutional rights when a desired book is made available at a library desk rather than on the library's shelves.

5. The district court's claim that the First Amendment forbids "viewpoint" discrimination and "content" discrimination in library-weeding decisions is untenable and unsupported by any decision of the Supreme Court. Libraries are supposed to engage in "content" and "viewpoint" discrimination when culling books from their collections, and the district court's no-viewpoint-discrimination rule would prohibit government-owned libraries

19

from removing books that deny the Holocaust, promote crackpot conspiracy theories, or espouse obsolete and debunked scientific theories such as spontaneous generation or scientific racism. The district court also erred by following Justice Brennan's plurality opinion in *Pico*, as that opinion spoke only for three justices and the controlling opinion in *Pico* refused to weigh in on the First Amendment issues.

## STANDARD OF REVIEW

An order granting a preliminary injunction is reviewed for abuse of discretion, but issues of law are reviewed de novo and findings of fact are reviewed under the clearly-erroneous standard. *See DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018).

## ARGUMENT

## I.   NONE OF THE PLAINTIFFS HAVE STANDING TO CHALLENGE THE REMOVALS OF *#PRIDE*, *CROWN*, OR *IT'S YOUR WORLD*

Before considering the merits, the Court must ensure that the plaintiffs have standing to pursue their sought-after relief. *See Dep't of Education v. Brown*, 600 U.S. 551, 560 (2023) ("We have an obligation to assure ourselves of litigants' standing under Article III before proceeding to the merits of a case." (citation and internal quotation marks omitted)). The plaintiffs lack standing to challenge the removals of *#Pride*, *Crown*, and *It's Your World* from the middle-school library because: (1) None of the student plaintiffs attend Elizabeth Middle School; (2) None of the organizational plaintiffs have

members (or children of members) who attend Elizabeth Middle School; and (3) None of the authors of those books are members of The Authors Guild.

Students in the Elizabeth School District cannot access or check out library books at other schools within the district. *See* App. Vol. 1 at 177 (¶ 25). And a student cannot suffer "injury in fact" from book removals that occur at a library that she has no ability to access. So although C.C. has alleged Article III standing to sue over the 14 disputed titles held at her high-school library, she has no standing to challenge book removals at Elizabeth Middle School or Running Creek Elementary. And E.S. has standing to challenge book removals only at Running Creek Elementary—the school that he currently attends.

None of the other plaintiffs have standing to challenge the removals of *#Pride*, *Crown*, or *It's Your World* from Elizabeth Middle School. None of these books were written by members of The Authors Guild. *See* App. Vol. 1 at 20–21 (¶ 22). And the NAACP's declaration fails to identify any NAACP member who attends the middle school or has children who attend. *See id.* at 85 (¶ 8). That some NAACP members may experience feelings of anguish or distress from book removals at the middle-school library does not supply a basis for Article III standing. *See id.* at 86 (¶ 10); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III").

The district court acknowledged that "none of the Plaintiffs attend Elizabeth Middle School." App. Vol. 2 at 556. Yet it held that E.S. has standing to sue over the middle-school library books because "the mother of Plaintiff E.S. intends for E.S. and his younger sister to attend Elizabeth Middle School, which is the only middle school in the District." *Id.*; *see also* App. Vol. 1 at 77 (¶ 3). But E.S. is not *currently* suffering injury from the removal of middle-school library books, and the "some day intentions" expressed by his mother do not establish an "actual or imminent" injury under Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *see also McConnell v. Federal Election Comm'n*, 540 U.S. 93, 225–26 (2003) (denying standing to a Senator because the alleged injury caused by a campaign-finance law would not affect him until his reelection, making the injury "too remote temporally to satisfy Article III standing."); *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) ("A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct."). E.S.'s claims surrounding the middle-school library books are also unripe because E.S. is at least six years away from attending middle school, and all sorts of events could happen between now and then that would obviate any injury resulting from the middle-school book removals. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967).[17]

---

17. E.S.'s family could move to another school district, the school district might restore the removed books to the shelves, or E.S. might decide that he has no interest in accessing *#Pride*, *Crown*, or *It's Your World* at his middle-school library.

The district court also held that the NAACP has standing to challenge the middle-school book removals because some of its members *withdrew* their children from the Elizabeth School District in response to the book-removal episode. App. Vol. 2 at 556; App. Vol. 1 at 85 (¶ 9) ("Some NAACP members removed their children from Elizabeth schools because of the District's decision to remove books from their school libraries."). But those NAACP members no longer have children in the Elizabeth School District, so they have no ongoing stake in this litigation. And the prospective relief sought by the plaintiffs will not affect those NAACP members in the slightest, as their children no longer attend the Elizabeth School District and cannot access materials in its libraries regardless of what the courts decide.[18] The district court noted that NAACP members who withdrew from the Elizabeth School District might someday decide to re-enroll their children in the school district. *See* App. Vol. 2 at 566–557. But this is sheer speculation and the plaintiffs failed to produce any declaration or evidence showing that these NAACP members have any intention to return their children to the Elizabeth School District—or that they are even willing to consider this possibility.

## II. A School Library's Curation Decisions Are Government Speech

On the merits, the Court should reject the plaintiffs' First Amendment claims and hold that a public school's library-curation decisions are govern-

---

18. Any past injuries suffered by NAACP members who withdrew their children from the school district cannot confer standing to seek prospective relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

ment speech. Whenever the government joins or assists others in propagating a message, it is engaged in government speech—and it may choose the speech that it will subsidize or support without encountering rules against content or viewpoint discrimination. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." (citation omitted)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view" (citation and internal quotation marks omitted)); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 590–600 (1998) (Scalia, J., concurring in the judgment); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." (citation omitted)).

That remains the case even when the government-supported speech is created by private citizens[19] or delivered by private citizens.[20] The government may choose the artwork that hangs on the walls of government buildings, the quotations that appear on national monuments, the license-plate designs proposed by members of the public that appear on state-issued license plates, and the books housed in a government-owned library. All of these are

---

19. *See Walker*, 576 U.S. at 217; *Summum*, 555 U.S. at 470–72.
20. *See Rust*, 500 U.S. at 179–81.

creations of private citizens—the artwork, the quotations, the license-plate designs, and the books. But the use of government resources to promote and convey these ideas and messages is government speech, and it remains government speech even when it is boosting or propagating another person's handiwork.

The only exception to this principle arises when the government's assistance or subsidies create a "forum" for private speech. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995). In these situations, the courts will not allow the government to characterize the facilitation or funding that it provides to private speakers as its own speech, because the benefits are so broadly conferred that the selective withholding of these perks from a disfavored speaker seems akin to a penalty that "abridges" the freedom of speech, rather than the government acting as a participant in the marketplace of ideas. *See, e.g.*, *Shurtleff*, 596 U.S. at 248 ("The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a Christian flag."); *Rosenberger*, 515 U.S. at 830 ("'[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint.'" (quoting *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993)).

But a public-school library does not and cannot serve as a "forum" for private speech. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion of Rehnquist, C.J.) ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions."). A school library does not seek to accumulate as many publications as possible, and it does not allow its collection to serve as a dumping ground for any author or publisher who wants to propagate their intellectual property. Quite the opposite: A school library is *supposed* to curate its collection and retain only the materials that are useful, relevant, and appropriate for the students that it serves. *See* App. Vol. 1 at 168 (¶ 9) ("[T]he purpose of the Elizabeth School District's library collection is first and foremost to provide materials with educational value to the Elizabeth School District's students and teachers."); *id.* at 284 ("Library services in the Elizabeth School District aim to ensure students have access to age-appropriate materials necessary to facilitate the district's mission of providing students with excellent learning opportunities that inspire a passion for learning.").

School librarians must also provide quality control when selecting or retaining materials. They are supposed to weed books with poor content, mediocre writing style, inaccurate information, or biased, racist, or sexist terminology or views. *See also American Library Ass'n*, 539 U.S. at 204 (plurality opinion of Rehnquist, C.J.) ("'The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything'" (quoting W.

Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)). This compels librarians to discriminate not only on the basis of content, but also against *viewpoints* and *ideas* that are inaccurate, biased, racist, or sexist. Libraries and librarians must separate "the gold from the garbage," and the "garbage" will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, as well as viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities.

More importantly, a public-school library's selection and weeding decisions are government speech *by definition*. A library's curating decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the Supreme Court explained in *NetChoice*:

> An entity "exercis[ing] editorial discretion in the selection and presentation" of content is "engage[d] in speech activity." *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). And that is as true when the content comes from third parties as when it does not. (Again, think of a newspaper opinion page or, if you prefer, a parade.) Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product.

*Id.* at 731. And "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732; *see also id.* at 738 ("That those platforms happily convey the lion's share of posts submitted to them makes no significant First Amendment difference."). Most libraries are willing to carry the vast majority of available books, but that does not mean that they are no longer engaged in "speech" when they decide to exclude certain materials from their collections. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 204 (2003) (plurality op. of Rehnquist, C.J.) ("[L]ibraries collect only those materials deemed to have 'requisite and appropriate quality.'").

And a library's acquisition and weeding decisions remain its own "speech" even though a library is conveying the speech of others when deciding whether to include materials in its collection. Like a social-media platform, a library is "in the business . . . of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 603 U.S. at 738. As *NetChoice* explains:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* So too with a library. The "individual messages" originate with the authors, but "the larger offering" is the library's speech. *See id.* And a library's

28

acquisition and weeding decisions "rest on a set of beliefs about which [materials] are appropriate" to include in the library's collection and "which [materials] are not." *Id.* Finally, the aggregate of the library's curating decisions gives the collection "a particular expressive quality" unique to that library. A library is "engage[d] in speech activity"[21] when it curates its collection, and that means that a government-owned library's acquisition and weeding decisions qualify as government speech.[22]

The district court rejected the government-speech argument, but none of its reasons are persuasive. First, the district court noted that other courts have "generally" held that "the placement and removal of books in public school libraries is not government speech." App. Vol. 2 at 536; *see also id.* (citing and quoting *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325 (N.D. Fla. 2024), and *Virden v. Crawford County Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024). But the brute fact that other courts have rejected the government-speech argument is not a *reason* for this Court to follow their lead, and none of those

---

21. *NetChoice*, 603 U.S. at 731 (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

22. A government-speech holding will not immunize public-library weeding decisions from *all* forms of constitutional attack, and it may still be possible to challenge book-removal decisions on Establishment Clause or Equal Protection grounds.

opinions offer persuasive reasons for concluding that school-library curation decisions fall outside the boundaries of government speech.

The Eighth Circuit's opinion in *GLBT Youth* erred by treating the government-speech issue as a component of Article III standing. *See GLBT Youth*, 114 F.4th at 667 ("Defendants argue that all Plaintiffs lack standing because the removal of books from public school libraries constitutes government speech."). Government speech is a merits question and has nothing to do with whether a plaintiff has suffered injury in fact. The Eighth Circuit (and the district court) went further off track by assuming that the government-speech argument would make the content of the library books into government speech. *See id.* at 668 ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)).[23] That is untrue, and *NetChoice* establishes that the act of curation is speech distinct from the speech that appears within the curated materials. *See* pp. 27–29, *supra*. No one is claiming that the content of school-library books is government speech. But whenever a public or private library selects

---

23. *See also* App. Vol. 2 at 536 ("Take, for example, a high school library that includes Hitler's manifesto *Mein Kampf*. No one would seriously argue that placing this book in a school library constitutes government speech."); *PEN American Center*, 711 F. Supp. 3d at 1331 ("[T]he Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves.").

or removes books from its collection, those curation decisions are the speech of the library—and that speech is distinct from the speech of the authors that appears inside the library books. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). And *GLBT Youth*, *Pen American Center*, and *Virden* do not even attempt to reconcile their stance with the Supreme Court's opinion in *NetChoice*, which holds that curation decisions are speech of the curator—even when the curator is compiling the speech of others.

