# United States Court Of Appeals For The Tenth Circuit

---

**ELIZABETH SCHOOL DISTRICT,**

*Defendant - Appellant,*

v.

**KRISTEN CROOKSHANKS, AS PARENT AND NEXT OF FRIEND OF A MINOR ON BEHALF OF C.C.; MINDY SMITH, AS PARENT AND NEXT OF FRIEND OF A MINOR ON BEHALF OF E.S.; NAACP-COLORADO-MONTANA-WYOMING STATE AREA CONFERENCES; AND THE AUTHORS GUILD,**

*Plaintiffs - Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CASE NO. 1:24-cv-03512-CNS-STV
THE HONORABLE CHARLOTTE N. SWEENEY

---

### APPELLEES' ANSWER BRIEF

---

Timothy R. Macdonald
Sara R. Neel
American Civil Liberties Foundation
of Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone:  720.402.3107
Email:  tmacdonald@aclu-co.org
            sneel@aclu-co.org

Craig R. May
Thomas C. Dec
Celyn D. Whitt
Kendra M. Kumor
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:  303.244.1800
Facsimile:   303.244.1879
Email:   may@wtotrial.com
            dec@wtotrial.com
            whitt@wtotrial.com
            kumor@wtotrial.com

*Attorneys for Plaintiffs - Appellees*

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

CORPORATE DISCLOSURE STATEMENT .................................................... viii

STATEMENT OF PRIOR OR RELATED APPEALS ......................................... ix

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................... 2

STATEMENT OF THE CASE ............................................................... 3

I.     ESD'S BOOK BANNING PROCESS ....................................................... 5

      A.    Elizabeth elects a self-described conservative school board. .............. 5

      B.    The Board begins to impose its political views on school libraries. ......................................................................... 6

      C.    The community reviews certain "sensitive" books. ........................... 9

      D.    ESD Board members internally discuss library book removals during the review process................................................. 12

      E.    The Board decides to permanently remove the books. ...................... 15

II.    PLAINTIFFS' LAWSUIT ......................................................... 16

SUMMARY OF ARGUMENT .......................................................... 20

STANDARD OF REVIEW .............................................................. 23

ARGUMENT AND AUTHORITIES .................................................... 25

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE ALL OF THE REMOVED BOOKS ............................................................... 25

      A.    The District Court correctly found Plaintiffs have standing to challenge the books removed from Elizabeth Middle School. ........... 25

      B.    ESD cannot moot Plaintiffs' injury by conditionally making the Removed Books available only to Plaintiffs..................................... 28

II.     THIS COURT SHOULD APPLY *PICO* AS THE PROPER STANDARD IN BOOK REMOVAL CASES AND AFFIRM THE DISTRICT COURT ................................................................................. 33

    A.     *Pico*'s standard has been applied by lower courts for over four decades and is consistent with the general rule against viewpoint discrimination ..................................................... 34

    B.     The District Court properly applied *Pico* to the facts of this case ................................................................................... 37

III.    THE GOVERNMENT SPEECH DOCTRINE DOES NOT APPLY HERE ................................................................................... 42

IV.     ESD'S CONTENTION THAT LIBRARY BOOK REMOVAL DECISIONS SHOULD BE "CATEGORICALLY IMMUNE" FROM FIRST AMENDMENT SCRUTINY IS WAIVED, WRONG, AND DANGEROUS ........................................................................... 47

V.      THE DISTRICT COURT PROPERLY CONSIDERED ALL EVIDENCE IN GRANTING THE PRELIMINARY INJUNCTION .......... 53

CONCLUSION ................................................................................. 53

STATEMENT REGARDING ORAL ARGUMENT ........................................... 55

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..................................... 56

# TABLE OF AUTHORITIES

## CASES

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........................................34

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ...........................................35, 36, 37

*Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) .............................3, 23, 24

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................................33

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982) ........................... 1, 11, 22, 35, 39, 40, 41, 42, 45, 48, 50, 51

*C.K.-W. by and through T.K. v. Wentzville R-IV Sch. Dist.*,
619 F. Supp. 3d 906 (E.D. Mo. 2022)..............................34

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) .........................................50

*Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*,
895 F. Supp. 1463 (D. Kan. 1995)..................................49

*Chiu v. Plano Indep. Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) .......................................36

*Colorado v. Griswold*,
99 F.4th 1234 (10th Cir. 2024) .....................................23

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985) ................................................22, 44

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 996 (W.D. Ark. 2003)............................30

*Deal v. Mercer Cnty. Bd. of Educ.*,
911 F.3d 183 (4th Cir. 2018) .......................................27

*Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .......................................................................29

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) ...................................................43, 45

*Hafen v. Howell*,
    121 F.4th 1191 (10th Cir. 2024) ....................................................24

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) .......................................................................19

*Heideman v. South Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ......................................................53

*Hutchinson v. Pfeil*,
    211 F.3d 515 (10th Cir. 2000) ........................................................25

*In re First Nat. Bank, Englewood, Colo.*,
    701 F.2d 115 (10th Cir. 1983) ........................................................31

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) .......................................................24

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) .......................................................................35

*Little v. Budd Co., Inc.*,
    955 F.3d 816 (10th Cir. 2020) ........................................................47

*Little v. Llano County*,
    No. 23-50224, __ F.4th __, 2025 WL 1478599
    (5th Cir. May 23, 2025).............................................23, 43, 49, 50

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................25

*Martin v. City of Struthers, Ohio*,
    319 U.S. 141 (1943) .......................................................................32

*Matal v. Tam*,
    582 U.S. 218 (2017) ..................................................................45, 47

*Minarcini v. Strongsville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ............................................41

*Moody v. Netchoice*,
    603 U.S. 707 (2024) ....................................................46

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .......................................................25

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ....................................................30

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ..................................22, 35, 36, 52

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ...............................................26, 29

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
    711 F. Supp. 3d 1325 (N.D. Fla. 2024)........................43

*Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) .....................................32

*Red Lion Broad. Co. v. F.C.C.*,
    395 U.S. 367 (1969) ....................................................49

*Reedy v. Werholtz*,
    660 F.3d 1270 (10th Cir. 2011) .................................24

*Regan v. Taxation With Representation of Wash.*,
    461 U.S. 540 (1983) ....................................................36

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) ....................................................32

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
    601 F.3d 1096 (10th Cir. 2010) .................................28

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) .................................24

*Shelton v. Tucker,*
    364 U.S. 479 (1960) .......................................................................51

*Shurtleff v. City of Boston, Mass.,*
    596 U.S. 243 (2022) ...............................................................22, 45

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) .....................................................................46

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ...............................................................49, 51

*Tattered Cover, Inc. v. City of Thornton,*
    44 P.3d 1044 (Colo. 2002) ..........................................................51

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) ...............................................................19, 51

*United States v. Am. Library Ass'n, Inc.,*
    539 U.S. 194 (2003) ...............................................................35, 44

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016) ...............................................37, 47

*Virden v. Crawford Cnty.,*
    No. 2:23-CV-2071, 2024 WL 4360495
    (W.D. Ark. Sept. 30, 2024)...........................................................43

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ..................................................................... 1

*Watchtower Bible v. Vill. of Stratton,*
    536 U.S. 150 (2002) .....................................................................31

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................25

*Wyandotte Nation v. Sebelius,*
    443 F.3d 1247 (10th Cir. 2006) ....................................................24

**OTHER AUTHORITIES**

Catherine J. Ross,
  *Are "Book Bans" Unconstitutional? Reflections on Public School Libraries and the Limits of Law*,
  76 Stan. L. Rev. 1675, 1692 (2024) ..................................................................34

*From Book Rating to Book Bans: A Critical Content Analysis of BookLooks.org's Report Cards on LGBTQIA+ Titles*,
  8 J. Intell. Freedom & Privacy 17 (Am. Libr. Ass'n 2023) ................................ 7

Johany G. Dubon,
  *Rereading Pico and the Equal Protection Clause*,
  92 Fordham L. Rev. 1567 (2024).....................................................................34

Will Carless, et. al,
  *What's behind the national surge in book bans? A low-tech website tied to Moms for Liberty*, USA Today (Oct. 11, 2023) ........................................................... 7

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellees state that there is no information to disclose pursuant to Federal Rule of Appellate Procedure 26.1.

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior appeals of this case, and there are no appeals related to this case.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It is the guiding principle across both the plurality and dissenting opinions in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) ("*Pico*"), with even the dissent "cheerfully conced[ing]" that a school board may not exercise its discretion "in a narrowly partisan or political manner," *id.* at 907 (Rehnquist, J., dissenting). And it is an undeniable, common thread throughout First Amendment jurisprudence when the government facilitates private speech through governmental programs and nonpublic forums.

Defendant-Appellant Elizabeth School District ("ESD") seeks to snuff out that fixed star, and either replace it with the government speech doctrine—a doctrine that no court has adopted in the library book removal context—or, even more concerning, replace it with nothing at all, arguing for the first time on appeal that the First Amendment does not protect Plaintiffs' right to be free from ESD's attempts to prescribe its brand of political orthodoxy in school libraries. Rather than acknowledging that the federal and Colorado Constitutions require some form of protection against a school board's unfettered discretion to remove books from school libraries, ESD instead argues for the wholesale elimination of any

constitutional protection in this realm. That argument is unpreserved, wrong, and dangerous.

