No. 25-1105

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

ELIZABETH SCHOOL DISTRICT,

*Defendant–Appellant*,

v.

KRISTEN CROOKSHANKS, AS PARENT AND NEXT OF FRIEND OF A MINOR ON BEHALF OF C.C.; MINDY SMITH, AS PARENT AND NEXT OF FRIEND OF A MINOR ON BEHALF OF E.S.; NAACP-COLORADO-MONTANA-WYOMING STATE AREA CONFERENCES; AND THE AUTHORS GUILD,

*Plaintiffs–Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-03512-CNS-STV – Hon. Charlotte N. Sweeney

**BRIEF OF FIRST AMENDMENT PROFESSORS AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE**

G.S. HANS
    Civil Rights and Civil Liberties
        Clinic
    Cornell Law School
    Myron Taylor Hall
    Ithaca, NY 14853
    (607) 254-5994

*Counsel for* Amici Curiae

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF AMICI CURIAE ................................................................. 1

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 3

I.     THE DISTRICT COURT, LIKE MANY OTHER COURTS, PROPERLY DECLINED TO CHARACTERIZE THE LIBRARY'S REMOVAL PRACTICES AS GOVERNMENT SPEECH ................................. 3

     A. Government Speech Doctrine Proves a Poor Fit for Library Removal Practices .................................................................................. 3

     B. This Court Should Not Extend *Moody v. NetChoice* to the School Library Context ............................................................................... 8

II.    DESPITE LACKING A MAJORITY OPINION, *PICO* PROVES USEFUL IN ANALYZING SCHOOL LIBRARY BANS ........................... 10

III.   *HAZELWOOD* DOES NOT APPLY IN THE SCHOOL LIBRARY CONTEXT, AND EVEN IF IT DID, APPELLANT WOULD NOT MEET ITS "LEGITIMATE PEDAGOGICAL CONCERNS" STANDARD .......... 13

IV.   THE COURT SHOULD FOLLOW THE EIGHTH CIRCUIT'S REASONING IN *GLBT YOUTH* AND DECLINE TO ADOPT THE FIFTH CIRCUIT'S ERRONEOUS RULING IN *LLANO COUNTY* ....................... 15

CONCLUSION ......................................................................................... 17

APPENDIX: LIST OF SIGNATORIES ................................................... 18

CERTIFICATE OF COMPLIANCE ....................................................... 21

CERTIFICATE OF SERVICE ................................................................ 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
    457 U.S. 853 (1982)............................................................2, 6–7, 10–13

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) ........................................................3, 6, 15

*Hazelwood School District v. Kuhlmeier*,
    484 U.S. 260 (1988).........................................................................2, 13–14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)......................................................................................8

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)......................................................................................7

*Little v. Llano County*,
    138 F.4th 834 (5th Cir. 2025) ...........................................................3, 15–16

*Matal v. Tam*,
    582 U.S. 218 (2017).................................................................................4–5

*Moody v. NetChoice*,
    603 U.S. 707 (2024)................................................................................2, 8–9

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974)......................................................................................8

*PEN American Center, Inc. v. Escambia County School Board*,
    711 F.Supp.3d 1325 (N.D. Fl., 2025) ........................................................11

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022)......................................................................................6

*Walker v. Sons of Confederate Veterans*,
    576 U.S. 200 (2015).................................................................................4–5

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ................................................................................. 6

**Other Authorities**

American Library Association,
   *Library Bill of Rights*,
   https://www.ala.org/advocacy/intfreedom/librarybill ................................... 9–10

Heidi Kitrosser,
   *The Government Speech Doctrine Goes to School*,
   24-15 Knight First Amend. Inst. (Oct. 11, 2024),
   https://knightcolumbia.org/content/the-government-speech-doctrine-goes-to-
   school ....................................................................................................... 14

## INTEREST OF *AMICI* CURIAE[1]

*Amici* are First Amendment scholars and experts who research, write, and teach about the Free Speech Clause. Collectively, amici have written scholarly books and dozens of academic articles on freedom of expression and access to information. Amici write to urge the court to uphold the District Court's ruling and reject appellant's arguments, which misconstrue core principles of First Amendment doctrine.

Amici submit this brief pursuant to Fed. Rule App. P. 29(a) and do not repeat arguments made by the parties. No party's counsel authored this brief, or any part of it. No party's counsel contributed money to fund any part of the preparation or filing of this brief. Amici file this brief with the consent of the parties.