The district court's second reason for rejecting the government-speech argument was that *NetChoice* "had nothing to do with government speech" because the internet platforms in that case were private actors engaged in private speech. App. Vol. 2 at 537. But *NetChoice* establishes that an entity's curation decisions are speech that belongs to the curator—and its holding means that libraries (whether private or public) are engaged in speech of their own when culling materials in their collections. *NetChoice* prevents the government from commandeering the curation decisions of a private library, and it equally prevents the judiciary from using the Speech Clause to override a government-owned library's decisions to add or remove materials in its collection.

Finally, the district court relied on the following passage from *Matal v. Tam*:

> [W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous mis-

> use. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents.

App. Vol. 2 at 537 (quoting *Matal*, 582 U.S. at 235). But none of these observations from *Matal* are relevant to this case. The school district's government-speech argument does not characterize "private speech" as "government speech," because it makes no claim that the content of a library book becomes government speech by virtue of its inclusion in a public-school library. Nor would a government-speech holding allow the government to "silence or muffle the expression of disfavored viewpoints" because students have countless ways to access books outside their school library, and librarians are *supposed* to engage in viewpoint discrimination when selecting or weeding library materials. *See* pp. 43–44, *infra*.

## III. A School District Does Not "Abridge" Or "Impair" The Freedom Of Speech By Removing Books From Its Libraries

If this Court rejects the government-speech argument, it should *still* hold that a school library's book removals are categorically immune from scrutiny under the Speech Clause and article II, section 10 of the Colorado Constitution. That is because a school district does not and cannot "abridge"[24] or

---

24. U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech").

"impair"[25] a constitutional right by withdrawing assistance that it previously provided to those seeking to exercise a constitutional prerogative. *See Ysursa*, 555 U.S. at 359–60 & n.2 (state law that "removes politically related deductions from an existing system" is not an "abridgment of the unions' speech," even though it revokes assistance that the state had previously been providing to the unions' speech activities); *Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech"); *id.* at 201 ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected").

Suppose that the town of Elizabeth decided to open and operate a county-owned gun store that allows county residents to borrow weapons in the same way that they borrow library books—by checking them out for a few weeks and promising to return them. The government-speech doctrine would not apply to the county's decisions to stock and shelve weaponry in this store, as assembling a collection of firearms is conduct rather than the propagation of a government-sponsored message.[26] Yet if the town of Eliza-

---

25. Colo. Const. art. II, § 10 ("No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty").

26. Certainly a private gun-store owner who is restricted by law from selling certain weapons would not have a claim that the law abridges his freedom of *speech*, even if he had a claim under the Second Amendment or some other constitutional provision. *See Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997) ("Although . . . speech is a component of all peddling . . . the [Supreme Court's] cases do not place significant limita-

beth decided to remove handguns from this government-owned store, that would not "infringe" the right to keep and bear arms—even though the Second Amendment protects the right to "receive" handguns as much as the First Amendment protects the right to "receive" information and ideas.[27] The removal of handguns from this government-owned store is constitutionally permissible not because the town is engaged in "government speech," but because a town does not "infringe" the right to keep and bear arms (or any other constitutional right) by removing handguns from a government-owned store that it had no obligation to open or operate in the first place. *See Ysursa*, 555 U.S. at 359.

Or suppose that the town of Elizabeth had operated a public hospital before *Dobbs* that offered abortion services and other medical procedures to its residents. None of these medical services qualify as "government speech," yet the town of Elizabeth could still remove abortion services from the menu without "abridging" or violating the erstwhile right to abortion. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 510 (1989) ("Nothing in the Constitution requires States to enter or remain in the business of performing abortions."). This prerogative comes not from the government-speech doctrine, but from the fact that the Constitution does not require the govern-

---

tions on the right of government to prevent the sale of goods or services that are not themselves forms of protected speech.").

27. *See District of Columbia v. Heller*, 554 U.S. 570, 628–32 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

ment to assist or facilitate efforts to exercise a constitutional right,[28] nor does it prevent the government from selectively withdrawing subsidies or assistance that it previously extended. *See Ysursa*, 555 U.S. at 359–60 & n.2.

The analysis is no different when a school district removes books from its libraries. A public school does not (and cannot) "abridge" the right to receive information and ideas by removing a book from its library collection, even though its actions make it slightly more difficult for students to access the removed materials when compared to the world that existed before the book removals occurred. *See Ysursa*, 555 U.S. at 359–60 & n.2; *see generally* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002). Students remain free to access the removed books from any other source (such as Amazon.com or private bookstores) without fear of punishment or penalty from the government. And although the school district is no longer *facilitating* efforts to obtain those books at its libraries, that does not violate or even implicate anyone's constitutional rights, any more than a decision to remove handguns from a government-owned store or withdraw abortion services from government-owned hospitals.

The district court and the plaintiffs appear to agree with some (although not all) of this analysis. No one in this litigation has argued or even suggested that a school district would violate the First Amendment by refusing to add new materials to its libraries in the first instance; they have claimed that the

---

28.  The right to counsel for criminal defendants is one notable exception to this rule. *See* note 16, *supra*.

First Amendment is implicated only by the *removal* of books that were already part of a school library's collection. The district court also appears to acknowledge that school districts will not violate the First Amendment if they remove library books for reasons unrelated to their content or viewpoint. *See* App. Vol. 2 at 553 ("Plaintiffs have shown that the District removed the 19 books based on the authors' and books' content and viewpoints on issues such as race, sexual orientation, gender identity, LGBTQ content, and to promote the Board's self-proclaimed 'conservative values.'"). Yet the district court insists that a school district *will* "abridge" a student's or author's First Amendment rights if it removes a book *after* adding it to the library because it opposes the viewpoints expressed in the removed book. The district court's stance can be summarized in the following chart:

| | School district refuses to add book to its library | School district removes book after adding it to its library |
|---|---|---|
| For reasons unrelated to its content or viewpoint | Constitutional | Constitutional |
| Because it disapproves of the book's content | Constitutional | Unclear |
| Because it disapproves of the book's viewpoints | Constitutional | Unconstitutional |

But these distinctions are nonsensical. A school district that refuses to add *The Bluest Eye* to its libraries because it disapproves of the book's "viewpoint" imposes a greater injury on students who wish to read that book (and the author who wishes to propagate her book) than a school district that re-

moves *The Bluest Eye* after adding it to its library's collection. The school district that initially allows a book into the library, but later changes its mind and removes it, has at least provided *some* access to the disputed material. The school district that refuses to purchase that book in the first instance, by contrast, has withheld *all* library access to the contested tome. If the Elizabeth School District's decision to weed *The Bluest Eye* "abridges" the plaintiffs' First Amendment rights to receive information and ideas, then a school district that refuses to purchase that book has *a fortiori* "abridged" the First Amendment rights of students who wish to access that book.

The district court's attempt to distinguish viewpoint-motivated book removals from other book-removal decisions is equally untenable. The plaintiffs' right to "receive information and ideas"[29] from *The Bluest Eye* would be no less affected if a school district had weeded that book for reasons unrelated to its viewpoint. And a student suffers the *same* loss of access when a library book is removed—regardless of whether it is removed for benign or nefarious reasons. It is the *fact* that a book was removed, and not the school district's *motivations* for removing it, that diminishes a student's ability to "receive information and ideas" from that book. Yet none of these book-removal decisions will ever violate the Speech Clause by "abridging" the right to receive information and ideas because there is no constitutional requirement for public schools to provide libraries in the first place, and there is no consti-

---

29. *Stanley*, 394 U.S. at 564.

tutional requirement for a school district to offer any particular book through its libraries. Excluding books from a school-library collection does not (and cannot) "abridge" the freedom of speech, because the Speech Clause does not require a school district to facilitate or subsidize anyone's efforts to access a particular book.

## IV. THE SCHOOL DISTRICT CANNOT BE VIOLATING THE PLAINTIFFS' FIRST AMENDMENT RIGHTS WHEN THE DISPUTED TITLES REMAIN AVAILABLE TO THE PLAINTIFFS IN THE SCHOOL DISTRICT'S LIBRARIES

There is an additional reason why the plaintiffs cannot show that the school district is violating their constitutional rights: All of the disputed titles have been returned to the libraries from which they were taken and are available for C.C., E.S., and the members of the NAACP and their children to obtain upon request. *See* App. Vol. 1 at 183–184 (¶¶ 38–41). The defendants cannot be violating the plaintiffs' "right to receive information" when the plaintiffs and their members remain capable of accessing the 19 disputed titles at the school district's libraries. And the plaintiffs cannot obtain a preliminary injunction by complaining that *other* students can no longer access the disputed titles, because the plaintiffs must establish a violation of their own constitutional rights and not someone else's. *See Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) ("[A] section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else"); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

Library patrons do not suffer violations of their First Amendment "right to receive information" when their desired books are stored behind a library desk rather than on the library's shelves. Many materials in a library's collection can be obtained only by asking a librarian for assistance, such as books stored in a rare-book room, books that are difficult to find, or books that can be obtained only through interlibrary loan. A school district cannot be sued under 42 U.S.C. § 1983 whenever it offers materials to students that are not available on its library shelves, and a school district does not violate anyone's First Amendment "right to receive information" by offering books in a manner that requires students to seek a librarian's assistance. Justice Kennedy's and Justice Breyer's concurrences in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), also make clear that "small" or non-significant burdens on a library patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (Breyer, J., concurring in the judgment) (upholding restriction given the "comparatively small burden that the Act imposes upon the library patron"). Here, the plaintiffs cannot identify *any* burden that might be imposed on C.C., E.S., or the members of the NAACP or their children, as the school district has spared them the inconvenience of having to search for the disputed books on the library shelves and allows them to obtain their desired book directly from a librarian. And even if the

plaintiffs attempted to theorize or concoct a "burden," it would be far less than the burdens imposed by Children's Internet Protection Act, which required adult library patrons to ask a librarian to unblock filtered materials before internet access would be allowed. *See id.* at 199–201.

The members of the Authors Guild also cannot show a violation of their First Amendment rights when their books remain in the school district's libraries and are available to C.C., E.S., and the members (and children of members) of the NAACP. The plaintiffs failed to produce evidence that any student other than C.C., E.S., and an identified daughter of an NAACP member[30] has any interest in accessing the disputed books written by members of the Authors Guild, so they cannot show that the school district's curation decisions have impeded their right to have these children access their works.

Yet the district court held that the school district is *still* violating the plaintiffs' First Amendment rights because the students would have to identify themselves as plaintiffs or children of NAACP members before they can obtain the disputed books at their school library—and this "compelled disclosure" (according to the district court) would violate the plaintiffs' constitutional rights under *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449 (1958). That is untenable. C.C. and E.S. do not need to disclose *anything* because they have sued through their parents and next friends, Kristen

---

30.   App. Vol. 1 at 85 (¶ 8).

Crookshanks and Mindy Smith, whose full names appear in the caption. The officials at Elizabeth School District know full well who the children of Kristen Crookshanks and Mindy Smith are, as they have access to school records that identify a student's parents or legal guardian, and the court filings have already disclosed C.C.'s and E.S.'s initials, sex, and current grade. The school officials already know exactly who C.C. and E.S. are, and neither C.C. nor E.S. will need to "disclose" anything before obtaining the disputed titles from their school librarian.

The NAACP does not claim to have any members who are students in the Elizabeth School District, and it identifies only *one* member who has a child at Elizabeth High School who wants to check out the disputed titles. *See* App. Vol. 2 at 85 (¶ 8). The plaintiffs do not claim that this student is unwilling to disclose that her parent is a member of the NAACP, and they do not claim that this student or her parents would face any risk of doxxing or retaliation by the school librarians who learn of her NAACP affiliation. *See Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 607 (2021) ("Because NAACP members *faced a risk of reprisals* if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest 'sufficient to justify the deterrent effect' of disclosure—we concluded that the State's demand violated the First Amendment." (emphasis added) (citations omitted)). In all events, the NAACP will *have* to eventually identify the members that give it associational or organizational standing if it wants to survive a motion for summary judgment. *See Summers v. Earth*

41

*Island Institute*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm"). If it wants to hide behind *NAACP v. Alabama* and refuse to disclose the identity of those individual members, then the NAACP won't be able to establish standing at summary judgment or at trial.