ESD's actions run afoul of the federal and Colorado Constitutions. Plaintiffs request this Court find that the District Court did not abuse its discretion in granting Plaintiffs' motion for preliminary injunction and affirm the District Court's order in all respects.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Do Plaintiffs have Article III standing to challenge all of the Removed Books, where Plaintiff E.S. alleges he will attend ESD's only middle school, NAACP members have removed their children from the middle school because of the removal of the books, and Plaintiffs would only have access to the Removed Books at school upon identification of their association with this lawsuit?

2. Did the District Court commit legal error by applying the standard in the plurality opinion in *Pico*, which is the leading standard applied by courts to analyze First Amendment claims challenging school library book removals and is consistent with the general rule that when the government facilitates private speech it may not engage in invidious viewpoint discrimination?

3. Did the District Court commit legal error in finding that the government speech doctrine is inapplicable to school library book removal decisions, where no court has found library curation decisions to be government

speech and such decisions do not comport with any of the factors courts consider in determining what constitutes government speech?

## STATEMENT OF THE CASE[1]

In August 2024, the Elizabeth School District ("ESD" or "the District") removed 19 books from its libraries' shelves alleging these books contain explicit content.[2] App. Vol. 2 at 467 (¶ 66). The removal of these books was not based on educational concerns, the well-being of students, or established review procedures, but rather on overtly political motives. The District, through its school Board members, violated Plaintiffs' protections under the First Amendment, and set a dangerous precedent of censorship driven by ideology rather than educational merit.

The 19 "Removed Books" are:

- *The Hate U Give* by Angie Thomas;

- *Beloved* by Toni Morrison;

- *The Bluest Eye* by Toni Morrison;

---

[1] On appeal, ESD does not challenge any of the factual findings of the District Court as clearly erroneous. As such, the Court should not find that the District Court abused its discretion in granting a preliminary injunction based on any of the District Court's factual findings. *See Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009).

[2] ESD also placed dozens more books on a so-called "Sensitive List," with restrictions on how a student could access those books, but that list is not at issue in this appeal. *See* App. Vol. 1 at 027–29 (¶¶ 51–65).

- *The Kite Runner* by Khaled Hosseini;

- *You Should See Me in a Crown* by Leah Johnson;

- *#Pride: Championing LGBTQ Rights* by Rebecca Felix;

- *George* (now published and referred to as *Melissa*) by Alex Gino;

- *It's Your World—If You Don't Like It, Change It* by Mikki Halpin;

- *The Perks of Being a Wallflower* by Stephen Chbosky;

- *Thirteen Reasons Why* by Jay Asher;

- *Looking for Alaska* by John Green,

- *Nineteen Minutes* by Jodi Picoult;

- *Crank* by Ellen Hopkins;

- *Glass* by Ellen Hopkins;

- *Fallout* by Ellen Hopkins;

- *Identical* by Ellen Hopkins;

- *Burned* by Ellen Hopkins;

- *Smoke* by Ellen Hopkins; and

- *Redwood and Ponytail* by K.A Holt.[3]

---

[3] *Redwood and Ponytail* was not voted on for removal by the ESD Board. On September 5, 2024, a parent emailed Board President Rhonda Olsen complaining about the book's existence at the Running Creek Elementary School library. App. Vol. 1 at 158. The parent's complaint was solely based on the fact that the book includes two female characters who develop strong feelings for each other. Less than an hour later, President Olsen responded that she would have the book removed. *Id.* In addition, *Speak* by Laurie Anderson, was checked out of the library at the time the Board voted to permanently remove the books, so it was not voted upon by the Board. *See* App. Vol. 1 at 177 (¶ 22). According to ESD, *Speak* remains "temporarily suspended" from ESD libraries during this litigation (App.

## I.     ESD'S BOOK BANNING PROCESS

### A.     Elizabeth elects a self-described conservative school board.

The Town of Elizabeth, is a small majority-white community located east of
Colorado Springs in Elbert County, Colorado. App. Vol. 1 at 022. ESD educates
approximately 2,600 students across four public schools. App. Vol. 2 at 524. Each
of the District's four schools has its own library. App. Vol. 2 at 524. At the time of
the relevant events, ESD was governed by a five-member Board including Rhonda
Olsen (President), Heather Booth (Vice President),[4] Mary Powell (Secretary),
Mike Calahan (Treasurer) and Jonathan Waller (Assistant/Secretary/Treasurer) (the
"Board"). App. Vol. 1 at 022 (¶ 27). Dan Snowberger is the District's
Superintendent and Kimberly Moore is the District's Chief Academic Officer.
App. Vol. 2 at 524.

The Board's efforts to prescribe a specific set of values in ESD schools
began long before the Board's final decision to remove the 19 books from ESD
libraries. Beginning in 2021, members of the Board fanned controversy on issues
like Critical Race Theory and the so-called "LGBTQ agendas" in ESD. App. Vol.
1 at 023 (¶¶ 29–33). In Fall 2023, after a majority of the Board resigned in protest,

---

Vol. 2 at 47), but it was not addressed in the District Court's preliminary injunction
order. As such, when Plaintiffs refer to the "19 Removed Books" that list includes
*Redwood and Ponytail*, but not *Speak*.

[4] Director Booth resigned from the Board on January 13, 2025. App. Vol. 1
at 268.

Elizabeth elected a slate of new board members—to replace those who resigned—who campaigned on what they claimed were "conservative values." App. Vol. 1 at 024 (¶¶ 34–36). Soon after the newly elected Board took office, the Board changed book fair providers from Scholastic to SkyTree Books, because SkyTree promises school book fairs without books containing any LGBTQ content, Critical Race Theory, foul language, explicit content, or "dark magic." App. Vol. 1 at 025 (¶ 41).

**B.      The Board begins to impose its political views on school libraries.**

In 2024, under the guise of protecting students from obscene materials, the newly-constituted Board directed a committee of parents, teachers, administrators, and community members (the "Board Curriculum Review Committee" or "BCRC") to create a list of books containing "sensitive topics." App. Vol. 1 at 027 (¶ 52). Directors Booth and Powell served as the two Board representatives on the BCRC. App. Vol. 1 at 216.

To develop the so-called Sensitive List, the BCRC began by examining online lists of books that had been banned or challenged elsewhere to see if those books were in ESD libraries. App. Vol. 2 at 332. The District relied heavily on evaluations from the online platform "BookLooks," a self-described book rating system that presents itself as an objective guide for evaluating school library

materials.[5] App. Vol. 2 at 333. However, even a cursory examination reveals that BookLooks is not an impartial or scholarly source. It was created and operated by individuals who rate books based on their ideological beliefs. *See* App. Vol. 2 at 362 ("Summary of Concerns [George/Melissa]: This book contains alternate gender ideologies and transitioning . . . ."). The site lacks academic oversight and strips excerpts from their larger narrative. As a result, it promotes a skewed and often misleading representation of the literature, reducing complex, award-winning works to isolated passages. *See* App. Vol. 2 at 335–444 (BookLooks.org reviews available for the Removed Books).

While most books were added to the Sensitive List but left in ESD libraries, there were some books that some BCRC reviewers believed were too controversial to be kept in ESD libraries at all. On July 25, 2024, the Board Clerk removed 14

---

[5] Booklooks has been used to ban books in many parts of the country. *See From Book Rating to Book Bans: A Critical Content Analysis of BookLooks.org's Report Cards on LGBTQIA+ Titles*, 8 J. Intell. Freedom & Privacy 17 (Am. Libr. Ass'n 2023), https://journals.ala.org/index.php/jifp/article/view/8142; Will Carless, et. al, *What's behind the national surge in book bans? A low-tech website tied to Moms for Liberty*, USA Today (Oct. 11, 2023), https://www.usatoday.com/story/news/investigations/2023/10/05/website-driving-banned-books-surge-moms-for-liberty/70922213007/. During the pendency of this litigation (as of March 23, 2025), BookLooks.org ceased its operations noting: "It has been quite a ride with many ups and downs since God called us to this work in 2022, but after much prayer and reflection it has become apparent that His work for us here is complete and that He has other callings for us. We give thanks to Him for the opportunity to do this work, and we are grateful for the kind words of support from all those who found this work useful." *See* www.booklooks.org.

books from the Elizabeth High School library, and by August 9, 2024, three more books were removed from the Elizabeth Middle School library and one book was removed from Running Creek Elementary library. App. Vol. 1 at 029 (¶ 67). The Board announced that the books had been "temporarily suspended" from ESD libraries. App. Vol. 1 at 030 (¶ 69).

On August 12, 2024—after the books had already been removed from ESD libraries—the Board voted to formally adopt Policy 9.7, which directs the BCRC to develop a list of books in ESD libraries that contain the listed "sensitive" topics. App. Vol. 1 at 102. According to Policy 9.7, "special attention" should be given to books that contain "racism/discrimination," "religious viewpoints," "sexual content," "graphic violence," "profanity/obscenity," "drug or excessive alcohol use," or "ideations of self-harm or mental illness." App. Vol. 1 at 104; *see also* App. Vol. 1 at 190. Policy 9.7 also explained that a book's inclusion on the Sensitive List means that, if a child tries to check it out, their parent(s) will automatically be notified. Parents can also prohibit their children from checking out all books on the Sensitive List. App. Vol. 1 at 016 (¶ 2).