## INTRODUCTION

In recent years, several courts have considered the constitutionality of viewpoint-based removals of books from public school libraries. Nearly all the courts to have considered the question have properly rejected the arguments that such removals do not violate the First Amendment. This court should also reject such arguments.

---

[1] A complete list of amici curiae is provided in the Appendix.

Amici make three primary points. First, appellant's reliance upon government speech doctrine to insulate its decisions from First Amendment review should not succeed. As the District Court properly held, school library curation decisions do not constitute government speech as school libraries do not serve as conduits for government messaging. Public school libraries promote the intellectual development of students, and despite appellant's contentions, the removal policies of school libraries do not implicate the type of editorial discretion rights of private actors discussed in *Moody v. NetChoice*, 603 U.S. 707 (2024).

Second, the framework developed by Justice Brennan's plurality opinion in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), provides the best approach to guide courts in evaluating school library removal policies. Though Justice Brennan's plurality opinion does not bind lower courts, many courts have employed it in school library cases, including the District Court in this case. Appellant's implications that *Pico* has no value belie the wide invocation of Justice Brennan's plurality opinion, and the District Court appropriately used it in its analysis.

Third, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), does not apply in the school library context; even if it did, appellant would not meet *Hazelwood*'s "legitimate pedagogical concerns" standard. *Hazelwood* concerned a high school's control of a student newspaper, which students produced as part of a

course. The District Court properly held that appellant's actions do not implicate *Hazelwood* and that, even if *Hazelwood* applied, appellant's determinations cannot constitute legitimate pedagogical concerns justifying the removal of school library books.

Amici conclude by observing that the Fifth Circuit's recent decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc), is an outlier in school library cases and misstates multiple First Amendment doctrines; this court should instead look to the Eighth Circuit's decision in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), and other recent school library cases, to guide its analysis in upholding the District Court's Order.

## ARGUMENT

### I.    THE DISTRICT COURT, LIKE MANY OTHER COURTS, PROPERLY DECLINED TO CHARACTERIZE THE LIBRARY'S REMOVAL PRACTICES AS GOVERNMENT SPEECH

#### A.    Government Speech Doctrine Proves a Poor Fit for Library Removal Practices

Appellant relies heavily upon their inaccurate claim that a library's removal processes constitute government speech, thus exempting such action from traditional First Amendment analysis. A majority of courts, including the District Court in this case, that have evaluated this argument have declined to adopt it, concluding that government speech doctrine is a poor fit for library removal

practices. Amici agree with appellees' arguments and write to emphasize both the inapplicability of government speech doctrine to school libraries and the need to keep the doctrine limited, as repeatedly emphasized by the Supreme Court.

The government speech doctrine allows government actors and institutions to speak to advance state policies or otherwise to convey the views of the state without implicating the First Amendment. See, e.g., *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture."); *Walker v. Sons of Confederate Veterans*, 576 U.S. 200, 207–208 (2015) ("[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey") (quoting *Pleasant Valley Grove v. Summum*, 555 U.S. 460, 468 (2009)).

In *Walker v. Sons of Confederate Veterans*, the Supreme Court held that a Texas state program that permitted individuals to submit potential designs for specialty license plates constituted government speech. According to the Court, such plates (even when designed by private parties) communicate a message to the public on behalf of the state, particularly given the approval process that Texas oversaw for specialty plates. *Walker*, 576 U.S. at 213. *Walker* emphasized how the designs of the license plates "indicate that the message conveyed by those designs

4

is conveyed on behalf of the government," *id.* at 214; "'...they thus constitute government speech.'" *Id.* (internal citations omitted).

Two years later, in *Matal v. Tam*, the Court declined to treat the U.S. Patent and Trademark Office's federal trademark registration system as government speech. *Matal v. Tam*, 582 U.S. 218, 239 (2017) ("Trademarks are private, not government, speech.") Importantly, *Tam* characterized government speech as "a doctrine susceptible to dangerous misuse," *id.* at 235, precisely because the government could easily claim control over massive amounts of private speech merely by affixing its own label. According to Justice Alito's opinion in *Tam*, *Walker* "likely marks the outer bounds of the government-speech doctrine." *Id.* at 238. Expanding it beyond *Walker* would contravene the necessary limits the Court has placed on the doctrine. Because the trademark registration system has not been traditionally used to convey a government message, because it did not lead the public to associate registered marks with the government's own speech, and because the wide range of registered trademarks could not communicate any coherent message on behalf of the government, government speech doctrine did not apply. *Tam* at 236–238.