Finally, judicial relief must be limited to the named plaintiffs. *See Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *United States v. National Treasury Employees Union*, 513 U.S. 454, 478 (1995) ("[W]e neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants"). So the plaintiffs must assist the courts and the school district in crafting a remedy that will enable C.C., E.S., and the children of NAACP members to obtain the disputed titles without making those books available to non-parties. They cannot obtain a universal remedy by concealing the identity of affected students and insisting that every student in the school district must therefore be given access to the removed titles.[31]

---

31. The district court also relied on *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), which held that a school district violated its students' First Amendment rights by moving its Harry Potter books from the shelves to a location where they remained "highly visible" to students, while requiring students to submit a signed permission slip from a parent or legal guardian before checking out those books. *Counts* is wrongly decided and should be disavowed by this Court. *Counts* complains that it is "stigmatizing" for schoolchildren to obtain

## V.    THE DISTRICT COURT ERRED IN HOLDING THAT THE SPEECH CLAUSE FORBIDS "VIEWPOINT" DISCRIMINATION AND "CONTENT" DISCRIMINATION IN SCHOOL-LIBRARY CURATION DECISIONS

The district court insists throughout its opinion that the First Amendment prohibits public-school libraries from removing books because they disapprove of the "viewpoints" expressed therein. App. Vol. 2 at 549; *id.* at 554 ("It is unconstitutional . . . to remove books from a school library merely because the District 'disagree[s] with the views expressed in the books.'" (citation omitted)). In some places, the district court even suggests that *content* discrimination is constitutionally forbidden when school librarians curate their collections. *See id.* at 553 ("Plaintiffs have shown that the District removed the 19 books based on the authors' and books' content and viewpoints"). Each of these ideas is nonsensical and unsupported by case law.

---

parental permission before checking out Harry Potter books, but there is no constitutional right to be free from stigma, and there is nothing problematic with a school district, which is acting in loco parentis, requiring parental consent before allowing children to check out library books. *Counts* is also incompatible with the Supreme Court's subsequent ruling in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), because it applies strict scrutiny to a supposedly content-based requirement of parental consent. But neither the plurality opinion in *American Library* nor either of the concurrences applied strict scrutiny to content-based restrictions on library materials, and a six-justice majority upheld the content-based restrictions in the Children's Internet Protection Act (CIPA) without any one of the six justices suggesting that strict scrutiny (or any type of heightened scrutiny) should apply. *See American Library*, 539 U.S. at 198–214 (plurality); *id.* at 214–15 (Kennedy, J., concurring in the judgment); *id.* at 215–20 (Breyer, J., concurring in the judgment).

Content discrimination is not only permissible but inevitable when libraries make collection decisions. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) ("Public library staffs *necessarily consider content* in making collection decisions and enjoy broad discretion in making them." (emphasis added)). Libraries are supposed to establish standards for the materials in their collection, and they must ensure that their limited shelf space is reserved for quality publications. "Viewpoint discrimination" is equally unavoidable, and there is nothing wrong with viewpoint-based removals of library books that deny the Holocaust, promote crackpot conspiracy theories, or espouse obsolete and debunked scientific theories such as spontaneous generation or scientific racism. Of course, the government could never ban or censor a publication on these grounds, nor could it discriminate against these views in a traditional public forum. But libraries are not "forums" of any sort,[32] and they *must* impose content-based (and viewpoint-based) standards when deciding how to allocate their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality op.); *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005). A public library cannot function if its librarians are prohibited from making content- or viewpoint based weeding decisions, or if its librarians can be sued whenever a library patron suspects that a weeding decision was influenced by the content or viewpoints expressed in a book.

---

32.  *See Chiras*, 432 F.3d at 614 ("'[F]orum analysis and heightened judicial scrutiny . . . are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *American Library*, 539 U.S. at 205 (plurality op. of Rehnquist, C.J.))).

The district court relied on *Board of Education v. Pico*, 457 U.S. 853 (1982), to support its claim that the First Amendment prohibits "viewpoint" discrimination in school-library weeding decisions. But *Pico* says nothing of the sort. Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of school-library decision making ever taken by a Supreme Court justice,[33] acknowledges that content discrimination is permissible and allows libraries to remove books based on content that is "pervasively vulgar" or that lacks "educational suitability." *Pico*, 457 U.S. at 871 (plurality op.); *id.* at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection). The *Pico* plurality opinion says only that school libraries may not weed books "in a narrowly partisan or political manner"[34]—a far cry from the near-total prohibition on viewpoint discrimination that the district court endorsed.

More importantly, the Brennan plurality opinion in *Pico* was joined by only three justices, so it has no status as law. In cases such as *Pico*, which fail to

---

33. *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 915 (E.D. Mo. 2022) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

34. *See Pico*, 457 U.S. at 870 (plurality op.); *id.* at 872 ("[S]chool boards may not remove books from school library shelves *simply because* they dislike the ideas contained in those books." (emphasis added)).

produce a rationale that garnered five or more votes, the lower courts must follow the opinion of the justice (or justices) who "concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977); *see also id.* ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). In *Pico*, the controlling opinion under *Marks* belonged to Justice White, who concurred in the judgment and refused to join any portion of Justice Brennan's plurality opinion. *See Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment); *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995) (acknowledging that "Justice White's concurrence in *Pico* represents the narrowest grounds for the result in that case"); *Muir v. Alabama Educational Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) ("[T]he opinion of Justice White [is] the narrowest grounds for the judgment [in *Pico*]"); *C.K.-W. by & through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("Justice White's opinion [in *Pico*] therefore controls"); *Walls v. Sanders*, --- F. Supp. 3d ----, No. 4:24-CV-00270-LPR, 2024 WL 5192031, at *7 n.49 (E.D. Ark. Dec. 20, 2024) ("Justice White's decisive concurrence in the judgment . . . controls under *Marks v. United States*, 430 U.S. 188, 193 (1977)"). Yet Justice White's

opinion refused to weigh in on the constitutional standards for determining whether a library-book removal violates the First Amendment:

> The District Court found that the books were removed from the school library because the school board believed them "to be, in essence, vulgar." 474 F. Supp. 387 (E.D.N.Y. 1979). Both Court of Appeals judges in the majority concluded, however, that there was a material issue of fact that precluded summary judgment sought by petitioners. The unresolved factual issue, as I understand it, is the reason or reasons underlying the school board's removal of the books. I am not inclined to disagree with the Court of Appeals on such a fact-bound issue and hence concur in the judgment of affirmance. Presumably this will result in a trial and the making of a full record and findings on the critical issues.
>
> The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. I see no necessity for doing so at this point. . . . [I]f there is an appeal, if there is dissatisfaction with the subsequent Court of Appeals' judgment, and if certiorari is sought and granted, there will be time enough to address the First Amendment issues that may then be presented. . . .
>
> We should not decide constitutional questions until it is necessary to do so, or at least until there is better reason to address them than are evident here. I therefore concur in the judgment of affirmance.

*Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment). The controlling opinion in *Pico* remains entirely agnostic on whether the First Amendment imposes *any* constraints on book-removal decisions made by public-school libraries, and it merely concurs in a judgment that affirms a federal court of appeals' decision vacating a ruling that granted summary

judgment for the school district and remanding the case for trial. *See id.* at 856–61 (plurality op. of Brennan, J.) (describing the lower-court proceedings). So there is *no* binding precedent from the Supreme Court that restricts a public school's authority to remove books from its libraries—and no precedent that precludes this Court from holding that public-school library curation decisions are government speech or otherwise immune from First Amendment scrutiny.[35]

## VI. The District Court Violated The Federal Rules Of Evidence By Admitting Hearsay Declarations

The district court refused to hold an evidentiary hearing and decided the motion for preliminary injunction on the papers. *See* App. Vol. 2 at 529–532. But the district court relied upon hearsay declarations that are inadmissible under the Federal Rules of Evidence. The precedent of this Court allows district courts to disregard the Federal Rules of Evidence when ruling on motions for preliminary injunctions. *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not ap-

---

35. The district court falsely claims that Justice White's vote to remand the case for factfinding indicates that Justice White believed that the Speech Clause constrains a public school's ability to remove books from its libraries. *See* App. Vol. 2 at 542–543 ("If Justice White was 'entirely agnostic on whether the First Amendment imposes any constraints on book- removal decisions made by public-school libraries'" . . . his preference to remand the case for further factfinding on the school board's motivations would be pointless."). Justice White voted to remand the case so that the Supreme Court could determine whether it would be even be necessary to weigh in on the First Amendment questions.

ply to preliminary injunction hearings."). The school district therefore acknowledges that the district court's reliance on hearsay was permissible under *Heideman*, but wishes to preserve this issue for consideration by the en banc court or the Supreme Court of the United States.

## CONCLUSION

The preliminary injunction should be vacated and the case remanded for further proceedings.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

CHRISTOPHER O. MURRAY
LAURA J. ELLIS
JULIAN R. ELLIS JR.
First & Fourteenth PLLC
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
(719) 286-2475 (phone)
chris@first-fourteenth.com
laura@first-fourteenth.com
julian@first-fourteenth.com

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

MICHAEL FRANCISCO
First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 784-0522
michael@first-fourteenth.com

BRYCE D. CARLSON
Miller Farmer Carlson Law LLC
5665 Vessey Road
Colorado Springs, Colorado 80908
(970) 744-0247 (phone)
bryce@millerfarmercarlson.com

Dated: April 11, 2025

*Counsel for Defendant-Appellant*

49

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-appellant Elizabeth School District respectfully requests oral argument, as the issues in this appeal are sufficiently complex and important to warrant argument time.

## CERTIFICATE OF SERVICE

I certify that on April 11, 2025, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Tenth Circuit and served through CM/ECF upon:

Timothy R. Macdonald
Sara R. Neel
Laura Moraff
American Civil Liberties Union Foundation of Colorado
303 East 17th Avenue, Suite 350
Denver, Colorado 80203
(720) 402-3151
tmacdonald@aclu-co.org
sneel@aclu-co.org
lmoraff@aclu-co.org

Craig R. May
Thomas C. Dec
Celyn D. Whitt
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
(303) 244-1862 (phone)
(303) 244-1879 (fax)
may@wtotrial.com
dec@wtotrial.com
whitt@wtotrial.com

*Counsel for Plaintiffs-Appellees*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.    This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 12,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This motion complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.


 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell

Dated: April 11, 2025    *Counsel for Defendant-Appellant*

52

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on April 11, 2025, this brief was transmitted to the Clerk of the United States Court of Appeals for the Tenth Circuit, through the court's CM/ECF document filing system.

Counsel further certifies that: (1) required privacy redactions have been made, 10th Cir. R. 25.5; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendant-Appellant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:24-cv-03512-CNS-STV

KRISTEN CROOKSHANKS, as parent and next of friend of a minor on behalf of C.C.;
MINDY SMITH, as parent and next of friend of a minor on behalf of E.S.;
NAACP–COLORADO–MONTANA–WYOMING STATE AREA CONFERENCES; and
THE AUTHORS GUILD,

     Plaintiffs,

v.

ELIZABETH SCHOOL DISTRICT,

     Defendant.

---

**ORDER**

---

     This is a book-removal case stemming from the Elizabeth School District (the District) in Elizabeth, Colorado. The District voted to permanently remove 19 books from its school libraries, including titles such as *The Kite Runner* and *The Bluest Eye*—books that had been in District libraries for years. Students of the District, parents of students, the local NAACP chapter, and authors of the removed books have challenged their removal on First Amendment grounds.