The same day, the Board voted to adopt Policy 9.9, which provided that "[b]ooks will not be shared between students,"[6] and prohibited all in-classroom libraries. App. Vol. 1 at 292.

### C.  The community reviews certain "sensitive" books.

Before permanently removing these books, the Board displayed them in its office for approximately 25 days so that parents and community members could weigh in on whether they thought the books should be removed from ESD libraries or added to a "Sensitive List." App. Vol. 1 at 030 (¶ 72). The Removed Books were displayed in the Board's office, with passages that the Board found troubling tabbed so reviewers could easily turn to the portions of the books that the Board disagreed with—reducing these books to isolated scenes and stripping them of their context. App. Vol. 1 at 030 (¶ 69).

The Board provided forms that parents could fill out following review of a particular Removed Book. The form provided two options: (1) "this book should be Returned to the library and listed on the sensitive topic list," or (2) "this book should be Removed from the library collection." App. Vol. 1 at 030-31 (¶ 72). There was no option to return the Removed Books to school libraries and leave

---

[6] Plaintiffs have brought separate claims challenging the constitutionality of ESD's prohibition of student book sharing at ESD schools as a violation of Plaintiffs' freedom of expression (App. Vol. 1 at 058–59), but those claims are not part of Plaintiffs' motion for preliminary injunction.

them off the Sensitive List, allowing students to check them out like any other book. App. Vol. 1 at 030 (¶ 72).

Many parents filled out forms indicating they wanted the books to be removed because the books did not align with their political views. For example, one parent of a high school student wrote that *#Pride: Championing LGBTQ Rights* should be removed because "LGBTQ themes do not belong in our public schools" App. Vol. 1 at 128. A parent wrote that "Middle school students are too young to be exposed to the pride movement, same sex marriage, stonewall riots and pride parades." App. Vol. 1 at 129. A parent wrote that *You Should See Me in a Crown* should be removed "because of it's [sic] CRT undertones and homosexual storyline." App. Vol. 1 at 137. Parents wrote that *Melissa/George* should be removed because, according to them, it "is evil trans-ideology" that "has no place in any school," or is "morally offensive." App. Vol. 1 at 131.

One parent wrote that *It's Your World—If You Don't Like It, Change It* should be removed because the "Women's Rights chapter supports abortion and equates it with healthcare when it is the murder of a human life," and the book contains an example letter that "encourages the reader to oppose parental notification laws which is exactly what our ESD board is trying to put in place." App. Vol. 1 at 133. One parent advocated for the removal of *The Hate U Give*,

writing that it has "themes of anti-police, anti-white, pro BLM/riots and gang activity." App. Vol. 1 at 135.

Another parent claimed that *The Kite Runner* is "very racially divisive" and has "LGBTQ themes that do not belong in school." She also wrote that she does "not want teens reading a book that criticizes Christianity." App. Vol. 1 at 140.

As the District Court recognized, "[t]hat parents want to remove books for partisan reasons does not permit government officials to do the same." App. Vol. 2 at 550 (citing *Pico*, 457 U.S. at 872). Further, although largely ignored by the Board members, many parents who filled out the Board's forms opposing the book removals focused on the educational value of the Removed Books and a desire for students to be exposed to a broad range of ideas and viewpoints. For example, one parent expressed that "[w]e do our children a dis-service if we sugar-coat and cherry-pick literary material that could broaden their minds to others' experiences." App. Vol. 1 at 142. Some parents also opposed the Board's decision to remove the books because of the stigmatizing messages the Board was sending, noting, for instance, that the books ESD chose to remove created an environment that "is not welcoming to anyone who is not white, straight and politically conservative." App. Vol. 2 at 149.

**D.    ESD Board members internally discuss library book removals during the review process.**

The Board members campaigned on promises to implement their vision of conservative values, and they did so by eliminating the Removed Books from ESD libraries. App. Vol. 1 at 024 (¶ 36). The District Court credited five specific, contemporaneous statements in concluding that the Board's reason for removing the books from ESD libraries was based on their view of conservative values:

August 4, 2024, Email from Director Booth: "We need to be cautious about the way we frame our stance on politics in our schools. While I completely agree that we must keep politics out of the classroom and shield our students from partisan influences, it's equally important to remember that our commitment to conservative values was a key aspect of our campaign. We all ran on a platform that promised to uphold these values in our district, reflecting the majority sentiment of our community. . . . [C]onservative values are exactly what we are and plan to continue to bring into the district." App. Vol. 1 at 115.

August 19, 2024, Email from Director Booth: "As an elected official committed to conservative values for our children, I feel a strong obligation to honor the promises made during my campaign. Many parents in our community are concerned about the content of books available in schools and libraries. It is our responsibility to respect these concerns and uphold our campaign commitments to the majority." App. Vol. 1 at 119.

September 5, 2024, Email from President Olsen: In responding to a parent's email asking to remove *Redwood and Ponytail* from ESD elementary school libraries, a book described as a "glowing and heartfelt addition to the middle-grade LGBTQ genre" (App. Vol. 1 at 159), President Olsen responded: "Thank you so much for bringing this to our attention. The review of the library books to ensure age appropriate content is a new process for the district and we really appreciate it when parents bring to our attention any items that may have been missed. I will request that the book be removed from the library for further review." App. Vol. 1 at 158.

September 7, 2024, Email Chain between Director Powell and Director Booth: Director Powell stated she voted to move *#Pride: Championing LGBTQ Rights* to the sensitive list and up to the high school from the middle school (but not completely remove it) because "this book is largely a history of LGBTQ, and doesn't totally try to indoctrinate. But, just the overall topic is going to tend to that regardless. I also thought it would be a good thing to show some openness to other viewpoints, as long as it isn't indoctrinating. I voted same on 'Crown' because while it has some racist overtones, they are just the main character handling them. About halfway through you find out she is a lesbian. There is another prom contestant who is also, and they form a relationship. There isn't anything graphic other than discussing a kiss that I saw, and it is not the central theme of the book at

all. I thought the story was overall a good one of empowerment for black students - this is a very successful girl. There is also some good general friend support, etc. in the story." Director Booth responded: "Personally, LGBTQ is only regarding sexual preference which doesn't belong in any school. . . . Our constituents will not be happy about us returning any of these books. That is who we are beholden to." App. Vol. 1 at 124–25.

September 8, 2024, Email from Director Powell: In discussing her decision to vote to remove *#Pride: Championing LGBTQ Rights* and *You Should See Me in a Crown*, Director Powell stated that President Olsen "made a really good point – they both have gender identity ideology in them, and do we really want that out there at all?" App. Vol. 1 at 154.

The District Court credited these contemporaneous statements over the Board members' post-hoc, litigation-inspired declarations, which insisted that the decision to remove the 19 books was based on legitimate pedagogical concerns, like shielding students from sexually explicit content. *See* App. Vol. 1 at 165–281 (ESD Board members' declarations). Given the stark contrast between the above contemporaneous emails and the Board members' declarations, the District Court concluded the declarations were "pretextual." App. Vol. 2 at 549.

**E.  The Board decides to permanently remove the books.**

On September 9, 2024, the Board announced its decision to permanently banish all "temporary suspended" books from ESD libraries instead of returning them. App. Vol. 1 at 017 (¶ 5). The Board decided not to return the books to ESD libraries because the books contained same-sex relationships, included LGBTQ+ characters, discussed racism, involved police violence, or otherwise struck Board members as "disgusting." App. Vol. 1 at 045 (¶ 124). This despite that many of the books had been on ESD shelves for over a decade without issue from parents, students, teachers, or librarians. *See* App. Vol. 1 at 187.

Even a cursory review of the Removed Books reveals their objective educational value. For example, *Beloved* is a Pulitzer Prize-winning novel by Nobel Laurate Toni Morrison. It is a deeply human story of trauma and slavery. Moreover, while it includes painful moments, to remove this book is to silence an important voice in African American literature and deny students the opportunity to grapple with part of our shared history. App. Vol. 1. at 034 (¶ 84).

Khaled Hosseini's *The Kite Runner*, set against the backdrop of disruption in Afghanistan, gives readers insight into Afghani culture and history. The difficult scenes are not gratuitous; they are part of a larger narrative. *The Kite Runner* is a #1 New York Times bestselling novel. App. Vol. 1 at 034 (¶ 88).

*Looking for Alaska*, by John Green, explores the lives of teenagers exploring grief, friendship, and meaning. It does not glorify risky behavior; rather, it examines the consequences of one's choices. *Looking for Alaska* was awarded the American Library Association's Michael L. Printz Award and was the Los Angeles Times Book Prize finalist, and is included in NPR's "Top Ten Best-Ever Teen Novels" and TIME magazine's "100 Best Young Adult Novels of All Time." App. Vol. 1 at 040 (¶¶ 103–04).

Similar accolades are present for many of the Removed Books, but because Board members found these books "disgusting," decided that "LGBTQ . . . doesn't belong in any school," and deemed them out of line with their so-called "conservative values," ESD determined that all 19 books would be permanently banished from school libraries. App. Vol. 1 at 203. ESD also made clear that it may continue to remove books from ESD libraries based on the book's conformity with the Board's perceived conservative values. App. Vol. 2 at 559.

## II.    PLAINTIFFS' LAWSUIT

Plaintiffs include ESD students who wish to browse and/or check out the Removed Books from their school libraries, a membership organization representing the parents of middle school students who wish to browse and/or check out the Removed Books, and a membership organization representing authors whose books were removed.