The most recent major Supreme Court case addressing the government speech doctrine, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), characterizes the analysis that a court must conduct to determine whether the government speech

doctrine applies in a specific case as "a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* at 252. Justice Breyer's majority opinion in *Shurtleff* advised courts that "[the] review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *Id*. Conducting a contextual analysis in this case, as in many other recent cases addressing the question, leads to the conclusion that government speech does not properly characterize school library removal policies. As the Eighth Circuit put it in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, citing *Shurtleff* and *Tam*, "it is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *GLBT Youth in Iowa*, 114 F.4th 660, 668 (8th Cir. 2024).

Indeed, no reasonable visitor to a public school library would understand its shelves' contents to convey a government message, because transmitting government orthodoxies is antithetical to a public school library's role in our democratic system. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637 (1943) ("That [public schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.") *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, at 868–69 (quoting *Keyishian v.*

*Board of Regents*, 385 U.S. 589 (1967)) ("'[S]tudents must always remain free to inquire, to study and to evaluate, and to gain new maturity and understanding.' The school library is the principal locus of such freedom.")

The nature of public school libraries belies the notion that the libraries could reasonably be perceived as conduits for government messaging. It also follows from the nature of school libraries that elected officials may not exercise viewpoint-based control over them without breaching another limit on government speech doctrine: the notion that the state may not fund or operate "an existing medium of expression" while seeking to "control it . . . in ways which distort its usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Just as elected officials may not require lawyers to avoid making certain arguments as a condition of legal services funding, *id*. at 543, and may not use public broadcasting stations "in an unconventional way to suppress speech inherent in the nature of the medium," *id*. at 543 (citing *FCC v. League of Women Voters*, 468 U.S. 364, 396-97 (1984)), they also may not impose ideological straightjackets on the traditional "locus" of public school students' freedom of inquiry – the school library. *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 868–69.

**B.      This Court Should Not Extend *Moody v. NetChoice* to the School Library Context**

Of course, an essential precursor to appellant's claim that its viewpoint-based removal of library books is government speech is the question of whether they are engaged in speech at all. Appellant contends that last term's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), stands for the proposition that the selection and curation of titles constitutes appellant's expression. The District Court appropriately distinguished *NetChoice*, concluding that it had "nothing to do with government speech." App. Vol. 2 at 537. While that is an important point, the fundamental distinction between the conduct of social media companies and of public school libraries is the qualitatively different nature of the manner in which they decide what to make available to their users.

By definition, libraries are designed to be pluralistic. In contrast, newspapers express themselves in ways that convey a particular set of values. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Similarly, organizers of a high profile public parade are "making some sort of collective point, not just to each other but to bystanders along the way." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568 (1995). And

social media platforms make choices that "rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which are less so). And in the aggregate they give the feed a particular expressive quality." *NetChoice*, 603 U.S. at 738. One social media company may choose to direct itself toward a more conservative audience, another may wish to appeal to a more progressive crowd. One platform may cater to movie lovers, another to aficionados of cat videos. Their choices of what to post give them an identity. They make them who they are.

To be sure, libraries may legitimately engage in content-based decision making without offending the First Amendment. A library may, for example, decide that it has plenty of books on science and not enough about art, or vice versa. But that is not a decision made to "express" the library's viewpoint or message; indeed, it is not a message at all.

Rather, a library's function, as distinct from that of a newspaper, a parade organizer, or a social media company, is to provide "for the interest, information, and enlightenment of all people of the community the library serves." American Library Association, *Library Bill of Rights*, https://www.ala.org/advocacy/intfreedom/librarybill. Moreover, making choices to cater to particular constituencies is antithetical to the role of the public library. The Library Bill of Rights, first adopted by the American Library Association in 1939,

9

specifically admonishes that "Materials should not be excluded because of the origin, background, or views of those contributing to their creation," that "Libraries should provide materials and information presenting all points of view on current and historical issues," and that "Materials should not be proscribed or removed because of partisan or doctrinal disapproval." *Id*.

Appellant's suggestion to extend editorial discretion to library removal policies remains unsupported by the reasoning in *NetChoice*, which only discussed the editorial discretion of private entities, and would expand government speech doctrine, contravening the Supreme Court's explicit guidance to limit that doctrine. This court should therefore decline to adopt appellant's arguments regarding editorial discretion for government speech.