     Before the Court is Plaintiffs' motion for preliminary injunction. ECF No. 9. Defendant responded, ECF No. 25, and Plaintiffs replied, ECF No. 28. Also pending is Defendant's motion to exclude Plaintiffs' proffered evidence supporting their preliminary injunction motion. ECF No. 27. Plaintiffs responded, ECF No. 30, and Defendant replied,

ECF No. 31. For the reasons explained below, the Court DENIES Defendant's motion to exclude, and it GRANTS Plaintiffs' motion for preliminary injunction. The District is ordered to immediately return the books to the library shelves, and it is enjoined from any conduct that violates this order.

## I.  BACKGROUND

### A.    Removed Books

In August 2024, the Board of Education (the Board) for the District identified 19 books that it stated were too sensitive to be in the District's libraries.[1] ECF No. 25 at 7–9. The Board removed these books from the District's libraries and displayed them in the Board's office so that community members could weigh in on whether they thought the books should be returned to the District's libraries and added to the Sensitive List[2] or permanently removed from District libraries. *Id.* The Removed Books are:

(1)    *The Hate U Give* by Angie Thomas;
(2)    *Beloved* by Toni Morrison;
(3)    *The Bluest Eye* by Toni Morrison;
(4)    *The Kite Runner* by Khaled Hosseini;
(5)    *You Should See Me in a Crown* by Leah Johnson;
(6)    *#Pride: Championing LGBTQ Rights* by Rebecca Felix;
(7)    *George* (now published and referred to as *Melissa*) by Alex Gino;
(8)    *It's Your World—If You Don't Like It, Change It* by Mikki Halpin;
(9)    *The Perks of Being a Wallflower* by Stephen Chbosky;

---

[1] In referring to the Removed Books, the parties sometimes refer to 18 Removed Books, and in other places, they refer to 19 Removed Books. *Compare* ECF No. 1, ¶ 67 ("In total, eighteen books (the 'Removed Books') were taken out of ESD libraries."), *with* ¶ 190 ("The Elizabeth School District, acting through its Board, removed at least nineteen books from ESD libraries in a narrowly partisan or political manner because the Board disagrees with the ideas or views contained in those books."). It appears the District removed the nineteenth book—*Redwood and Ponytail*—a month after removing the first 18. ECF No. 9 at 10. For consistency, the Court will refer to the 19 books collectively as the Removed Books.

[2] A book's inclusion on the Sensitive List means that, if a student tries to check it out, their parents will automatically be notified. Parents can also prohibit their children from checking out all books on the Sensitive List. ECF No. 9 at 4.

     (10)   *Thirteen Reasons Why* by Jay Asher;
     (11)   *Looking for Alaska* by John Green,
     (12)   *Nineteen Minutes* by Jodi Picoult;
     (13)   *Crank* by Ellen Hopkins;
     (14)   *Glass* by Ellen Hopkins;
     (15)   *Fallout* by Ellen Hopkins;
     (16)   *Identical* by Ellen Hopkins;
     (17)   *Burned* by Ellen Hopkins;
     (18)   *Smoke* by Ellen Hopkins; and
     (19)   *Redwood and Ponytail* by K.A. Holt.

ECF No. 9 at 4. For 25 days, the Removed Books were displayed in the Board's office, with passages pre-marked in each book that the Board found troubling. *Id.* The Board provided forms that parents could fill out following review of a particular Removed Book. *Id.* The form provided two options: (1) "this book should be Returned to the library and listed on the sensitive topic list," or (2) "this book should be Removed from the library collection." *Id.* (citing ECF No. 9-8 (Elizabeth School District's Book Review Form)). There was no option on the form to return the books to school libraries and leave them off the Sensitive List. *Id.*

    **B.**    **Plaintiffs**

    Plaintiffs include current District students who intended to browse and check out the Removed Books from their school libraries but have not been able to do so since the Board removed them. ECF No. 9 at 10.

    Plaintiff C.C. is a junior at Elizabeth High School who spends much of her free time reading and browsing books in the school library. *Id.* (citing C.C. Decl.). She states that she wants to check out the Removed Books from her school library but is unable to do so. *Id.* at 11.

Plaintiff E.S. is in preschool at Running Creek Elementary and uses the school's library to borrow books. *Id.* (citing Smith Decl.). His mother brings this action on his behalf, stating that she intends for E.S. and his younger sister to attend elementary, middle, and high school in the District and is concerned that her children are unable to read the Removed Books. *Id.*

Plaintiff NAACP - Colorado–Montana–Wyoming State Area Conference (NAACP) has members who are parents of students in the District who use their school library to discover new information and explore a wide array of ideas and viewpoints. *Id.* at 11–12 (citing Prescott Decl.). Like C.C., the parents state that their children intended to use the school library to access information about race, racism, LGBTQ history, gender identity, and other topics that are important to them. *Id.* at 12.

Finally, Plaintiff the Authors Guild includes authors whose books were removed from District libraries because, according to Plaintiffs, of the viewpoints expressed in the books. *Id.* Authors Guild member Ellen Hopkins wrote *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke* to help teenagers navigate difficult situations and express her views on the perils and realities of addiction, abuse, and promiscuity. *Id.* (citing Hopkins Decl.). Authors Guild member Angie Thomas wrote *The Hate U Give* to express her views on racism, police misconduct, and the value of teenagers using their voices to advocate for people and causes they care about. ECF No. 1, ¶¶ 81–82. Authors Guild member Alex Gino wrote *George* (now published and referred to as *Melissa*) which offers an authentic portrayal of a child navigating gender identity while addressing themes of courage, self-discovery, acceptance, and friendship. *Id.* (citing Gino Decl.). Authors Guild member John

Green wrote *Looking for Alaska* to express his views on loss, grief, and intimacy, and to share his views with teenagers who may be experiencing death and grief for the first time. ECF No. 1, ¶¶ 103–04. Authors Guild member Jodi Picoult wrote *Nineteen Minutes* to help young adults feel seen and express her views on the consequences of teasing and failing to stand up against bullying. *Id.*, ¶¶ 106–08. According to Plaintiffs, because the Board disagrees with these authors' viewpoints and worldviews, the authors believe that they can no longer share their views with District students. *Id.* at 13 (citing Hopkins Decl. and Gino Decl.).

###   C.   Defendant Elizabeth School District

The District educates approximately 2,600 students across four traditional public schools. ECF No. 25 at 1. The District's schools includes Running Creek and Singing Hills Elementary Schools, Elizabeth Middle School, and Elizabeth High School. *Id.* Each of the District's four traditional public schools has its own library. *Id.* at 3.

The District is governed by a five-director Board of Education (the Board). The Board directors at the relevant time were Rhonda Olsen (President), Heather Booth (Vice President), Mary Powell (Secretary), Mike Calahan (Treasurer), and Jonathan Waller (Assistant Secretary/Treasurer). *Id.* Dan Snowberger is the District's superintendent and was unanimously appointed to the position by the Board on March 13, 2023. *Id.* at 2. Finally, Kim Moore is the District's Chief Academic Officer. *Id.* at 4 n.2.

###   II.  PENDING MOTIONS

Plaintiffs seek a preliminary injunction requiring the Removed Books to be returned to District libraries and enjoining the Board from continuing to remove books because of

5

their disagreement with the ideas and viewpoints contained in the books. ECF No. 9 at 2.

In support of their motion, Plaintiffs provide the following:

- Declarations from C.C. Ms. Crookshanks, Ms. Smith, Ms. Prescott, Ms. Hopkins, and Alex Gino;

- District memorandum dated August 12, 2024, concerning "9.7 Library Sensitive Topic Protocol and Book Lists," which lists the 19 "Temporarily Suspended Books," and the various books on the "Sensitive Topic Draft Book List";

- The District's Book Review Form (blank and completed forms);

- Various emails between Superintendent Snowberger, Board directors, and other District employees; and

- Various emails between Board directors and interested citizens (e.g., graduates of the District, grandparents of District students, etc.).

The District objects to each of these exhibits and moves to exclude them. ECF No. 27. In the alternative, the District asks the Court to hold an evidentiary hearing—applying the Federal Rules of Evidence at this early stage—in resolving these objections.

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes courts to enter preliminary injunctions and issue temporary restraining orders. Fed. R. Civ. P. 65(a)–(b). "District courts have discretion over whether to grant preliminary injunctions." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 796 (10th Cir. 2019). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.*

A party seeking preliminary injunctive relief must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence

of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). The movant must demonstrate that "all four of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and the movant's "failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford all the relief that the movant could expect to win at trial. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2004). A request for disfavored injunctive relief "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

## IV.  ANALYSIS

The Court first addresses the District's motion to exclude before turning to Plaintiffs' motion for preliminary injunction.

### A.     The District's Motion to Exclude Evidence (ECF No. 27)

*1.    The District's Evidentiary Objections*

The District contends that Plaintiffs' proffered evidence is inadmissible for a variety
of reasons, but it primarily objects on hearsay grounds. The Court is not persuaded.

Even if the Federal Rules of Evidence applied at this stage (as explained below,
they do not), many of the District's objections are plainly baseless. For example, the
District objects to its own employees' and Board directors' emails as hearsay:

| | |
|---|---|
| Email from Superintendent Snowberger to Director Powell, dated August 5, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from Director Booth to [redacted], dated August 19, 2024, and remainder of email thread (Same objection for Exhibit 11 & 12). | Inadmissible hearsay. FRE 802. |
| Email from Director Powell to Director Booth, dated September 8, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from Director Powell to [redacted], dated September 8, 2024. | Inadmissible hearsay. FRE 802. |
| Email from Superintendent Snowberger to J. Maher, dated August 19, 2024. | Inadmissible hearsay. FRE 802. |
| Email from President-Director Olsen to Superintendent Snowberger and M. Seefried, dated September 5, 2024, and remainder of email thread. | Inadmissible hearsay. FRE 802. |
| Email from M. Seefried to Chief Academic Officer Moore, dated September 11, 2024. | Inadmissible hearsay. FRE 802. |
| Email from Chief Academic Officer Moore to P. Slade, dated September 10, 2024. | Inadmissible hearsay. FRE 802. |

ECF No. 27 at 19–23 (objections taken verbatim from the District's motion). Statements
by Superintendent Snowberger, Board directors, Chief Academic Officer Moore, and

8

other District employees are not hearsay; under Federal Rule of Evidence 801(d)(2)(D), these are opposing party statements that are excluded from the definition of hearsay.[3]

Moreover, Plaintiffs point out that many of their exhibits are not offered to establish the truth of the matter asserted. ECF No. 30 at 4. And they argue that the book review forms (even if they were being offered for the truth asserted in them) are business records under Rule 802(6). *Id.* at 4–5. The District ignores these arguments as well.

At its core, many of the District's objections lack any legal basis, and the Court does not anticipate the District raising similarly meritless objections in the future. However, a very small number of objections have merit. It is true that some of the exhibits not written by a District employee or Board director contain hearsay or otherwise may be speculative. Courts in this District, however, have held that "hearsay statements . . . are fair game" at the preliminary injunction stage. *EIS Ultimate Holding, LP v. Huset*, No. 23-CV-02324-GPG-MDB, 2024 WL 4472008, at *9 (D. Colo. Sept. 19, 2024) (citing *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees*, 680 F. Supp. 3d 1250, 1268 (D. Wyo. 2023) (observing that "a court may consider affidavits based on hearsay when evaluating requests of preliminary injunctions"), and *Shea v. Ditech Fin. LLC*, 208 F. Supp. 3d 380, 382 (D. Mass. 2016) ("The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction.")).

In sum, the Court overrules the District's evidentiary objections at this stage.

---

[3] That these are opposing party statements should have been obvious to the District's counsel. But even so, Plaintiffs raise this argument in their response, ECF No. 30 at 4, and Defendant abandons the argument by completely ignoring it in its reply.