Plaintiff C.C. is an eleventh-grade student at Elizabeth High School who spends much of her free time reading. App. Vol. 1 at 064. She regularly spends time in her school library and enjoys browsing the library shelves to discover interesting books to read. App. Vol. 1 at 067. She is interested in browsing and/or checking out the Removed Books from her school library, but now, when C.C. browses her school library, she is "only . . . able to find books that fit the school board members' worldview." App. Vol. 1 at 067. C.C. was brought to tears by ESD's decision to remove books from her school library, both because she could no longer browse or check out the Removed Books, and because "it was so clear that they were targeting LGBTQ people" like her. App. Vol. 1 at 066.

Plaintiff E.S. is in preschool at Running Creek Elementary and uses the school's library to choose books. App. Vol. 1 at 077. His parents intend for E.S. and his younger sister to attend elementary, middle school, and high school at ESD. App. Vol. 1 at 077. It is important to E.S.'s parents that throughout E.S.'s education, he has access to a diverse array of books where he can learn about difficult subjects and different viewpoints. App. Vol. 1 at 078. They are also concerned that the District's actions are sending a message that it is not okay to learn about race and racism in America and that stigmatizes LGBTQ+ identities. App. Vol. 1 at 079.

Plaintiff NAACP has members who are parents of students in ESD who use their school libraries to discover new information and explore a wide array of ideas and viewpoints. App. Vol. 2 at 523. Like C.C., these students intended to use their school library to access information about race, racism, LGBTQ history and identity, and other topics that are important to them. App. Vol. 2 at 523. Plaintiff NAACP also has members who are parents of students in ESD who want their children to have access to all of the books that have been removed from their school libraries. App. Vol. 2 at 523. Now, however, all these students are prevented from accessing the Removed Books through their school libraries, because those books contain ideas that fall outside the Board's partisan, political orthodoxy. App. Vol. 1 at 045.

Plaintiff the Authors Guild ("Guild") includes authors whose books were removed from ESD libraries because of the viewpoints expressed therein. App. Vol. 2 at 523. Guild member Ellen Hopkins wrote *Crank*, *Glass*, *Fallout*, *Identical*, *Burned*, and *Smoke* to help teenagers navigate difficult situations and express her views on the perils and realities of addiction, abuse, and promiscuity. App. Vol. 2 at 523. Guild member Angie Thomas wrote *The Hate U Give* to express her views on racism, police misconduct, and the value of teenagers using their voices to advocate for people and causes they care about. Guild member Alex Gino wrote *George* (now published and referred to as *Melissa*), which offers an authentic

portrayal of a child navigating gender identity while addressing themes of courage, self-discovery, acceptance, and friendship. App. Vol. 2 at 523. Guild member John Green wrote *Looking for Alaska* to express his views on loss, grief, and intimacy, and to share his views with teenagers who may be experiencing death and grief for the first time. Guild member Jodi Picoult wrote *Nineteen Minutes* to express her views on the consequences of teasing and failing to stand up against bullying. Because the Board disagrees with these authors' viewpoints, the authors can no longer share them with ESD students. App. Vol. 2 at 524.

On December 19, 2024, Plaintiffs filed suit alleging violations of their First Amendment rights under the federal and Colorado constitutions. The following day, Plaintiffs filed a motion for preliminary injunction to return the Removed Books to library shelves during the pendency of this litigation.

On March 19, 2025, the District Court granted Plaintiffs' preliminary injunction—recognizing that under both *Pico* and *Hazelwood*[7], Plaintiffs are likely to succeed on the merits of their claims—ordering ESD to return the 19 titles to the

---

[7] *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that school districts are entitled to exercise broad discretion in the management of curricular affairs, like editorial control of a school newspaper, "so long as their actions are reasonably related to legitimate pedagogical concerns"). The District Court also found that even applying the standard stated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), Plaintiffs would prevail as ESD can "point to no substantial disruption caused by the Removed Books." App. Vol. 2 at 554–56 n.12.

library shelves. App. Vol. 2 at 520–64. In doing so, the District Court relied on the evidence of ESD's "blatantly unconstitutional" motivations under *Pico* and other precedents. App. Vol. 2 at 547.

In response, ESD filed a motion to stay the District Court's order pending appeal. App. Vol. 1 at 013. ESD then filed an emergency motion for administrative stay and stay pending appeal in this Court. This Court initially denied the emergency motion without prejudice because the District Court decided to temporarily stay its March 19 preliminary injunction order. App. Vol. 1 at 013. The District Court later denied ESD's requested stay ordering ESD to return the removed books by April 5, 2025. On April 4, ESD filed a renewed emergency motion for administrative stay pending appeal. This Court denied the motion and lifted the temporary stay on April 28, 2025. ESD certified that the Removed Books have been returned to their respective library shelves and are accessible to all students as of May 2, 2025.

## SUMMARY OF ARGUMENT

The Court should affirm the District Court's order because it did not abuse its discretion in granting Plaintiffs' motion for preliminary injunction.

*First*, Plaintiffs have standing to challenge all of the Removed Books from ESD's schools. Plaintiff E.S. has sufficiently alleged an imminent injury with respect to the removal of three books from Elizabeth Middle School, as E.S.'s

parents intend for him to attend this school as the only public middle school in the District. Plaintiff NAACP's members have alleged an ongoing injury where some members removed their children from Elizabeth schools to avoid what they perceived to be a "manifestation of racism."[8] App. Vol. 1 at 85–86 (¶ 9). Further, ESD cannot eliminate the student Plaintiffs' injuries by making the Removed Books available only to students based on their identification with this litigation. That ESD voluntarily provided the student Plaintiffs some access to the Removed Books in response to being sued does not moot this case. The student Plaintiffs still suffer actual injury in the form of stigmatization by forced identification with this lawsuit in order to access the Removed Books.

**Second**, *Pico* is the proper standard under which to analyze Plaintiffs' claims. The *Pico* plurality opinion has served as a guardrail for lower courts' analyses of public school book removal decisions for the last four decades and it was correct. There is no reason to replace *Pico* here, as this case is nearly factually identical to *Pico*. The District Court properly applied *Pico*'s prohibition on politically motivated book removal decisions. The *Pico* standard is also consistent with the general rule that when the government facilitates private speech through

---

[8] In addition, since the filing of the lawsuit, Plaintiffs' counsel has learned that the NAACP has at least one member with a child who attends Elizabeth Middle School and will present those facts to the District Court as the case proceeds.

governmental programs and nonpublic forums, the government may restrict speech based on content but not based on invidious viewpoint discrimination. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985).

While ESD attempts to distract the Court using hypotheticals about book selection decisions, government-owned gun stores, and government-provided abortion services, this case is about ESD's decision to remove 19 books because those books did not fit into its chosen political ideology. *Pico*'s standard is clear and easily applied to this case: if the "decisive factor" in the Board's decision was that it "dislike[s] the ideas contained in those books," and the Board seeks to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," then the book removal is unconstitutional under the First Amendment. *Pico*, 457 U.S. at 872.

***Third***, the government speech doctrine has never been adopted by any court in a library book removal case. The District Court correctly found the doctrine inapplicable here, for good reason. ESD's library book removal decisions satisfy none of the factors the Supreme Court uses to determine what constitutes government speech. *See Shurtleff v. City of Boston, Mass.*, 596 U.S. 243, 252 (2022).

Finally, ESD's alternative argument—that library book removal decisions are immune from First Amendment scrutiny because they allegedly do not "abridge" or "impair" speech (Opening at 32–38)—was not raised below and is waived before this Court. The Court should not address it. And regardless, it is erroneous and dangerous. ESD proposes for the first time on appeal to have no standard at all. That position is inconsistent with long-standing constitutional protections against government-prescribed political orthodoxy.

The Fifth Circuit's recent outlier decision in *Little v. Llano County*, No. 23-50224, __ F.4th __, 2025 WL 1478599 (5th Cir. May 23, 2025) (en banc), does not change the analysis, and stands alone as the only circuit decision to reject *Pico*'s longstanding and well-established standard. That case was wrongly decided, purportedly overturning more than four decades of lower courts' application of the First Amendment to library book removal cases since *Pico*, and this Court should not find it persuasive.

<u>**STANDARD OF REVIEW**</u>

This Court reviews the grant or denial of a preliminary injunction for abuse of discretion. *Colorado v. Griswold*, 99 F.4th 1234, 1239 (10th Cir. 2024). "An abuse of discretion occurs when the district court commits an error of law or makes clearly erroneous factual findings." *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). This Court has "characterized an abuse of

discretion as 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Id.* (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009)). A factual finding is "clearly erroneous" if it is "without factual support" or if "after reviewing all of the evidence [the Court] is left with the definite and firm conviction that a mistake has been made." *Hafen v. Howell*, 121 F.4th 1191, 1207 (10th Cir. 2024). An "error of law" occurs when the district court applies the "wrong legal standard," for example, when the relied-upon legal standard has been explicitly overruled. *See Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006). This Court's "review of a district court's exercise of discretion is narrow, and [it] consider[s] the merits of the case only as they affect that exercise of discretion." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 752 (10th Cir. 2024).[9]

---

[9] In ESD's Renewed Emergency Motion for Administrative Stay and Stay Pending Appeal before this Court, ESD implied that the District Court erred in reviewing Plaintiffs' preliminary injunction motion as a motion to return to the status quo as opposed to a mandatory injunction subject to an allegedly heightened standard of review. (ECF No. 28-1 at 18 n.6.) The District Court thoroughly considered the nature of Plaintiffs' requested relief and properly determined that Plaintiffs seek a return to the status quo, not any affirmative action absent during the last uncontested period. App. Vol. 2 at 533–34. ESD failed to present any argument in its Opening Brief that the District Court incorrectly determined the type of relief requested by Plaintiffs, and has therefore forfeited any argument to the contrary. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.").