## II. DESPITE LACKING A MAJORITY OPINION, *PICO* PROVES USEFUL IN ANALYZING SCHOOL LIBRARY BANS

Appellant repeatedly emphasizes the non-precedential value of *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) (*Pico*), the sole Supreme Court case to address how the First Amendment applies in school libraries. Amici, like appellees, stress the usefulness of *Pico* in evaluating First Amendment claims in this area even if the plurality opinion does not bind lower courts.

*Pico* concerned a student's challenge to the removal of books from a school library, ostensibly because of the books' content; the student argued that the

10

removal violated the First Amendment. After the student prevailed in the U.S. Court of Appeals for the Second Circuit, the school board appealed to the U.S. Supreme Court. *Id.* at 856–861. At the Supreme Court, five justices voted in favor of the student, but without a single controlling opinion. Justice Brennan's plurality opinion garnered three votes (in addition to Justice Blackmun's support for most of the opinion); Justice White concurred only in the judgment. *Id.* at 853-54.

Because *Pico* lacked a majority opinion, Justice Brennan's plurality opinion does not bind lower courts. But despite appellant's insistence, Brennan's plurality opinion has value as an illustrative framing of the constitutional issues and the most robust statement from the Supreme Court about them — one that many lower courts have used in the intervening decades. *See, e.g.*, *PEN American Center, Inc. v. Escambia County School Board*, 711 F.Supp.3d 1325, 1331 (N.D. Fl., 2025) ("[T]he common theme in all of the potentially relevant standards (e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials cannot remove books solely because they disagree with the views expressed in the books."). Justice Brennan asserted that school libraries do not have unfettered discretion to remove books given the rights of students to receive information. *Pico*, 457 U.S. at 865–69. In his view, "if [the school board] intended by their removal decision to deny respondents access to ideas with which [the board] disagreed, and if this intent was the decisive factor in [board's] decision, then [the board has]

11

exercised their discretion in violation of the Constitution."[2] *Id.* at 871. In effect, book removals on the basis of viewpoint violate the First Amendment; removals on other bases, such as obscenity, may not. *Id.* at 871.

Judged purely for its persuasive force, the *Pico* plurality opinion provides the correct standard. It strikes the most sensible balance among the practical imperatives of school board control, the need for public schools to train future leaders, and the role of the library in educating students. And while *Pico*'s critics assert that its plurality opinion cannot stand for much, they neglect to acknowledge that the Supreme Court has not repudiated its logic in the intervening forty years despite ample opportunities to do so. Denigrating *Pico* as valueless thus ignores its careful consideration of competing interests that school libraries must balance.

Despite the fractured nature of the *Pico* opinion, a majority of justices agreed on some common themes, including the point that school boards cannot constitutionally remove library books in a "'narrowly partisan or political

---

[2] Justice Brennan took pains to note that his opinion did not create an *affirmative* obligation to carry books ("[N]othing in our decision today affects in any way the discretion of a local school board to choose books to add to the libraries of their schools. Because we are concerned in this case with the suppression of ideas, our holding today affects only the discretion to *remove* books.") *Pico*, 457 U.S. at 871–72 (emphasis original). Appellant spends much energy discussing the distinctions between adding and removing (or what it euphemistically calls "weeding") books, but amici do not contend that *Pico* or any other First Amendment decision creates an *affirmative* obligation to carry certain titles. That question is not at issue in this case.

manner.'" *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting) (quoting the plurality opinion to this effect and "cheerfully conced[ing] the point"). Given the issues in this case, this guidance provides a helpful frame for this court to apply in affirming the District Court's decision.

Using the *Pico* framework does not put the judicial system in the role of permanent overseer of school library decision-making. The applicable rule remains both simple and limited: schools cannot remove books from school libraries purely based on viewpoint. This rule does not limit the ability of schools to remove obscene library books. Nor does it create an affirmative obligation to shelve books without reference to content. The District Court properly contextualized *Pico* as a "useful starting point" for its analysis, and this court need not reverse that decision given the common use of *Pico* to that end.

## III. *HAZELWOOD* DOES NOT APPLY IN THE SCHOOL LIBRARY CONTEXT, AND EVEN IF IT DID, APPELLANT WOULD NOT MEET ITS "LEGITIMATE PEDAGOGICAL CONCERNS" STANDARD

The District Court properly observed that the Supreme Court's ruling in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), does not apply in the instant case and that, if it did apply, the appellant would not meet its "legitimate pedagogical concerns" standard. Amici write to emphasize the latter point. Specifically, we explain that the *Hazelwood* standard is not a rubber stamp, and it is certainly not the government speech doctrine by another name. At

13

minimum, it charges courts to determine whether a purported exercise of

pedagogical judgment is simply a pretext for viewpoint discrimination. The

District Court rightly found that the defendant school district cannot withstand this

inquiry.