### 2.    The District's Request for an Evidentiary Hearing

The District, in the alternative, asks the Court to hold an evidentiary hearing on Plaintiffs' proffered evidence applying the Federal Rules of Evidence. The Court declines to do so for at least four reasons.

First, Tenth Circuit caselaw is clear on this issue: "The Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("We must be mindful, therefore, as the Supreme Court has cautioned, that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))). If the Court granted the District's request, it would need to delay a ruling on Plaintiffs' preliminary injunction motion while the parties prepared their various witnesses and then hold a multiday hearing. In addition to the delay, such a hearing would amount to a trial on the merits—something the Tenth Circuit has counseled against. *See id.* ("[I]t bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."). Applying these elementary principles leads to one conclusion: the District's request to hold an evidentiary hearing and apply the Federal Rules of Evidence at this stage would be improper.

Second, as will be seen below in granting Plaintiff's preliminary injunction motion, the Court largely relies on the District's own statements in determining that Plaintiffs are likely to succeed on the merits. The Court has already explained why the District's

hearsay objections to these statements are baseless, and thus an evidentiary hearing on these statements would be a waste of time.[4]

Third, in its reply, the District goes far beyond the bounds of what it argued in its motion to exclude (and what Plaintiffs addressed in their response brief). Take, for example, the District's contention that Plaintiffs are seeking a mandatory injunction, and thus arguing that the application of the Federal Rules of Evidence is heightened here. ECF No. 31 at 4. This is the first time the District raises this issue, which is curious because Plaintiffs make clear in their preliminary injunction motion that they "seek a preliminary injunction in order to preserve the status quo—when all of the Removed Books were available in ESD libraries." ECF No. 9 at 14. It is Plaintiffs' position that, because their motion merely seeks to return the Removed Books to District libraries, "the preliminary injunction in this case does not require defendant[] to do something that they were not doing during the last uncontested period." *Id.* (quoting *Evans v. Fogarty*, 44 F. App'x. 924, 928 (10th Cir. 2002)). Defendant does not address this issue at all in its response, ECF No. 25, nor in its motion to exclude, ECF No. 27. Thus, arguing a new issue in a reply separate and apart from the preliminary injunction briefing is improper.

Fourth, the District makes factually incorrect statements in its reply brief. For example, the District mischaracterizes the evidence Plaintiffs rely on as simply the statements by "parents of two students, the head of the local NAACP chapter, and select members of another trade group," and "not of the School Board members." ECF No. 31

---

[4] The Court may have reached a different conclusion had the District objected on foundation or authenticity grounds, but it did not—it only objected on hearsay grounds.

at 1. Not so. Plaintiffs cite countless statements from Board directors throughout their preliminary injunction motion. *See* ECF No. 9 (extensively citing statements from the Board President, Vice President, Secretary, Treasurer, and Assistant Secretary/Treasurer).

To be sure, the District's argument for an evidentiary hearing has some support: "most courts hold that when the written evidence reveals a factual dispute, an evidentiary hearing must be provided[.]" Wright & Miller, *Federal Practice & Procedure*, § 2949 Procedure on Application for Preliminary Injunction (3d ed.) (citing cases from the Eleventh Circuit and others but not the Tenth Circuit). However, whether "the facts are bitterly contested," *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003), is not so obvious here. On one hand, the District is not disputing that the books were removed from the library shelves. On the other, the District's motivation for removing the books is in dispute. The latter appears to go to the merits of the dispute and not the underlying facts. Or said a bit differently, the key underlying facts here are not bitterly contested.

Further, in the more recent cases, the factual dispute was more germane to the injunctive relief. In *Moon v. Med. Tech. Assocs., Inc.*, 577 F. App'x 934 (11th Cir. 2014), for example, the issue was whether former employees were violating restrictive covenants in an employment agreement.

> To reach its conclusion in [granting the preliminary injunction], the district court made extensive factual findings. In fact, the district court's order—which [the defendant] drafted—includes almost five pages of factual findings. However, many of these facts are disputed by the parties' conflicting affidavits. For example, *the Plaintiffs dispute whether they competed in the*

> *restricted area, whether they solicited [the defendant's]*
> *customers, and whether [the defendant's] customer*
> *relationships were substantial*.

*Id.* at 939 (emphasis added and internal citations omitted). In the Court's view, the factual

disputes highlighted by the Eleventh Circuit in *Moon* are plainly distinguishable from the

facts of this case.

Similarly, in *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, Four

Seasons accused the defendant of gaining unauthorized access to the Four Seasons

computer network and thus proprietary and confidential materials located on the network.

320 F.3d 1205, 1208 (11th Cir. 2003). The Four Seasons filed an emergency motion for

an ex parte temporary restraining order, seeking to prevent the defendant from accessing

its computer network. *Id.* The district court granted the preliminary injunction. *Id.* The

Eleventh Circuit faulted the district court for not holding an evidentiary hearing when the

"facts surrounding the alleged unauthorized computer use [were] in dispute." *Id.* As with

*Moon*, the Court finds the factual dispute in *Four Seasons* distinguishable from the instant

case because here, there is no dispute that the District has removed the books from the

libraries.

\* \* \*

Because the Federal Rules of Evidence do not apply at this stage, the District's

motion to exclude is denied.

**B.**    **Plaintiffs' Motion for Preliminary Injunction (ECF No. 9)**

The Court has reviewed Plaintiffs' motion and reply, the District's response, and the various exhibits and affidavits attached to the parties' briefings. ECF Nos. 9, 25, 28. The Court considers the four requirements governing a preliminary injunction below and concludes that Plaintiffs have satisfied their burden of showing that a preliminary injunction is warranted.

### 1.    Likelihood of Success on the Merits

Before a court may issue a preliminary injunction, the movant must establish a substantial likelihood of prevailing on the merits of its claims. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). However, "the determination of a motion for a preliminary injunction and a decision on the merits are different." *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980).

### a.    Status Quo

As an initial matter, Plaintiffs argue that they "seek a preliminary injunction in order to preserve the status quo—when all of the Removed Books were available in ESD libraries." ECF No. 9 at 13. Thus, according to Plaintiffs, this is not a disfavored injunction that requires them to satisfy a higher burden. *Id.* The District does not respond to this argument. *See generally* ECF No. 25.

"To determine whether an injunction is mandatory or prohibitory, [courts] look at the substance of the injunction and compare it to the status quo ante—i.e., the 'last uncontested period preceding the injunction.'" *Evans*, 44 F. App'x at 928–29 (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir.

14

2001)). In *Dominion Video*, the Tenth Circuit held that a preliminary injunction requiring the defendant to take affirmative action to activate satellite television subscribers was not mandatory. 269 F.3d at 1155 ("EchoStar asserts that the injunction forces it to take affirmative action to activate new Dominion subscribers. The injunction, however, prohibits EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable."). The court explained that the requested injunction did "not compel [the defendant] to do something it was not already doing during the last uncontested period preceding the injunction." *Id.*

The Court finds that Plaintiffs' requested relief is not a disfavored injunction. First, the District offers no response to this argument and thus waived its opposition. Second, as in *Dominion Video,* Plaintiffs' requested injunction does not require the District to do something that it was not already doing during the last uncontested period—return the Removed Books to the District libraries' shelves so that students can peruse them and borrow them if desired. Third, a preliminary injunction during the pendency of these proceedings will not provide substantially all the relief to which Plaintiffs may be entitled. *See* ECF No. 1 at 45–47 (seeking permanent injunction, past and future pecuniary and non-pecuniary losses, declaratory relief, and attorney fees).

For these three reasons, the heightened burden for mandatory injunctions does not apply.

### b.    First Amendment Rights at Stake

Plaintiffs argue that the students' interest in accessing books in their respective school libraries is constitutionally protected. ECF No. 9 at 14–21. The District disagrees,

arguing that the District library curation decisions are government speech immune from First Amendment scrutiny. ECF No. 25 at 12. Caselaw does not support the District's position, and therefore, the Court agrees with Plaintiffs.

The First Amendment of the U.S. Constitution and Article II, Section 10 of the Colorado Constitution protect the right to receive information and ideas.[5] *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas. This freedom (of speech and press) . . . necessarily protects the right to receive . . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." (internal citations and quotations omitted)); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1051, 1054 (Colo.), *as modified on denial of reh'g* (Apr. 29, 2002) (the "First Amendment to the United States Constitution protects . . . the right to receive information and ideas," and that right is extended under the Colorado Constitution, which "provides broader free speech protections than the Federal Constitution"). This protection is heightened in public schools. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

The District's argument—that its decisions as to the library contents are government speech immune from First Amendment scrutiny—finds little support in the

---

[5] Section 10 of the Colorado Constitution is titled *Freedom of Speech and Press* and provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

caselaw. Courts generally hold that the placement and removal of books in public school libraries is <u>not</u> government speech. *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) ("Contrary to Defendants' contention, the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries."); *id.* at 668 ("[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking."). This makes sense.

Take, for example, a high school library that includes Hitler's manifesto *Mein Kampf*. No one would seriously argue that placing this book in a school library constitutes government speech. *See id.*; *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("[T]the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints, the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves."); *id.* (distinguishing cases cited by the school "because the speech embodied in a library collection is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property"); *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) ("[T]he Supreme Court has not extended [the government speech] doctrine to the placement and removal of books in libraries.").

The District also relies on *Moody v. NetChoice, LLC* for the proposition that "expressive activity includes presenting a curated compilation of speech originally created by others." 603 U.S. 707, 728 (2024). To be sure, *NetChoice* held that the "First Amendment offers protection when an entity engaging in expressive activity, *including compiling and curating others' speech*, is directed to accommodate messages it would prefer to exclude." *Id.* at 731 (emphasis added). Or stated in another way, an "entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)). Although compelling, the Court is not persuaded that *NetChoice* requires a different outcome. *NetChoice* had nothing to do with government speech—it concerned states' power to control whether and how third-party social-media posts are presented to other users. *Id.* at 717.

The Court rejects the District's invitation to extend government-speech precedents by applying *NetChoice* or its other cited authority to the facts at hand—something the Supreme Court has expressly discouraged. *Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, *we must exercise great caution before extending our government-speech precedents*." (emphasis added)).

18

The Court holds that it is Plaintiffs' First Amendment rights at stake—not the District's.

### c.    Plaintiff-Authors' First Amendment Rights

Plaintiffs argue that the District violated the Authors Guild Plaintiffs' constitutional right to share their books free from undue viewpoint-based censorship. ECF No. 9 at 21–25. The District offers no response to this narrow argument. Regardless, the Court agrees with Plaintiffs.

Authors have a right to share their books and ideas, and this right is protected under the First Amendment. *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. *This freedom embraces the right to distribute literature, and necessarily protects the right to receive it*." (internal citation omitted and emphasis added)); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants." (internal citation omitted)).

### d.    Whether the District's Book Removal Violated the Students' First Amendment Rights

The District first argues that Plaintiffs have not made a clear showing of likely success on the merits because a school library's curation decisions are government

19

speech immune from First Amendment scrutiny. ECF No. 25 at 12. The Court has already rejected that argument. But the District goes on, arguing that, even if the District's curation decisions are not government speech, the three-justice plurality opinion in *Pico* on which Plaintiffs rely is nonprecedential and doctrinally stale. *Id.* at 13. Instead, the District argues that the Court must proceed under the rubric for curricular-related speech established in *Hazelwood*. *Id.* The Court addresses the *Pico* and *Hazelwood* decisions in turn and then analyzes whether Plaintiffs are likely to succeed on the merits under both frameworks.

i.      *Supreme Court's* Pico *Decision*

Plaintiffs rely on the plurality opinion of Justice Brennan in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). The case involved a school district's decision to remove nine books from the school library. *Id.* at 856. *Pico*, however, produced seven opinions, none of which garnered a majority.