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.     PLAINTIFFS HAVE STANDING TO CHALLENGE ALL OF THE REMOVED BOOKS**

ESD attacks Plaintiffs' standing by claiming: (1) Plaintiffs' lack standing to challenge the books removed from Elizabeth Middle School and (2) student Plaintiffs suffer no injury as they may access all of the Removed Books during the pendency of this litigation. Both arguments are wrong.

**A.     The District Court correctly found Plaintiffs have standing to challenge the books removed from Elizabeth Middle School.**

Standing must be demonstrated "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, (1992). "At the preliminary injunction stage, then, the plaintiff[s] must make a 'clear showing' that [they] [are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008)). Plaintiffs have made a sufficient showing of concrete, imminent injury as well as actual, ongoing injury. *See Lujan*, 504 U.S. at 560 (describing injury-in-fact as either imminent *or* actual); *Hutchinson v. Pfeil*, 211 F.3d 515, 521 (10th Cir. 2000) (holding an injury in fact must be "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical").

Plaintiff E.S. has alleged sufficiently imminent injuries with respect to the removal of *#Pride*, *You Should See Me in a Crown*, and *It's Your World* from

Elizabeth Middle School. The mother of Plaintiff E.S. intends for E.S. and his younger sister to attend Elizabeth Middle School, which is the only middle school in the District. App. Vol. 1 at 77–78 (¶¶ 2–6). Where there is only one middle school in the district for E.S. to attend, E.S.'s challenge to his right to access library materials from the middle school library that he will attend is sufficiently imminent. The Supreme Court has found imminent injury where parents of elementary and middle school children sought to challenge a school district's high school admissions policies. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (finding "imminent injury" where plaintiffs alleged "elementary and middle school children may be denied admission to the high schools of their choice when they apply for those schools in the future"). Imminent injury is present here because E.S. is challenging the library book removal policy implemented at ESD's only middle school.

Plaintiff NAACP also alleges an actual and ongoing injury with respect to the removal of the three books from Elizabeth Middle School. Portia Scott, the local NAACP President, asserts that "[s]ome NAACP members removed their children from Elizabeth schools because of the District's decision to remove books from their school libraries," explaining that one member removed a fifth grader from Running Creek Elementary due to the book removals, which they perceived as a "manifestation of racism in the District." App. Vol. 1 at 85–86 (¶ 9). The

Fourth Circuit has found that sending a student to a neighboring school district to avoid a school's First Amendment violations constitutes an ongoing, actual injury-in-fact. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018). Contrary to ESD's contentions, the grant of a preliminary injunction would redress the removed student's injuries because "the removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Id.* at 190. And the student need not avow in the compliant that she would reenroll in the school if the court were to grant a preliminary injunction to make this showing. *Id.* Thus, ESD's argument that these NAACP members no longer have a stake in this litigation because their children are no longer enrolled in ESD schools has no merit (Opening at 23), especially when the very reason they no longer attend ESD schools is ESD's unconstitutional conduct.

Further, NAACP alleges its "members include parents whose children attend Elizabeth public schools" and that these members "have shared that the Elizabeth School District's removal of books from school libraries has interfered with their children's ability to access books by and about people of color." App. Vol. 1 at 084 (¶ 7). The NAACP need not identify specific members whose children attend the middle school as ESD suggests, although the organization has at least one member with a child who attends Elizabeth Middle School. *See supra* n.8. Rather, the NAACP's assertion that its members attend Elizabeth schools and have been

injured by their children's lack of access to books about people of color is sufficient to show Plaintiffs are likely to establish standing at this stage.

As such, Plaintiffs have made a clear showing that they are likely to establish standing for the removal of the books from Elizabeth Middle School at this stage of the litigation.

### B. ESD cannot moot Plaintiffs' injury by conditionally making the Removed Books available only to Plaintiffs.

ESD argues that Plaintiffs suffer no injury because ESD has made the books available to students who show they are Plaintiffs in this litigation. (Opening at 38.) That is legally and factually wrong.

Legally, it is well-settled that ESD cannot insulate itself from judicial review by voluntarily ceasing its unconstitutional activity with respect to Plaintiffs. "The rule that 'voluntary cessation of a challenged practice rarely moots a federal case . . . traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010). "[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Id.*

In this case, ESD's ploy to make the books available only to Plaintiffs was a bald attempt to deprive the District Court of the ability to review its actions. In

January 2025, after Plaintiffs filed this lawsuit, ESD claimed, on the day that its response brief was due, that the books would be made available *only* to students who identified themselves as Plaintiffs in this litigation or members of the NAACP. App. Vol. 1 at 183 (¶ 38). Later, ESD claimed that it had disposed of the original copies of the books in the fall of 2024, but then accepted a donation from an undisclosed individual who allegedly conditioned their donation upon the books being available only to the Plaintiffs. *See* Appellees' Supplemental Appendix at 012–013 (¶¶ 5–12). The donation appears to have been a litigation tactic made for the sole purpose of attempting to diminish Plaintiffs' injury during the pendency of this case.

In addition, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quoting *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). ESD has stated that its book removal process is ongoing and removed *Redwood and Ponytail* and possibly other books on an ad hoc basis. App. Vol. 1 at 104 ("[T]he BCRC will analyze the school library resources on an ongoing basis."); App. Vol. 1 at 049–50 (¶¶ 151–52); *see supra* n.3. As such, there is every reason to believe that Plaintiffs' injuries would recur should this litigation end.

As a factual matter, Plaintiffs still suffer actual injury despite ESD making the books conditionally available only to them. The fact that the Removed Books are only available to Plaintiffs upon identification of their affiliation with this litigation is stigmatizing and harmful. Courts have long recognized that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association" as other restrictions on expression. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

While ESD attempts to minimize Plaintiffs' injuries as "small" or "non-significant" (Opening at 39), the stigma attached to Plaintiffs who seek to access the library books is anything but. To access the books that would have otherwise been available on library shelves, Plaintiffs must: (1) locate a librarian; (2) wait to consult the librarian about their chosen book; (3) ask to check out their chosen book; and (4) wait for the librarian to verify their identity and association with this litigation to confirm their ability to check out their chosen book. Plaintiffs are further burdened by the resulting "stigmatization" of a student who "choose to read" and is "known to be carrying a 'bad' book." *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003); *id.* at 1002 (holding that requiring parental permission to check out Harry Potter books violated students' First Amendment rights in part because "the stigmatizing effect of having to have parental permission to check out a book constitutes a restriction on access").

That school library staff may already know C.C. and E.S. by name does nothing to cure this harm. (*See* Opening at 40–41.) ESD seems to misunderstand the nature of the harm here: it is not that C.C. and E.S. must identify themselves, it is that they must identify themselves as Plaintiffs in ongoing litigation against the District over their First Amendment rights before they are permitted to access the books. *See Watchtower Bible v. Vill. of Stratton*, 536 U.S. 150, 164 (2002) (requiring a permit—even one granted without cost or waiting period—as a prior condition on the exercise of the right to speak imposes a burden on speech). In other words, while school staff may know C.C. and E.S. by name, they may not know that they are suing the District over its library book removal policy. In addition, any Plaintiff who is an NAACP member or whose parent is an NAACP member must both disclose their NAACP membership and that as a member of the NAACP they are Plaintiffs in this litigation, in violation of their First Amendment rights. *See In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 117 (10th Cir. 1983) (finding that to overcome abridgement of the freedom of association resulting from compelled disclosure of membership in an association, the government must show a "compelling interest" and "substantial relationship between the material sought and legitimate government goals," which ESD has not shown here).

The fact that Plaintiffs may be able to access the Removed Books through other sources—including public libraries, online libraries, or Amazon—also does not eliminate Plaintiffs' injuries.[10] *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 880 (1997) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."); *Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982). Plaintiffs have a right to access the Removed Books in their school libraries, when, as here, the 19 books were removed because they were deemed to be inconsistent with the Board's political views. Plaintiffs have established and maintain injuries sufficient to show standing to protect such rights at this stage in the litigation.

In addition, ESD's standing arguments say nothing about the standing of the Author's Guild, whose members authored many of the Removed Books. *See* App. Vol. 2 at 523. It is well-settled that the Guild Plaintiffs have a First Amendment right to share their books free from viewpoint discrimination. *See Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143 (1943) (The First Amendment "embraces the

---

[10] The argument that some students may be able to access books from other sources (Opening at 35) also ignores that these opportunities may not be available to all students. Some may not be able to afford to purchase the book from Amazon, some may not have access to an online library at home, and some may not live near or be able to find public transportation to a public library. For some students, their school library may be their only meaningful access to a selection of books.

right to distribute literature."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963) (finding the First Amendment "embraces the circulation of books"). The Guild has sufficiently alleged that ESD's actions violate its members' freedom of expression, specifically, their right to communicate their views to students without undue government interference. *See* App. Vol. 1 at 20–21 (¶¶ 22–23).