*Hazelwood* concerned a high school principal's decision, made after

consulting with the school's journalism teacher, to remove two stories from an

edition of the school newspaper before it went to print. The Supreme Court did not

reach its conclusion — that the stories' removal reflected reasonable pedagogical

concerns — lightly. Rather, it cited several supporting factors, including: the

school newspaper was produced as part of the school's Journalism II course, the

principal's stated concerns entailed journalistic ethics and best practices, and the

paper's faculty advisors concurred with the principal's judgment. The Court also

observed, in a footnote, that a former professional journalist had testified at the

trial and had agreed that the removed stories did not meet journalistic standards.

*Hazelwood*, 484 U.S. 260, 262–64 and 273–76; Heidi Kitrosser, *The Government

Speech Doctrine Goes to School*, 24-15 Knight First Amend. Inst. (Oct. 11, 2024),

https://knightcolumbia.org/content/the-government-speech-doctrine-goes-to-school

[https://perma.cc/6TBZ-CQXF (text accompanying nn. 103-110)].

As the District Court rightly concluded, even if the *Hazelwood* standard

applies in the instant case, appellant stands on far weaker footing than did the

*Hazelwood* defendants. First, appellant's own statements suggest that their motives were "partisan or political" rather than pedagogical. App. Vol. 2 at 551–52. Second, the very nature of the decision — the removal of library books rather than a curricular or disciplinary determination — and of the decisionmakers — elected school board members rather than teachers or school principals — bolster the conclusion that it is not pedagogical in nature. The District Court therefore properly ruled that *Hazelwood* did not apply in this case, and this court should uphold that ruling.

## IV. THE COURT SHOULD FOLLOW THE EIGHTH CIRCUIT'S REASONING IN *GLBT YOUTH* AND DECLINE TO ADOPT THE FIFTH CIRCUIT'S ERRONEOUS RULING IN *LLANO COUNTY*

After the District Court issued its preliminary injunction, the U.S. Court of Appeals for the Fifth Circuit released an *en banc* ruling in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc), upholding a school library's removal of books. Amici encourage this court to decline to adopt the Fifth Circuit's faulty reasoning in *Llano County* and instead follow the Eighth Circuit's approach in *GLBT Youth in Iowa Schools Task Force v. Reynolds,* 114 F.4th 660 (8th Cir. 2024). The Eighth Circuit's reasoning better reflects the state of First Amendment doctrine, and the Fifth Circuit's ruling errs in its analysis.

In 2024, the Eighth Circuit ruled in *GLBT Youth* that the government speech doctrine did not apply to school libraries. *GLBT Youth*, 114 F.4th at 668. A year

15

later, in *Llano County*, the Fifth Circuit overturned its own precedent and disavowed the *Pico* standard. *Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc). Of these two paths, the Eighth Circuit's approach is the better option, as discussed *supra* Part I.

The Fifth Circuit, in addition to issuing a decision inconsistent with every court in recent years that has addressed the question, overruled its own thirty-year-old precedent to reach that result. *Id.* at 837 (overruling *Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184 (5th Cir. 1995)). The *Llano County* court decided to do so because *Campbell* dared to adopt the reasoning of *Pico* and because the Fifth Circuit has rarely cited it. *Id.* The *Llano County* court misread both *Campbell* and Justice Brennan's *Pico* opinion to mandate an *affirmative* right for libraries to carry books from a range of perspectives rather than prohibiting *removal* on the basis of content. *Llano County*, 138 F.4th at 845–56. This mistake reflects a classic elementary error in First Amendment law — confusing a positive right to speak (which the Supreme Court has never recognized) with a negative right prohibiting most government actions based on content.

A plurality of the *en banc* court also extended government speech to cover the removal practices of school libraries, inferring that *NetChoice* grants editorial discretion rights to those removal practices. As discussed *supra* Part I.B, that misreads *NetChoice*; it also ignores the repeated guidance of the Supreme Court in

16

*Tam* and *Shurtleff*. Indeed, extending editorial discretion rights in this way would lead to the *opposite* result in *Tam*. On this reading, the choices of the Patent and Trademark Office to approve some marks and deny others on the basis of offensiveness would constitute editorial discretion on the part of the PTO.