Justice Brennen announced the judgment of the court in a plurality joined by Justices Marshall and Stevens. *Pico*, 457 U.S. at 855. The plurality held that school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion,'" *Id.* at 872 (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

Justice Blackmun joined in the plurality with the exception of one part and wrote separately to clarify his First Amendment analysis. *Id.* at 875. Justice Blackmun disagreed with the plurality's assertion that school children have a "right to receive information." *Id.* at 87–79. He instead focused on the state's denial of access to ideas. *Id.* at 879 n.2 ("In

effect, my view presents the obverse of the plurality's analysis: while the plurality focuses on the failure to provide information, *I find crucial the State's decision to single out an idea for disapproval and then deny access to it*." (emphasis added)). In Justice Blackmun's view, the Court should hold that "school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Id.* at 879–80 ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment. At a minimum, allowing a school board to engage in such conduct hardly teaches children to respect the diversity of ideas that is fundamental to the American system."). The school board must "be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 880 (quoting *Tinker*, 393 U.S. at 509).

Justice White concurred in the judgment but favored delaying the announcement of a legal rule until the trial court established the reasons behind the school officials' decision to remove the books. *Id.* at 883. He did not reveal what standard he would use in judging the constitutionality of a school board's decision to remove certain books from school libraries.

It is well-established that a plurality opinion is not binding on this Court. *United States v. Friedman*, 528 F.2d 784, 788 (10th Cir. 1976) ("A mere plurality pronouncement of this type does not have the binding effect that [the defendant] argues for. A trial court does not necessarily err when it does not follow a rule promulgated by only three Justices

of the Supreme Court."), *vacated on other grounds*, 430 U.S. 925 (1977). Because *Pico*

failed to announce a legal rule blessed by five justices, the precedential value of *Pico* has

perplexed courts for years, including in the recent years. *PEN Am. Ctr.*, 711 F. Supp. 3d

at 1331 ("The applicable legal standard for evaluating alleged First Amendment violations

in the school library context is not entirely clear . . . .").

 Thirty years ago, a district court in this Circuit observed that,

> *[w]hat clearly emerges from the Pico decision is that the trial
> court must determine the motivation of the school officials in
> removing the book. Five of the justices in Pico agreed that
> some motivations would be unconstitutional*. The plurality
> found the motivations unconstitutional if school officials
> "intended by their removal decision to deny respondents
> access to ideas with which [the officials] disagreed, and if this
> intent was the decisive factor in [the removal] decision." *Pico,*
> 457 U.S. at 871. Removal may be permissible if based on
> vulgarity or "educational suitability." *Id.*

*Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 895 F. Supp. 1463, 1468–69 (D.

Kan. 1995) (emphasis added). Thus, according to *Case*, *Pico* "must be used as a starting

point," as this is the "only Supreme Court decision dealing specifically with removal of

books from a public school library." *Id.* at 1469; *see also Campbell v. St. Tammany Par.

Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) ("Even though the constitutional analysis in the

*Pico* plurality opinion does not constitute binding precedent, it may properly serve as

guidance in determining whether the School Board's removal decision was based on

unconstitutional motives. . . . [The Fifth Circuit has never suggested] that the *Pico* plurality

does not provide useful guidance in determining the constitutional implications of

removing books from a public school library."); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331

(stating that the "common theme" in all of the potentially relevant First Amendment school-

library cases "(e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials cannot remove books solely because they disagree with the views expressed in the books but that they can make content-based removal decisions based on legitimate pedagogical concerns . . .").

The District asks the Court to ignore the *Pico* plurality because, under *Marks v. United States*, 430 U.S. 188, 193 (1977),[6] the controlling opinion belongs to Justice White, who concurred in the judgment but did not join any portion of Justice Brennan's plurality opinion. ECF No. 25 at 15 (citing *Campbell*, 64 F.3d at 189) ("Justice White's concurrence in *Pico* represents the narrowest grounds for the result in that case.")). That may be true, but the District ignores that *Campbell* and other courts have decided that *Pico* still provides useful guidance in book-removal cases. *Campbell*, 64 F.3d at 189 (*Pico* "may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives").

The District goes on to copy the bulk of Justice White's concurrence, ECF No. 25 at 16, but it omits a key portion of the short concurrence: Justice White preferred to return the case to the district court to determine why the school board removed the books. *Pico*, 457 U.S. at 883 ("When findings of fact and conclusions of law are made by the District Court, that may end the case. If, for example, the District Court concludes after a trial that the books were removed for their vulgarity, there may be no appeal."). If Justice White was "entirely agnostic on whether the First Amendment imposes *any* constraints on book-

---

[6] *Marks* instructed that, when "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[ ] on the narrowest grounds.'" 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

23

removal decisions made by public-school libraries" as the District argues, ECF No. 25 at 16, his preference to remand the case for further factfinding on the school board's motivations would be pointless.

Like the cases outlined above, the Court finds that *Pico* remains a useful starting point in determining the constitutionality of the District's book-removal decision.

> ii.    Supreme Court's *Hazelwood Decision*

The District argues that the Court should defer to the Board's book-removal decision under *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260 (1988). ECF No. 25 (arguing that *Hazelwood* bars Plaintiffs' claims because school boards have "maximum deference over curricular and school-sponsored speech"). There, the Supreme Court held that school districts are entitled to exercise broad discretion in the management of curricular affairs "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. *Hazelwood* concerned a school official's "editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." *Id.* at 262. The Court held that school officials may exercise greater control over student expression that is a part of the school curriculum. *Id.* at 270–72.

The Tenth Circuit has cautioned courts not to read *Hazelwood* too narrowly by applying it only to activities conducted as part of the traditional school curriculum. *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924 (10th Cir. 2002). The *Fleming* court read the definition of "school-sponsored" speech to mean "activities that might reasonably

be perceived to bear the imprimatur of the school and that involve pedagogical concerns."

*Id.*

> If the speech at issue bears the imprimatur of the school and involves pedagogical interests, then it is school-sponsored speech, and the school may impose restrictions on it so long as those restrictions are reasonably related to legitimate pedagogical concerns. The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech.

*Id.* at 924–25. *Fleming* further counsels that the "level of involvement of school officials in organizing and supervising an event affects whether that activity bears the school's imprimatur." *Id.* at 925.

### iii.  *Plaintiffs are Likely to Succeed Under Either Standard*

Regardless of the standard the Court applies, the Court finds that Plaintiffs are likely to succeed on the merits of their claims.

Under the *Pico* framework, the Court looks to the District's stated motivations behind removing the 19 books. Plaintiffs argue that the District's motives were clear: the District removed the books based on the authors' and books' viewpoints and political ideologies. Plaintiffs point to emails and public statements from Board directors and other District employees. The Court highlights some of those below—concluding that the District's decisive factor in voting to permanently banish the Removed Books was because the District disagreed with the views expressed in the books and to further their preferred political orthodoxy.

First, in emails between the Board directors and Superintendent Snowberger, Director Heather Booth commented, "[w]e need to be cautious about the way we frame

our stance on politics in our schools. While I completely agree that we must keep politics

out of the classroom and shield our students from partisan influences, *it's equally

important to remember that our commitment to conservative values was a key aspect of

our campaign*." ECF No. 9-9 at 3 (emphasis added). She went on to write,

> It's crucial that as we navigate these discussions, we remain
> mindful of the promises we made and the values we pledged
> to support. By doing so, we can maintain our integrity and
> ensure that our actions align with the expectations of those
> who elected us. As I like to say "we need to keep politics out
> of the classroom and away from the kids". *However
> conservative values are exactly what we are and plan to
> continue to bring into the district.*

*Id.* (emphasis added). In response, Superintendent Snowberger stated, "I'm not opposed

to the change, Heather. This has been what we've spoken about since I've been hired so

it's just important that I know how the board wants to frame this. I certainly will take the

boards direction." *Id.* at 2. President-Director Rhonda Olsen then responded to the group

stating, "Our vision for the district could be considered by some to be conservative based.

We were very vocal about getting a superintendent and legal representation with

conservative values . . . ." *Id.*

Second, in an email between Director Booth and a graduate of the District, Director

Booth justified the book removal, stating that, "[a]s an elected official committed to

conservative values for our children, I feel a strong obligation to honor the promises made

during my campaign." ECF No. 9-10 at 2  (copying the entire Board).

Third, in a back-and-forth between Director Mary Powell and Director Booth,

Director Powell explains why she waffled on whether *#Pride - Championing LGBTQ*

*Rights* and *You Should See me in a Crown* should be removed or just marked sensitive.

ECF No. 9-12 at 3–4.

> I voted "Move to Sensitive List and move up to EHS" on #Pride because this book is largely a history of LGBTQ, and doesn't totally try to indoctrinate. But, just the overall topic is going to tend to that regardless. *I also thought it would be a good thing to show some openness to other viewpoints*, as long as it isn't indoctrinating.
>
> I voted same on "Crown" because while it has some racist overtones, they are just the main character handling them. About halfway through you find out she is a lesbian. There is another prom contestant who is also, and they form a relationship. There isn't anything graphic other than discussing a kiss that I saw, and it is not the central theme of the book at all. I thought the story was overall a good one of empowerment for black students - this is a very successful girl. There is also some good general friend support, etc. in the story.
>
> So, that is my reasoning, and Jon and Mike joined me in that vote. HOWEVER, if you and Rhonda strongly feel they should be REMOVED, I will change my vote on these two to REMOVE.

*Id.* (emphasis added). Director Booth responded, "[p]ersonally, LGBTQ is only regarding sexual preference which doesn't belong in any school. . . . Our constituents will not be happy about us returning any of these books. That is who we are beholden to." *Id.* Director Powell then responded, with Superintendent Snowberger and others copied, stating that she and President-Director Olsen "talked, and I have changed my vote on these two to REMOVE. I talked to both Jon and Mike and they also agree on REMOVE. *Therefore, all board votes for the 18 books are to REMOVE.*" *Id.* at 2 (emphasis added).[7]

---

[7] The District attempts to distance itself from Director Booth, stating that she resigned from the Board on January 13, 2025, and did not vote to permanently remove books from the library. ECF No. 25 at 1 n.1, 8

Fourth, Director Powell emailed an unknown recipient stating that she supported removing "the LGBTQ book and [] You should see me in a Crown." ECF No. 14 at 2. Convinced by Directors Booth and Olsen, Director Powell justified these removals because "they both have gender identity ideology in them, and do we really want that out there at all?" *Id.*

Fifth, a parent of a District student emailed President-Director Olsen complaining about *Redwood and Ponytail* by K.A. Holt. ECF No. 9-16 at 2–3. The parent's chief complaint was about the book's LGBTQ content. *Id.* Copying Superintendent Snowberger, Ms. Olsen responded, "[t]hank you so much for bringing this to our attention. The review of the library books to ensure age appropriate content is a new process for the district and we really appreciate it when parents bring to our attention any items that may have been missed. I will request that the book be removed from the library for further review." *Id.* at 2.

These five examples strongly suggest that the District's motivations behind removing the 19 books is blatantly unconstitutional under *Pico* and other precedents.[8] *See Pico*, 457 U.S. at 872 (school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their

---

n.7, 26 n.12. But the Board voted on September 9, 2024, to "permanently remove" the books. *Id.* at 8. Thus, even if Director Booth missed the September 9, 2024 meeting, she was still on the Board, and, even assuming that she did not vote (her correspondence suggests otherwise), her emails makes clear which way she intended to vote, and President-Director Olsen appeared to acknowledge Director Booth's "remove" vote.