## II. THIS COURT SHOULD APPLY *PICO* AS THE PROPER STANDARD IN BOOK REMOVAL CASES AND AFFIRM THE DISTRICT COURT

The plurality opinion in *Pico* has served as a guardrail for courts' analysis of public school book removal decisions for the last 43 years. There is no reason to discard *Pico*'s standard here. The *Pico* standard is consistent with the well-settled rule that when the government facilitates private speech through governmental programs and nonpublic forums, the government may restrict speech based on content but not based on invidious viewpoint discrimination.

The District Court properly applied *Pico* as a non-binding, but instructive, framework for analyzing Plaintiffs' First Amendment claims. ESD cannot show that the District Court committed legal error in its *Pico* analysis, nor does ESD argue that the District Court made any clearly erroneous factual findings. Indeed, the factual scenario presented in *Pico* is nearly identical to the scenario presented in this case. This Court should affirm the District Court's analysis under *Pico*.

**A.** *Pico*'s standard has been applied by lower courts for over four decades and is consistent with the general rule against viewpoint discrimination.

It is undisputed that the *Pico* plurality prohibiting politically-motivated viewpoint discrimination in book removal decisions is not binding precedent on this Court. *See* App. Vol. 2 at 539. But its persuasive power as a well-reasoned guardrail against politically-motivated book removals speaks for itself, as evidenced by courts' application of *Pico* for the past 43 years. The District Court committed no legal error by analyzing this case under *Pico*.

Lower courts have consistently applied *Pico* as persuasive authority when analyzing the constitutionality of book removals, while simultaneously acknowledging its precedential limits.[11] *See, e.g.*, *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1204 (11th Cir. 2009). Even the cases cited by ESD concede *Pico* remains an important and necessary starting point for book removal analyses. *See, e.g.*, *C.K.-W. by and through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914–15 (E.D. Mo. 2022) (referring to the plurality opinion and stating the court will "proceed under Justice Brennan's approach").

---

[11] *See also* Catherine J. Ross, *Are "Book Bans" Unconstitutional? Reflections on Public School Libraries and the Limits of Law*, 76 Stan. L. Rev. 1675, 1692 (2024) (explaining that "lower courts regularly cited and applied the *Pico* plurality's approach"); Johany G. Dubon, *Rereading Pico and the Equal Protection Clause*, 92 Fordham L. Rev. 1567, 1588–91 (2024) ("[L]ower federal courts have consistently applied *Pico* when reviewing book removal challenges.").

*Pico* is also consistent with the general rule that, while the government may have "broad discretion to make content-based judgments in deciding what private speech to make available to the public," it does not have complete immunity from First Amendment scrutiny. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 204–05 (2003) (plurality op.).

*First*, "[t]he First Amendment forb[ids] the Government" from using or controlling a government program, medium, or institution "in ways which distort its usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be tied to that specific nature. *Finley*, 524 U.S. at 585; *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it). Here, the unique nature of a school library is that it "is a place to test or expand upon ideas presented to [students], in or out of the classroom," and is the "principal locus" of students' freedom "to inquire, to study and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868–69. ESD's politically-motivated viewpoint-based discrimination distorts the very purpose of a school library as a gateway to a diversity of ideas outside of the prescribed curriculum.

*Second*, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983)). It cannot "effectively preclude or punish the expression of particular views," or engage in "invidious" viewpoint-based discrimination "calculated to drive certain ideas from the marketplace," *Id.* at 583, 587 (quotation marks and citation omitted). As such, ESD's contention that it has the unfettered discretion to withdraw access to viewpoints with which it disagrees is wrong. (*See* Opening at 32–33.)

*Third*, under First Amendment doctrine governing the distribution of speech through a non-public forum, a school library shelf's "status as a nonpublic forum" does not "give [ESD] unfettered power to exclude any [book] it wishe[s]." *Forbes*, 523 U.S. at 682. "A nonpublic forum . . . is not a private forum, and because it is a government-sponsored medium of communication, it is still subject to First Amendment constraints." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001). Specifically, any restriction in a nonpublic forum like ESD's libraries must be "reasonable in light of the purpose of the forum," and cannot be an effort "to suppress a particular viewpoint." *Id.* at 356.[12]

---

[12] ESD now argues that the District Court erred in prohibiting viewpoint discrimination because, while viewpoint discrimination is forbidden under First Amendment forum analysis, "libraries are not 'forums' of any sort." (Opening at 44.) But ESD argued the opposite before the District Court, stating: "the School Board's removal of the 19 titles is garden-variety regulation of access to a *non-*

*Pico* fits comfortably within this broader First Amendment doctrine. By contrast, discarding *Pico* and blessing book removals that seek to drive certain ideas out of society would conflict with these fundamental First Amendment principles. Whether it be *Pico*, government subsidized speech, or speech in a nonpublic forum, the "common theme" under any potentially relevant standard is that school officials cannot remove books from the library because they disagree with the political viewpoints expressed in the books.

As such, ESD cannot show that the District Court erred by applying *Pico* as one of the potentially applicable legal standards in evaluating Plaintiffs' claims. And without a finding of legal or factual error, this Court cannot find that the District Court abused its discretion in granting the preliminary injunction.

### B.  The District Court properly applied *Pico* to the facts of this case.

ESD argues the District Court erred in holding that *Pico* prohibits content and viewpoint discrimination in library book removal decisions. (Opening at 43.)

---

*public forum*." (Def. Opp. at 27 (emphasis added).) As the District Court correctly noted, "[t]o be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum *must not be based on the speaker's viewpoint* and must otherwise be reasonable in light of the purpose of the property." App. Vol. 2 at 555 (quoting *Forbes*, 523 U.S. at 682 (emphasis added)). ESD waived any argument that forum analysis and its attendant prohibition on viewpoint discrimination does not apply. *See Verlo v. Martinez*, 820 F.3d 1113, 1130 (10th Cir. 2016) ("Because the Judicial District waived any argument that the Restricted Areas are nonpublic fora, we conclude the district court did not abuse its discretion by evaluating the Plaintiffs' likelihood of success under the scrutiny applicable to public fora.").

In making this argument, ESD ignores several parts of the District Court's opinion. First, the District Court stated that "[i]t is unconstitutional—under both the federal and Colorado Constitutions—to remove books from a school library merely because the District 'disagrees with the views expressed in the books.'" App. Vol. 2 at 554. The District Court then explicitly stated that its "ruling does not prohibit the District from removing books based on legitimate pedagogical concerns." App. Vol. 2 at 554 n.11.

Thus, ESD's contention that the District Court improperly prohibited all content discrimination is wrong and based on a manufactured expansion of the District Court's ruling. No one is arguing that ESD may not make legitimate content-based book removal decisions. That, unfortunately, is not the facts of this case. Here, Plaintiffs have made a sufficient fact-based showing at this stage in the litigation—which ESD does not challenge—that ESD's book removal decisions were not based on legitimate content-based concerns, but rather, on the Removed Books' conformity (or lack thereof) with the ESD Board members' views of "conservative values," whatever that meant to them.

The District Court properly applied the *Pico* plurality opinion based on the facts presented. The facts of *Pico* are nearly identical to the facts of this case, making its framework particularly appropriate given the similarities.

In *Pico*, school board members from the Island Trees Union Free School District No. 26, attended a conference sponsored by Parents of New York United, "a politically conservative organization." 457 U.S. at 856. At this conference, the school board members obtained a list of books that the conservative organization described as objectionable. *Id.* Upon their return from the conference, it was discovered that nine of the "objectionable" books were in the school library, and the board removed the books from the library shelves so that board members could review them. *Id.* at 857. After review, the board issued a press release labeling the books "anti-American, anti-Christian, anti-Semitic, and just plain filthy," and concluding that the board had "a moral obligation to protect the children in our schools from this moral danger." *Id.* After the press release, the board appointed a "Book Review Committee" consisting of parents and school staff to review the nine books removed from library shelves. *Id.* The Book Review Committee made its recommendations to the board, voting to retain and remove certain books. The board then permanently removed all nine books from school libraries.

The facts of this case are strikingly similar. Here, ESD's Board assigned the task of reviewing the books in its libraries to the BCRC. App. Vol. 1 at 169. The BCRC was composed of Board Directors Booth and Powell, as well as parents, school staff, and community members. App. Vol. 1 at 027 (¶ 52), 216. To determine which books should be removed from ESD libraries, the BCRC used

BookLooks.org (App. Vol. 1 at 217; App. Vol. 2 at 332), a now-defunct website created by a member of Moms for Liberty and used as a tool to facilitate book bans, *see supra* n.5.

Based on this source, the BCRC recommended to the Board that it remove 19 books from ESD's libraries, and on September 9, 2024, announced its decision to permanently remove these books. App. Vol. 1 at 17. According to the contemporaneous statements by Board members at this time, the Board decided not to return the books to ESD libraries because the books contained same-sex relationships, included LGBTQ+ characters, discussed racism, involved police violence, or otherwise struck board members as "disgusting" and incompatible with their view of "conservative values." App. Vol. 1 at 017; App. Vol. 1 at 124 ("LGBTQ is only regarding sexual preference which doesn't belong in any school"); App. Vol. 1 at 115 ("[I]t's equally important to remember that our commitment to conservative values was a key aspect of our campaign. We all ran on a platform that promised to uphold these values in our district, reflecting the majority sentiment of our community.").