The Fifth Circuit's ruling in *Llano County* misreads core First Amendment principles and cases to reach a result inconsistent with other courts examining the issues. This court should therefore decline to adopt its reasoning.

## CONCLUSION

For the foregoing reasons, this Court should reject appellant's arguments and affirm the District Court's ruling.

Respectfully submitted,

Date: June 23, 2025                    /s/ G.S. Hans

G.S. Hans
Civil Rights and Civil Liberties Clinic
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853
(607) 254-5994

*Counsel* for Amici Curiae

17

## APPENDIX: LIST OF SIGNATORIES

Amici are listed in alphabetical order. Amici who teach at universities located within the Tenth Circuit are designated with an asterisk (*). Amici's law school affiliations are stated for purposes of identification only. The views expressed herein represent the views of the individual signatories and should not be taken as the views of their universities.

**Floyd Abrams**
Floyd Abrams Institute for Free Expression
Yale Law School

**Enrique Armijo**
Professor of Law
Elon University School of Law

**Carlos A. Ball**
Distinguished Professor
Rutgers Law School

**Dr. Cynthia Boyer**
INU Champollion
Université de Toulouse

**Erwin Chemerinsky**
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley School of Law

**Alan K. Chen***
Thompson G. Marsh Law Alumni Professor
University of Denver Sturm College of Law

**Catherine Crump**
Robert Glushko Clinical Professor of Practice in Technology Law
Director, Samuelson Law, Technology & Public Policy Clinic
UC Berkeley, School of Law

**Lisa Hoppenjans**
Associate Professor of Practice
Director, First Amendment Clinic
Washington University School of Law

**Heidi Kitrosser**
William W. Gurley Professor of Law
Northwestern Pritzker School of Law

**Christina Koningisor**
Associate Professor of Law
University of California College of Law, San Francisco

**Margaret B. Kwoka**
Lawrence Herman Professor in Law
The Ohio State University Moritz College of Law

**Genevieve Lakier**
Professor of Law and Herbert & Marjorie Fried Teaching Scholar
The University of Chicago Law School

**Gregg P. Leslie**
Executive Director, First Amendment Clinic
Professor of Practice
Arizona State University Sandra Day O'Connor College of Law

**Stacy Livingston**
Visiting Clinical Lecturer
Yale Law School

**Gregory P. Magarian**
Thomas and Karole Green Professor of Law
Washington University School of Law

**Leonard M. Niehoff**
Professor from Practice
University of Michigan Law School

19

**Clare R. Norins**
Clinical Associate Professor
Director, First Amendment Clinic
University of Georgia School of Law

**David A. Schulz**
Floyd Abrams Clinical Lecturer
Yale Law School

**Geoffrey R. Stone**
Edward H. Levi Distinguished Service Professor of Law
University of Chicago Law School

**Joseph Thai***
Watson Centennial Chair in Law
Presidential Professor
University of Oklahoma College of Law

**Scott Skinner-Thompson***
Associate Professor of Law
University of Colorado Law School

**Christina Tilley**
Professor of Law and Claire Ferguson-Carlson Fellow in Law
University of Iowa College of Law

**Erik Ugland**
Associate Professor
Diederich College of Communication
Marquette University

**Jonathan Weinberg**
Distinguished Professor of Law
Wayne State University

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(a)(7)(B) and 32 (g)(1)
the undersigned certifies that this brief:

   i)  complies with the type-volume limitation of Rule 32(a)(7)(B) and Rule
29(a)(5) because it contains 4,261 words, including footnotes and excluding the
parts of this brief exempted by Rule 32(f); and

   ii)  complies with the typeface requirements of Tenth Circuit R. 32(A) and the
type-style requirements of Rule 32(a)(5) because it has been prepared using
Microsoft Office Word for Mac, set in Times New Roman 14 size font.


 Date: June 23, 2025                  /s/ G.S. Hans

                                        G.S. Hans
                                        Civil Rights and Civil Liberties Clinic
                                        Cornell Law School
                                        Myron Taylor Hall
                                        Ithaca, NY 14853
                                        (607) 254-5994

                                        *Counsel* for Amici Curiae

## CERTIFICATE OF SERVICE

I certify that on June 23, 2025, the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the Court's CM/ECF system and was served through CM/ECF upon the attorneys of record in this matter, who are registered with the Court's CM/ECF system.

Date: June 23, 2025                          /s/ G.S. Hans

G.S. HANS
Civil Rights and Civil Liberties Clinic
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853
(607) 254-5994

*Counsel* for Amici Curiae