[8] Plaintiffs also cite several statements from publicly held board meetings attacking the content and views expressed in the Removed Books that easily could be characterized as political and partisan in nature. *See, e.g.*, ECF No. 9 at 3 nn.3, 8 n.4–6, 19 nn.7–10, 23 n.12 (Vice President Booth stated that the Board was instituting its new book protocols because the current Board members were elected "on these values to keep your (the majority) values in mind of this community, and that is what we are going to do").

removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion'" (quoting *Barnette*, 319 U.S. at 642)) (Brennen, J. plurality opinion); *Campbell*, 64 F.3d at 189 (Fifth Circuit finding that *Pico* "may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives"); *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331 (Supreme Court precedent in *Pico* and *Hazelwood* is that "school officials cannot remove books solely because they disagree with the views expressed in the books").

The District's conclusory argument that it "easily satisfies" the *Pico* plurality standard "because it is not withholding access to the titles at issue for narrowly partisan or political reasons," ECF No. 25 at 13, is belied by the District's stated reasons in these five examples and during live Board meetings. Moreover, the District argues that schools need flexibility to fulfill their educational mission. *Id.* at 20. But the Board has made clear that they are acting to fulfill the pledge to carry out their conservative agenda—not an educational mission.

The District next argues that it removed some of the books not to prescribe partisan orthodoxy but because they contain "sexually explicit and vulgar content." ECF No. 25 at 27. But again, the contemporaneous statements expressly state otherwise. For example, Secretary Powell explained to the Board directors that in *You Should See Me in a Crown*, "[t]here isn't anything graphic other than discussing a kiss that I saw." ECF No. 9-12 at 3. And she explained that *#Pride: Championing LGBTQ Rights* "is largely a history of LGBTQ, and doesn't totally try to indoctrinate. . . .  I also thought it would be a good thing to show some *openness to other viewpoints*, as long as it isn't indoctrinating." *Id.*

(emphasis added). Still, the Board—including Secretary Powell—voted to remove these books because of the viewpoints expressed in the books. At this stage, the Court puts much more weight on the contemporaneous statements made by the Board than it does on the after-the-fact declarations prepared with counsel's advice.[9]

For example, President-Director Olsen states that "I did not vote to remove any of the 19 disputed titles from the school district's libraries because of the 'ideas,' 'viewpoints,' or 'worldviews' contained or expressed in any of those books." ECF No. 25-3, ¶ 14. In light of the various emails and statements before the Court, the Court finds that her and the other directors' *post hoc* justifications plainly are pretextual. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292–93 (10th Cir. 2004) ("Although we do not second-guess the pedagogical wisdom or efficacy of an educator's goal, we would be abdicating our judicial duty if we failed to investigate whether the educational goal or pedagogical concern was pretextual. . . . [W]e may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive.").

The District also suggests that Plaintiffs cannot prevail because it allowed parents to weigh in on Removed Books. ECF No. 25 at 26. This argument does not help the District. First, the Board pre-selected and highlighted alleged inappropriate content in the books. True, many parents completed forms indicating that they wanted the books to be removed because the views expressed in the books did not align with their partisan,

---

[9] *See Fairbanks Cap. Corp. v. Kenney*, 303 F. Supp. 2d 583, 588 (D. Md. 2003) (a district court "must weigh and evaluate the evidence" when ruling on a preliminary injunction); *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1993 WL 283256, at *2 (M.D.N.C. Apr. 21, 1993) ("In the context of preliminary injunction, the court necessarily must weigh the evidence in order to determine the likelihood of success on the merits. In the context of summary judgment, such weighing of evidence is, of course, impermissible.").

political viewpoints.[10] For example, one parent of a high school student wrote that *#Pride* should be removed because "LGBTQ themes do not belong in our public schools." ECF No. 9-13 at 1. And a middle school parent wrote that "middle school students are too young to be exposed to the pride movement, same sex marriage, stonewall riots and pride parades." *Id.* at 3. Others commented that *You Should See Me in a Crown* should be removed "because of it[]s CRT [critical race theory] undertones and homosexual storyline." *Id.* at 10.

That parents want to remove books for partisan reasons does not permit government officials to do the same. *See, e.g.*, *Pico*, 457 U.S. at 872. Even assuming, as the District suggests, that the majority of parents wish to remove certain books based on their conservative beliefs, the First Amendment "offers sweeping protection" for those authors and readers who may adhere to the minority view. "In fact, it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (collecting Supreme Court cases including *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969) (recognizing the First Amendment rights of Ku Klux Klan members to advocate for white supremacy-based political reform achieved through violent means) and *Texas v. Johnson,* 491 U.S. 397, 405–06 (1989) (recognizing flag burning as a form of political expression protected by the First Amendment)). "Any other rule 'would effectively empower a majority to silence

---

[10] Of course, parents also argued the opposite: that books should be returned to the book shelves. *See, e.g.*, ECF No. 9-13 at 22 (arguing that the book removal is "not welcoming to anyone who is not white, straight, and politically conservative").

dissidents simply as a matter of personal predilections,' and the government might be inclined to 'regulate' offensive speech as 'a convenient guise for banning the expression of unpopular views.'" *Id.* (quoting *Cohen v. California,* 403 U.S. 15, 21, 26 (1971)).

The District's arguments under the *Hazelwood* standard fall short as well. *Hazelwood* asks whether the activity at issue "might reasonably be perceived to bear the imprimatur of the school and that involve pedagogical concerns." *Fleming*, 298 F.3d at 924. If it does, then the speech is "school-sponsored speech" that may be immune from First Amendment scrutiny. *Id.*; *see generally Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). The District cannot make this showing.

To start, the District has provided no persuasive authority that merely maintaining a book on a school library shelf constitutes school-sponsored speech. "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Id.* at 925. Given the District's stated position concerning the Removed Books, there is no chance that anyone will connect the views expressed in the Removed Books to the District. Stated a tad bit differently, no reasonable person would assume that the District is sponsoring the speech or views contained in the Removed Books.

Further, the District's book-removal decision is not "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. Again, the District's conclusory argument that the Board's removal decisions here "easily clear the reasonable relation to a legitimate pedagogical concern" bar, and that "no Board director voted to remove any of the 18 books based on the viewpoint expressed therein," ECF No. 25 at 9, 20, is plainly

32

contradicted by the District's own statements. Other than pretextual declarations, at this stage, there simply is no reason to believe that the books were removed because of vulgarity, age-inappropriateness, or for legitimate pedagogical concerns; the Board's own emails strongly suggest that the book removal was motivated by the directors' "commitment to conservative values." The Court questions what could be more partisan or political than removing books to further the Board's self-described conservative values. The District cites no authority suggesting that a school board may remove books to further their political orthodoxy—something the *Pico* plurality expressly said not to do. *Pico,* 457 U.S. at 870 (school boards "rightly possess significant discretion to determine the content of their school libraries . . . [b]ut that discretion may not be exercised in a narrowly partisan or political manner").

The facts of *Hazelwood* and *Fleming* also are plainly distinguishable. *Hazelwood* involved the regulation of speech in a high school newspaper that was published by students *in a journalism class*. *Hazelwood*, 484 U.S. at 264. No reasonable person would dispute that a school newspaper published in a journalism class and supervised by a journalism teacher is part of a school curriculum—making it fundamentally different than a book in a school library. *Id.* at 271 (indicating that school curriculum activities extent to "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school . . . whether or not they occur in a traditional classroom setting").

And *Fleming* involved a teacher-initiated and school-sponsored project where, following the Columbine school shooting, the high school invited students to paint tiles to

install in the halls of the school. *Fleming*, 298 F.3d at 920. The Tenth Circuit found that the tiles bore the school's imprimatur given the school's involvement in the project. *Id.* at 931. A library book, however, bears no such imprimatur. Unlike in *Fleming*, there is little to no "level of involvement of school officials." The District even suggests that it was unaware that some of these books had resided in their libraries for years, ECF No. 25 at 3, strongly indicating that maintaining books in a school library is not part of the District's curriculum.

* * *

In sum, Plaintiffs have shown that the District removed the 19 books based on the authors' and books' content and viewpoints on issues such as race, sexual orientation, gender identity, LGBTQ content, and to promote the Board's self-proclaimed "conservative values." This finding is especially true with respect to Plaintiffs' allegations under the Colorado Constitution. The District focuses entirely on the federal Constitution but completely ignores Plaintiffs' argument that they are likely to succeed under both the First Amendment of the United States Constitution and Article II, Section 10 of the Colorado Constitution. As previously noted, the Colorado Supreme Court has consistently afforded broader First Amendment protections under the Colorado Constitution. *Tattered Cover*, 44 P.3d at 1054 ("[O]ur state constitution provides more expansive protection of speech rights than provided by the First Amendment.").

At this stage, the Court must conclude that the District's "decisive factor" in removing the books was "because it found them objectionable in content and because it felt that it had the power, unfettered by the First Amendment, to censor the school library

for subject matter which the Board members found distasteful." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (further pointing out that neither the state nor the school board "was under any federal constitutional compulsion to provide a library for the [s]chool or to choose any particular books," but once "having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members"). It is unconstitutional—under both the federal and Colorado Constitutions—to remove books from a school library merely because the District "disagree[s] with the views expressed in the books."[11] *PEN Am. Ctr.*, 711 F. Supp. 3d at 1331. Such ideological justifications for removal fail under all the potentially relevant First Amendment standards. It remains to be seen whether Plaintiffs will be able to prove their allegations with respect to each of the challenged books at trial, but at the preliminary injunction stage, Plaintiffs have satisfied their burden of showing that they are likely to succeed on the merits of their claims.[12]

---

[11] The Court's ruling does not prohibit the District from removing books based on legitimate pedagogical concerns. *See PEN Am. Ctr.*, 711 F. Supp. 3d at 1331. As the District rightly argues, a school board could remove a collection of *Playboy* magazines in a school library (although it is hard to imagine *Playboys* ever reaching a public school library) and likely could remove a collection of books "promoting frauds—like Holocaust denial, that life in North Korea compares favorably to life in the Unites States, or that the Apollo 11 moon landing was faked—or overt racism." ECF No. 25 at 22. These issues are fundamentally different from the instant issue before the Court. But the Court rejects the District's argument that *Hazelwood* allows school boards to remove books to promote self-proclaimed conservative values. *See id.*

[12] Plaintiffs argue that, if *Pico* does not provide the proper framework, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), would apply. ECF No. 9 at 22–23; ECF No. 28 at 7–8; see *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 n.11 (4th Cir. 2013) (in a free-speech clothing case brought by a student, the Fourth Circuit observed that, "we must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise"). The District does not respond to this argument. The Court is not convinced that *Tinker* provides the correct framework, but the Court would find that Plaintiffs would prevail under this standard. *Tinker* provides that school "officials may not restrict speech based on 'undifferentiated fear or apprehension of disturbance' or a 'mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37 (10th Cir. 2013) (quoting *Tinker*,

> e.  *Whether the District's Book Removal Violated the*
> *Author Guild Plaintiffs' First Amendment Rights*

The District argues that the authors' viewpoint discrimination claims fail because the District's libraries are not a public forum for the authors' expression. ECF No. 25 at 27. Even if the Court treats the library as a nonpublic forum, the District's actions still violate the authors' First Amendment rights. "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum *must not be based on the speaker's viewpoint* and must otherwise be reasonable in light of the purpose of the property." *Arkansas Educ. Television Comm'n*, 523 U.S. at 682 (emphasis added). As discussed above, the Board's emails strongly suggest—if not expressly admit—that the exclusions were viewpoint-based. The authors have shown a likelihood of success on the merits of their First Amendment claim.

> f.  *Standing to Challenge the Removal of* You Should
> See Me in a Crown*, #Pride,* and It's Your World—If
> You Don't Like It, Change It

The District argues that none of the Plaintiffs have standing to challenge the removals of *You Should See Me in a Crown, #Pride: Championing LGBTQ Rights*, or *It's Your World—If You Don't Like It, Change It* because these three works were only found in the middle school library, and none of the Plaintiffs attend Elizabeth Middle School.