*Pico* thus provides a clear standard for this Court to implement based on the facts of this case: If the "decisive factor"[13] in the school board's decision is that the

---

[13] A "decisive factor" is defined as "a 'substantial factor' in the absence of which the opposite decision would have been reached." *Id.* at 871 n.22.

board "dislike[s] the ideas contained in those books," and the board seeks to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," then the book removal is unconstitutional under the First Amendment. *Pico*, 457 U.S. at 872. Put slightly differently, if ESD Board members "intended by their removal decision to deny [Plaintiffs] access to ideas with which [ESD Board members] disagreed, and if this intent was the decisive factor in [their] decision, then [ESD Board members] have exercised their discretion in violation of the Constitution." *Id.* at 871.

The *Pico* plurality also explicitly limited its holding to book *removal* decisions, which is the only issue before the Court in this case, despite ESD's attempts to broaden the issues presented to hypothetical scenarios involving a school district's refusal to *add* books to its libraries. *See Pico*, 457 U.S. at 871–72 ("Because we are concerned in this case with the suppression of ideas, our holding today affects only the discretion to *remove* books."); *see also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (explaining that neither the state nor the school board "was under any federal constitutional compulsion to provide a library for the [s]chool or to choose any particular books," but once "having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members"). As such, the *Pico*

plurality's standard applies only to a limited subset of First Amendment cases, and the facts of this case are squarely addressed by its framework, leaving no valid reason not to apply it here.

The District Court explicitly acknowledged that *Pico*, while not binding, is persuasive. App. Vol. 2 at 540. The District Court made no legal error. *Pico* espouses a prohibition on a specific type of viewpoint discrimination: that school boards may not remove books "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870. That is exactly what the Board members did here, finding the Removed Books "disgusting" and removing them in furtherance of their view of a "commitment to conservative values." App. Vol. 1 at 045, 115. ESD does not argue that the District Court's factual finding of viewpoint-based discrimination is clearly erroneous. The District Court properly applied *Pico*'s prohibition on viewpoint discrimination based on the Board's preferred political orthodoxy.

## III. THE GOVERNMENT SPEECH DOCTRINE DOES NOT APPLY HERE

ESD argues that this Court should deem ESD's library book removal decisions to be government speech, a doctrine that no court, let alone the Supreme Court (or any fraction if it), has ever applied to library book removal decisions. The District Court correctly found the doctrine inapplicable to book removal decisions, and this Court should reject the applicability of the government speech doctrine as well.

The District Court committed no legal error in declining to apply the government speech doctrine, and, notably, ESD does not appear to argue that the District Court committed legal error in this regard. (Opening at 23 ("On the merits, the Court *should* . . . hold that a public school's library curation decisions are government speech." (emphasis added)); *id.* at 29 ("The district court rejected the government-speech argument, but none of its reasons are *persuasive*." (emphasis added))). As such, the Court should not find that the District Court abused its discretion in granting a preliminary injunction on this basis.

Every court to have considered the government speech doctrine in this context has rejected it. *See, e.g.*, *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) ("[T]he placement and removal of books in public school libraries" is not government speech.); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (school library not viewed "as the government's endorsement of the views expressed in the books"); *Virden v. Crawford Cnty.*, No. 2:23-CV-2071, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) ("[T]he Supreme Court has not extended [the government-speech] doctrine to the placement and removal of books in libraries.").

ESD cites no case law to the contrary, as the recent Fifth Circuit opinion ESD cites did not garner a majority of the judges for the proposition that a public library's book removal decisions constitute government speech. *Little*, No. 23-

50224, __ F.4th __, 2025 WL 1478599, at n.† (only seven of seventeen judges signed on to this section of the opinion). And despite ESD's suggestion, *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003), did not treat curation decisions as government speech. The plurality explained that a library's role is to "decid[e] what private speech to make available to the public," *id.* at 204, 206, and cited *Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788, 802–803 (1985), a nonpublic forum case, with approval. The plurality emphasized how the restrictions at issue were consistent with the nature, history, and purpose of libraries' collection decisions (an inquiry relevant to nonpublic forum analysis) and highlighted the ease with which a patron could unblock any improperly blocked site, something that would not matter if there were no First Amendment right at issue. *Am. Library Ass'n, Inc.*, 539 U.S. at 208–09 (plurality op.); *see also id.* at 214 (Kennedy, J., concurring). While libraries "enjoy broad discretion" in making curation decisions, *id.* at 205 (plurality op.), nothing in the plurality's decision suggests that discretion is boundless. *American Library Association* was not a government speech case, and neither is this.

In addition, ESD makes no attempt to satisfy the factors considered by the Supreme Court in determining what constitutes government speech. "[T]o determine whether the government intends to speak for itself" or "instead create[s] a forum for the expression of private speakers' views" the Court looks to several

types of evidence including: (1) "the history of the expression at issue," (2) "the public's likely perception as to who (the government or a private person) is speaking," and (3) "the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252. The government must show "that the challenged activity constitutes government speech in the literal sense—purposeful communication of a governmentally determined message by a person acting within the scope of a power to speak for the government." *Id.* at 269–71 (Alito, J., concurring).

ESD's library book curation decisions fail each prong. Historically, school libraries have been treated as a place for students to "explore the unknown, and discover areas of interest and thought not covered by the prescribed [government] curriculum." *Pico*, 457 U.S. at 868–69. The public does not perceive a school's library as the government speaking. *See GLBT Youth in Iowa Sch. Task Force*, 114 F. 4th at 666–69 ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017))). And until the recent election of ESD Board's current members, ESD did not actively shape or control the removal of books from its libraries. *See* App. Vol. 1 at 170 (¶ 12) ("[U]ntil recently, . . . the Elizabeth School District did not have a uniform approach for purchasing library books or for reviewing and weeding those

materials.); *id.* (explaining many books were put on library shelves because ESD received "large donations from a variety of sources"). Each factor weighs heavily against a finding of government speech and in favor of the creation of a forum for private speakers' expression. As discussed above, *see supra* Section II.A, well-settled First Amendment principles prohibit viewpoint discrimination in such fora.

ESD's reliance on *Moody v. Netchoice* does not change the analysis. That case had nothing to do with government speech; it concerned states' power to regulate private social media platforms' editorial choices. 603 U.S. 707 (2024). In explaining that "[a]n entity exercise[ing] editorial discretion in the selection and presentation of content is engaged in speech activity," the Supreme Court found that a "State may not interfere with private actors' speech to advance its own vision of ideological balance." *Id.* at 741. The *Moody* Court says nothing about whether library curation decisions by a public school district constitute government speech, but instead reinforces Plaintiffs' position that "a fundamental aim of the First Amendment" is to ensure the public "has access to a wide range of views . . . by preventing the government from 'tilt[ing] public debate in a preferred direction.'" *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011)).

The District Court did not err in declining to apply a case involving the compilation of social media posts by a private company to the present case involving a public school board's decision to remove 19 books from its libraries.

The District Court correctly refused to extend the government speech doctrine to library book removals, like every other court to have considered the issue, and in consideration of the Supreme Court's express hesitancy to extend the government speech doctrine. *See Matal*, 582 U.S. at 235 ("[W]e must exercise great caution before extending our government-speech precedents.").

**IV.  ESD'S CONTENTION THAT LIBRARY BOOK REMOVAL DECISIONS SHOULD BE "CATEGORICALLY IMMUNE" FROM FIRST AMENDMENT SCRUTINY IS WAIVED, WRONG, AND DANGEROUS**

ESD asserts, for the first time on appeal, that "[i]f this Court rejects the government-speech argument, it should *still* hold that a school library's book removals are categorically immune from scrutiny . . . because a school district does not and cannot 'abridge' or 'impair' a constitutional right by withdrawing assistance that it previously provided to those seeking to exercise a constitutional prerogative." (Opening at 32–33.) It is well-settled that, "absent extraordinary circumstances, arguments raised for the first time on appeal are waived. This is true whether the newly raised argument is a bald-faced new issue or a new theory on appeal that falls under the same general category as an argument presented [below]." *Little v. Budd Co., Inc.*, 955 F.3d 816, 821 (10th Cir. 2020) (internal citations and quotations omitted); *see also, e.g.*, *Verlo*, 820 F.3d at 1132–33 (finding argument not presented to district court "is not a legitimate ground on which to reverse the preliminary injunction order"). ESD did not raise this

"immunity" argument before the District Court. And no "extraordinary circumstances" exist here. Thus, ESD waived the argument, and the Court should not consider it.

Even if this argument was not waived, it is wrong. To start, a super majority of the *Pico* Court agreed that the First Amendment prohibits school boards from wielding unfettered discretion in removing books from school libraries. Four Justices expressly adopted a rule prohibiting school boards from removing library books "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870–71 (Brennan, Marshall, Stevens, and Blackmun, JJ.). In addition, three dissenting justices "cheerfully concede[d]" that a school board cannot exercise its discretion in this way, and that "our Constitution does not permit the official suppression of *ideas*." *Id.* at 907 (Rehnquist, J., joined by Burger, C.J., and Powell, J., dissenting). And, as the District Court aptly explained, Justice White's concurring opinion sought to return the case to the district court to determine *why* the school board removed the books. *See* App. Vol. 2 at 542 (citing *Pico*, 457 U.S. at 883 (White, J., concurring)). If Justice White did not think the First Amendment applied to the plaintiffs' claims, "his preference to remand the case for further factfinding on the school board's motivations would be pointless." App. Vol. 2 at 543; *see also Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 895 F. Supp. 1463, 1468 (D.