---

393 U.S. at 508–09). Students' First Amendment rights cannot be abridged "unless the school reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'" *Id.* (quoting *Tinker*, 393 U.S. at 505–06). Not only does the District point to no substantial disruption caused by the Removed Books, but it also removed the books based on the District's perceived "unpopular viewpoints" contained in the books.

ECF No. 25 at 11–12.[13] Plaintiffs argue that the NAACP has standing to sue on behalf of

its members because the organization's members intend for their children to have access

to the Removed Books. ECF No. 28 at 2–3. They also argue that, even if some NAACP

members have moved their children to new schools following the policy changes, "the

'opportunity' to return [a student] to her home district, in addition to alleviating [] ongoing

feelings of marginalization, is surely a 'tangible benefit' sufficient to confer standing." *Deal*

*v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018).

The Court finds that Plaintiffs have standing to challenge the removal of *You*

*Should See Me in a Crown, #Pride: Championing LGBTQ Rights*, or *It's Your World—If*

*You Don't Like It, Change It*. Although none of the Plaintiffs attend Elizabeth Middle

School, the mother of Plaintiff E.S. intends for E.S. and his younger sister to attend

Elizabeth Middle School, which is the only middle school in the District. ECF No. 9-3

(Smith Decl.), ¶¶ 3–5. And Portia Prescott, the local NAACP president, states that "[s]ome

NAACP members removed their children from Elizabeth schools because of the District's

decision to remove books from their school libraries." ECF No. 9-4, ¶ 9. She provided an

example of one member, who had a fifth grader enrolled in Running Creek Elementary,

who saw the removal of books as a manifestation of racism in the District, prompting her

to unenroll her child from the elementary school. *Id.* If that fifth grader returns to the

District, presumably it will be at the start of the next school year, at which point the student

would be enrolled at Elizabeth Middle School as a sixth grader. Consistent with the Fourth

---

[13] The Court observes that, beyond disputing Plaintiff NAACP's standing to challenge these three Removed Books, the District does little to address the NAACP's claims in its response. Critically, it does not contest that the NAACP has standing to sue on behalf of its members.

Circuit's reasoning in *Deal*, the opportunity for students to return to their home district is a tangible benefit sufficient to confer standing.

* * *

It is clear and unequivocal to the Court that Plaintiffs have established a substantial likelihood of prevailing on their substantive claims at trial, and therefore, this factor weighs in favor injunctive relief.

### 2. Irreparable Harm

"Irreparable harm" means that the claimed injury "must be both certain and great"; it is not enough to be "merely serious or substantial." *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (citation omitted). Generally, a harm is not irreparable when the losses may be compensated by monetary damages. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The movant must show that the "injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted) (emphasis in original); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (showing irreparable harm is "not an easy burden to fulfill").

The "Supreme Court has instructed that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Stated differently, where "First Amendment rights are violated, irreparable injury is presumed." *Bioganic Safety Brands, Inc. v. Ament*, 174 F. Supp. 2d 1168, 1182–83 (D. Colo. 2001) (citing *Utah Licensed Bev. Ass'n v. Leavitt,* 256 F.3d 1061, 1076 (10th

38

Cir. 2001)); *see also Awad v. Ziriax,* 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation and quotations omitted)).

Plaintiffs argue that the presumption of irreparable harm applies because their First Amendment rights are implicated. ECF No. 9 at 25. The District argues that Plaintiffs are not harmed "as each of the previously removed books is now available for them to read, browse, or check out in the library from which it was taken." ECF No. 25 at 28. The District also argues that Plaintiffs' delay in seeking a preliminary injunction implies a lack of irreparable harm. *Id.* at 29.

The Court finds that there is a presumption of sufficient irreparable injury to warrant preliminary injunctive relief, and it rejects the District's delay argument.

First, Plaintiffs' (the students', parents', NAACP members', and authors') First Amendment rights clearly are implicated, so the presumption applies. Second, the District's proposed remedy—to put the removed books back in the libraries and make them available *only* to Plaintiffs, NAACP members, and NAACP members' children—is no remedy at all. ECF No. 25 at 10 (on the same day the District filed its opposition brief, the District states that it "decided to place copies of each of the 19 titles that the School Board voted to remove in the library from which they were taken[, and t]hese titles are available only to C.C., E.S., or any student who is either a member of the NAACP [] or who has a parent or guardian who is a member of the NAACP"). As Plaintiffs point out, such compelled disclosure would be an improper restraint on Plaintiffs' freedom of association and could chill potential litigants. *See NAACP v. State of Ala. ex rel.*

39

*Patterson*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association . . . ."). The Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations." *Id.* "To overcome the deterrent effect on associational rights resulting from compelled disclosure of membership lists, the government must demonstrate a *compelling* interest, and a substantial relationship between the material sought and legitimate governmental goals." *In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 117 (10th Cir. 1983) (citing *Patterson*, 357 U.S. at 461–64). The District has not attempted to make this showing.

There are other problems with the District's proposed remedy. To start, the District has made clear that the removal process is ongoing. ECF No. 9-14 at 2 (Superintendent Snowberger expressly stating that additional books may be "removed based on further discussion between members of the community and the Board of Education" anytime books are "brought to the attention of the district throughout the year by staff or parents"); ECF No. 26 (answer), ¶ 149 (admitting that book-removal process is ongoing). The District ignores this argument in its response.

More fundamentally, courts have held that a "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982). Thus, it "makes no difference for purposes of the First Amendment" that the "books in question have not been removed from the Library, but rather have simply been relocated . . . ." *Virden*, 2024 WL 4360495, at *4.

40

*Counts v. Cedarville School District* is instructive. 295 F. Supp. 2d 996 (W.D. Ark. 2003). There, all *Harry Potter* books were moved to an area of the school library that was inaccessible unless students had parental permission to check them out. *Id.* at 1001. In rejecting the school's justifications for relocating the books, the district court found it important that the plaintiff could not "simply go in the library, take the books off the shelf and thumb through them—perhaps to refresh her mind about a favorite passage—without going through the permission and check-out process is a restriction on her access. Thus, . . . such restrictions . . . amount to impermissible infringements of First Amendment rights." *Id.* at 1002. The District's proposed remedy fares no better.

The same analysis applies with greater force under the Colorado Constitution. *See Tattered Cover*, 44 P.3d at 1053–54. The Colorado Supreme Court has said that, "because our state constitution provides more expansive protection of speech rights than provided by the First Amendment, *it follows that the right to purchase books anonymously* is afforded even greater respect under our Colorado Constitution than under the United States Constitution." *Id.* at 1054 (emphasis added). The Court sees no reason why this protection would not apply to students' ability to check out books at a school library without disclosing their association with this lawsuit or the NAACP.

Finally, the District argues that Plaintiffs delayed longer than they should have in seeking this injunction. This argument has some merit, but given the considerations involved—parents and students had to weigh their constitutional rights against the consequences of suing the District, which could include public shaming and humiliation—the Court does not find the delay unreasonable. ECF No. 28 at 15 (citing various Plaintiff

declarations). This is not a run-of-the-mill business dispute; a brief glance at the District's internal correspondence shows that this is a politically charged issue. *See, e.g.*, ECF No. 9-9 (Board President discussing commitment to conservative values); ECF No. 9-12 (Board Director stating that LGBTQ literature "doesn't belong in any school" and the District's "constituents will not be happy about us returning any of these books"); ECF No. 9-13 (various book review forms from parents using strong language in opposition to ideas contained in certain Removed Books). Thus, such a delay in this situation does not signify a lack of injury.

* * *

Consistent with the above analysis, this factor, like the last, weighs in favor of injunctive relief.

### 3.    Balance of Hardships

"To be entitled to a preliminary injunction, the movant has the burden of showing that 'the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113 (D. Colo. 2021) (quoting *Heideman*, 348 F.3d at 1190). As discussed above, when a government actor denies an individual a constitutional right or protection, the resulting injury is inherently serious. *See Elrod*, 427 U.S. at 373; *Verlo*, 820 F.3d 1127; 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.2 (3d ed.) ("[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue.").

Quite the opposite, any injury to the District is minimal. The District contends that the District "would be forced to purchase, catalog, and re-shelve the removed titles," and that a preliminary injunction "would leave the District unable to make decisions regarding the curation of its school libraries until the end of this litigation." ECF No. 25 at 30. This argument fails.

The District has stated that "each of the previously removed books is now available for [Plaintiffs] to read, browse, or check out in the library from which it was taken." ECF No. 25 at 28. It is thus not clear that the District would be forced to purchase any books. And the alleged harm of having to catalog and re-shelves books is, quite frankly, absurd: librarians do this regularly each time a patron returns a book. Finally, it would be less burdensome *to the District* to return to Removed Books to the book shelves for students to peruse on their own time without any involvement from school librarians. Under the District's plan, a librarian must take several steps to ensure that a student is permitted to check out a Removed Book, such as verifying a student's affiliation to this lawsuit or verifying a student's parent's membership in the NAACP (which can change at any time).

Restoring the Removed Books to school library shelves will cause no injury to the District. *See Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 684 (D. Me. 1982) (Defendants failed to show that restoring *365 Days* to the school library pending decision on merits of Plaintiffs' First Amendment claims would cause them comparable injury to Plaintiffs). Even if it did, the Court finds that the District's concerns are outweighed by Plaintiffs' constitutional protections.

Plaintiffs have shown that the balance of harms favors granting their requested injunctive relief. Factor three weighs in Plaintiffs' favor.

4.    *Public Interest*

Finally, in considering whether Plaintiffs' requested injunctive relief is in the public interest, courts often find that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 237 F. Supp. 3d 1126, 1134–35 (D. Colo. 2017), *aff'd*, 916 F.3d 792 (10th Cir. 2019) (quoting *Connection Distrib., Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)); *Loc. Org. Comm., Denver Chapter, Million Man Mar. v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996) ("[A]s far as the public interest is concerned, it is axiomatic that the preservation of First Amendment rights serves everyone's best interest."). So too here.

Accordingly, the Court finds that the fourth factor weighs in favor of Plaintiffs' injunctive relief.

## V.  CONCLUSION

For the reasons explained below, the Court DENIES Defendant's motion to exclude. ECF No. 27. And finding that Plaintiffs have satisfied the four prerequisites for a preliminary injunction, the Court GRANTS Plaintiffs' motion. ECF No. 9.[14] Pending a final

---

[14] This order does not call into question a school's "legitimate power to protect children from harm." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011). But as Justice Scalia explained, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* Nor does this order address the scope of a school district's discretion over certain curricular matters. *See Hazelwood*, 484 U.S. at 273; *but see Fleming*, 298 F.3d at 920 ("We conclude by noting that the *Hazelwood* analysis does not give schools unbridled discretion over school-sponsored speech. A number of constitutional restraints continue to operate on public schools' actions, such as the Establishment Clause, the Free Exercise Clause, the Equal Protection Clause, and substantive due process."). The Court merely finds that school library books are not part of the mandatory curriculum—even when applying a broad definition of school curriculum. *Fleming*, 298 F.3d at 920 (warning against defining "school curriculum" activities too narrowly). As Plaintiffs rightly point out, no student is required to read every book in the library, ECF No. 9 at 15. and

trial on Plaintiffs' request for a permanent injunction or other resolution, the Court orders the District to return the Removed Books to their respective libraries no later than March 25, 2025, and the District is enjoined from removing additional books because the District disagrees with the views expressed therein or merely to further their preferred political or religious orthodoxy.[15]

DATED this 19th day of March 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

---

as the District acknowledges, eight of the 19 Removed Books have never been checked out, ECF No. 25 at 10, which plainly shows that those books are not part of any curriculum.

[15] Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiffs argue that a security is not necessary here because the District will not suffer any undue harm if the Court grants Plaintiffs' motion. ECF No. 9 at 29. The District offers no response and therefore concedes that security is unwarranted in this instance. Accordingly, the Court will not require Plaintiffs to post security.