Kan. 1995). Supreme Court precedent forecloses any argument that the Free Speech Clause does not apply at all to library book removal decisions.

ESD relies on the Fifth Circuit's recent decision holding that the First Amendment does not protect the right to challenge library book removals. *See Little*, No. 23-50224, __ F.4th __, 2025 WL 1478599, at *14. That case was wrongly decided. The Fifth Circuit's characterization of the right to receive information as a "brave new right," *id.* at *1, directly conflicts with Supreme Court holdings going back more than 50 years that the First Amendment "necessarily protects the right to receive . . . information and ideas." *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This is also true when it is the government providing access to the information. *See supra* II.A. For example, the Supreme Court has held "the people as a whole retain their interest in free speech by [public] radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment." *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) (explaining "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here").

After destroying this long-standing First Amendment right, the Fifth Circuit justifies its ruling by describing the application of *Pico*'s standard as "a nightmare." *Little*, No. 23-50224, __ F.4th __, 2025 WL 1478599, at *1, *9–10.

But lower courts—including the Fifth Circuit—have been applying the standard for over four decades without issue. Indeed, the Fifth Circuit had to overrule itself in *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), in order to espouse its recent holding. In *Campbell*, the Fifth Circuit found that "[e]ven though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives." *Id.* at 189. *Little* is now the first and only decision to conclude that the *Pico* plurality's standard is unworkable.

Further, the Fifth Circuit mischaracterized the right at issue, and analyzed the right to receive information as "requir[ing] a library to shelve particular books." *Little*, No. 23-50224, __ F.4th __, 2025 WL 1478599, at *8. But this case is about the narrow issue of suppression of ideas in the form of library book *removals*, and does not ask this Court to adjudicate a standard for the addition of books to library shelves. The *Pico* plurality explicitly limited its holding to book removals as the only issued presented, as should this Court. *See Pico*, 457 U.S. at 871–72.

In place of any binding legal authority supporting its argument, ESD employs hypothetical situations involving a "county-owned gun store that allows county residents to borrow weapons in the same way that they borrow library

books—by checking them out for a few weeks and promising to return them" (Opening at 33), and an Elizabeth-operated "public hospital before *Dobbs* that offered abortion services and other medical procedures to its residents" (Opening at 34).

It is unclear what purpose these illustrations serve. Both seem to imply that renting guns or offering abortion services is akin to accessing information from a school library. Both are red herrings, and both ignore the right to access information protected by the federal and Colorado Constitutions. *Stanley*, 394 U.S. at 564; *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1051 (Colo. 2002). Indeed, "[t]he vigilant protection of constitutional rights is 'nowhere more vital' than in our schools and universities." *Tinker*, 393 U.S. at 512 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The *Pico* plurality also emphasized the "special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." *Pico*, 457 U.S. at 868. The argument that school boards should have "*unfettered* discretion" to control the books on school library shelves "overlooks the unique role of the school library." *Id.* at 869.

ESD's hypotheticals also miss the key factual and legal distinction here: the government's *reason* for removing access to a specific type of gun or medical procedure or book. As discussed, Plaintiffs do not argue that ESD cannot remove

books for legitimate, content-based reasons, which is what these hypotheticals seem to contemplate: removing handguns and abortion services for reasons having nothing to do with the government's preferred political orthodoxy. Here, Plaintiffs' claim is that under long-standing First Amendment principles ESD cannot remove school library books based on their conformity with the Board member's political views. *See Finley*, 524 U.S. at 587 (holding the provision of government subsidies "may not aim at the suppression of dangerous ideas" and may not be "calculated to drive certain ideas from the marketplace" (quotation marks omitted)).

If library book removal decisions were to be categorically immune from First Amendment scrutiny, as ESD argues, school boards would have unfettered power to remove any books without oversight from parents, teachers, or librarians. A school board could remove access to a book based on any metric they choose. For example, a school board could decide to remove the presidential biographies of any Republican president, any texts critical of the current President, or any religious texts other than the Bible. This would be so even if a school librarian or teacher performed a holistic evaluation of the literary, artistic, political, or scientific value of the book and determined that the book at issue held significant educational value for students.

At bottom, ESD's proposed solution to the lack of binding legal precedent on the proper standard for review of library book removal decisions is to have no

standard at all—to make library book removal decisions "categorically immune" from First Amendment scrutiny. That is both untenable and dangerous, and should be flatly rejected by this Court. That is, if the Court chooses to consider its merits—despite ESD's failure to present this argument to the District Court.

## V. THE DISTRICT COURT PROPERLY CONSIDERED ALL EVIDENCE IN GRANTING THE PRELIMINARY INJUNCTION

The District Court properly considered hearsay evidence in granting Plaintiffs' preliminary injunction, and ESD provides no reason why this Court should overturn decades-old precedent on this issue. "The Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). This is with good reason, given the procedural posture of preliminary injunction hearings, which take place before the parties are able to develop a fulsome factual record. The Court should not reconsider its ruling in *Heideman*.

## <u>CONCLUSION</u>

The District Court did not abuse its discretion in granting Plaintiffs' motion for preliminary injunction. This Court should affirm the District Court's order in all respects, and the preliminary injunction should remain in place during the pendency of the District Court proceedings to ensure the protection of Plaintiffs' rights under the federal and Colorado constitutions.

Respectfully submitted,

|  | /s/ Kendra M. Kumor |
|---|---|
| Timothy R. Macdonald | Craig R. May |
| Sara R. Neel | Thomas C. Dec |
| American Civil Liberties Foundation | Celyn D. Whitt |
| of Colorado | Kendra M. Kumor |
| 303 E. 17th Avenue, Suite 350 | Wheeler Trigg O'Donnell LLP |
| Denver, CO 80203 | 370 Seventeenth Street, Suite 4500 |
| Telephone:  720.402.3107 | Denver, CO 80202 |
| Email:   tmacdonald@aclu-co.org | Telephone:  303.244.1800 |
|          sneel@aclu-co.org | Facsimile:   303.244.1879 |
|  | Email:   may@wtotrial.com |
|  |          dec@wtotrial.com |
|  |          whitt@wtotrial.com |
|  |          kumor@wtotrial.com |
| Dated:  June 16, 2025 | Attorneys for Plaintiffs - Appellees |

## STATEMENT REGARDING ORAL ARGUMENT

Although Plaintiffs-Appellees believe that the issues presented by this appeal are clear, they respectfully request oral argument to have the opportunity to address any questions the Court may have with respect to this case.


By: _s/ Kendra M. Kumor_

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:

> [X] this brief contains 12,974 words, excluding the parts of the brief
> exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [X] this brief has been prepared in a proportionally spaced typeface using
> Microsoft Word 2010/2019 in Times Roman 14 point font.

<table>
<tr>
<td></td>
<td><em>s/ Kendra M. Kumor</em></td>
</tr>
<tr>
<td>Timothy R. Macdonald<br>Sara R. Neel<br>American Civil Liberties Foundation<br>of Colorado<br>303 E. 17th Avenue, Suite 350<br>Denver, CO 80203<br>Telephone:  720.402.3107<br>Email:   tmacdonald@aclu-co.org<br>          sneel@aclu-co.org</td>
<td>Craig R. May<br>Thomas C. Dec<br>Celyn D. Whitt<br>Kendra M. Kumor<br>Wheeler Trigg O'Donnell LLP<br>370 Seventeenth Street, Suite 4500<br>Denver, CO 80202<br>Telephone:   303.244.1800<br>Facsimile:    303.244.1879<br>Email:    may@wtotrial.com<br>            dec@wtotrial.com<br>            whitt@wtotrial.com<br>            kumor@wtotrial.com</td>
</tr>
<tr>
<td></td>
<td>Attorneys for Plaintiffs - Appellees</td>
</tr>
</table>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of **APPELLEES' ANSWER BRIEF** was served on those listed below via the Tenth Circuit Court of Appeals' electronic email system this 16th day of June, 2025 to the following:

- **Bryce D. Carlson**
  bryce@millerfarmercarlson.com

- **Thomas Carl Dec**
  dec@wtotrial.com

- **Julian R. Ellis, Jr**
  julian@first-fourteenth.com

- **Laura J. Ellis**
  laura@first-fourteenth.com

- **Michael Francisco**
  michael@first-fourteenth.com

- **Timothy R. Macdonald**
  tmacdonald@aclu-co.org

- **Craig Ruvel May**
  may@wtotrial.com

- **Jonathan F. Mitchell**
  jonathan@mitchell.law

- **Christopher Owen Murray**
  chris@first-fourteenth.com

- **Sara R. Neel**
  sneel@aclu-co.org, mbailey@aclu-co.org

- **Celyn D. Whitt**
  whitt@wtotrial.com

- **Kendra M. Kumor**
  kumor@wtotrial.com

*s/ Kendra M. Kumor*