No. 25-1105

# In the United States Court of Appeals for the Tenth Circuit

---

KRISTEN CROOKSHANKS, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ELIZABETH SCHOOL DISTRICT,

*Defendant-Appellant.*

---

On appeal from the United States District Court
for the District of Colorado, Case No. 24-cv-03512-CNS-STV
The Honorable Charlotte N. Sweeney

---

**BRIEF OF *AMICUS CURIAE*
FOUNDATION FOR INDIVIDUAL RIGHTS AND
EXPRESSION IN SUPPORT OF PLAINTIFFS-APPELLEES
AND AFFIRMANCE**

---

TAYLOR WASHBURN
EMILY WILLIAMS
BALLARD SPAHR LLP
1301 Second Avenue, Suite 2800
Seattle, Washington 98101
Telephone: (206) 223-7000
washburnt@ballardspahr.com
williamsea@ballardspahr.com

*Attorneys for* Amicus Curiae
*Foundation for Individual Rights
and Expression*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations; and (2) no publicly held corporations hold 10 percent or more of the stock or ownership interest in *amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF CONTENTS .............................................................ii

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF *AMICUS CURIAE* ..........................................1

SUMMARY OF ARGUMENT .................................................2

ARGUMENT ...........................................................................5

    I.    Removal of library books is not government speech ..............5

        A.    Each of the *Shurtleff* factors weighs decisively against holding that library book removal is government speech ...........................................7

        B.    One man's "garbage" is another's "gold." ....................14

    II.    The First Amendment forbids removal of school library books on partisan grounds ..................................................20

        A.    Under *Pico*, courts must consider the "reasons" why books were removed. ..........................................20

        B.    The School District violated the First Amendment by removing books on partisan grounds.....................25

CONCLUSION ......................................................................29

# TABLE OF AUTHORITIES

**Cases**                                             **Page(s)**

*ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.,*
  557 F.3d 1177 (11th Cir. 2009) ........................................... 18

*Ark. Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998) ............................................................... 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v.*
  *Pico,* 457 U.S. 853 (1982) ..................... 3–5, 9, 11, 14–17, 21–25, 28

*Bystrom By & Through Bystrom v. Fridley High Sch., Indep.*
  *Sch. Dist. No. 14,*
  822 F.2d 747 (8th Cir. 1987) ................................................. 28

*Campbell v. St. Tammany Par. Sch. Bd.,*
  64 F.3d 184 (5th Cir. 1995) ................................................... 24

*Case v. Unified Sch. Dist. No. 233,*
  908 F. Supp. 864 (D. Kan. 1995) .......................................... 24

*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005) ................................................... 9

*Colorado v. Griswold,*
  99 F.4th 1234 (10th Cir. 2024) ............................................... 8

*Community-Service Broad. of Mid-America, Inc. v. FCC,*
  593 F.2d 1102 (D.C. Cir. 1978) ............................................. 14

*Doe v. City of Albuquerque,*
  667 F.3d 1111 (10th Cir. 2012) ............................................. 21

*Fayetteville Pub. Libr. v. Crawford Cnty., Ark.,*
  684 F. Supp. 3d 879 (W.D. Ark. 2023) ........................... 24, 25

*FCC v. League of Women Voters of Calif.,*
  468 U.S. 364 (1984) ............................................................... 14

*Gingery v. City of Glendale*,
  831 F.3d 1222 (9th Cir. 2016) ............................................ 18

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
  114 F.4th 660 (8th Cir. 2024) .............................................. 6

*Griswold v. Driscoll*,
  616 F.3d 53 (1st Cir. 2010) ................................................ 18

*Kincaid v. Gibson*,
  236 F.3d 342 (6th Cir. 2001) .............................................. 14

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ..................................... 2, 6, 11, 13, 14

*Little v. Llano Cnty., Tex.*,
  138 F.4th 834 (5th Cir. 2025) .......................................... 6, 24

*Marks v. United States*,
  430 U.S. 188 (1977) ..................................................... 21, 22

*Matal v. Tam*,
  582 U.S. 218 (2017) ......................................................... 10

*Moody v. NetChoice, LLC*
  603 U.S. (2024) ........................................................ 12, 13

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
  711 F. Supp. 3d 1325 (N.D. Fla. 2024) ............................ 6, 23

*Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*,
  638 F.2d 404 (2d Cir. 1980) .............................................. 23

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ........................................................... 7

*Pratt v. Indep. Sch. Dist. No. 831*,
  670 F.2d 771 (8th Cir. 1982) ............................................. 15

*Rust v. Sullivan,*
500 U.S. 173 (1991) ............................................................... 7

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022) ........................................ 5, 7, 8, 10, 11

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ............................................................. 13

*Stanley v. Georgia,*
394 U.S. 557 (1969) ............................................................. 20

*Stanley v. Magrath,*
719 F.2d 279 (8th Cir. 1983) ............................................. 14

*Taylor v. Roswell Indep. Sch. Dist.,*
713 F.3d 25 (10th Cir. 2013) ............................................. 28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ............................................................. 21

*United States v. Am. Libr. Ass'n,*
539 U.S. 194 (2003) ....................................................... 15, 16

*VDARE Found. v. City of Colo. Springs,*
11 F.4th 1151 (10th Cir. 2021) ........................................ 7, 8

*Virden v. Crawford Cnty., Ark.,*
No. 2:23-CV-2071, 2023 WL 5944154 (W.D. Ark. Sept. 12,
2024) .................................................................... 23, 24, 25

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ....................................................... 21, 28

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ..................................................... 5, 7, 8

**Other Authorities**

*Bartlett's Familiar Black Quotations* 338 (Retha Powers ed., Little Brown & Co., 2013) .................................................... 2

Catherine J. Ross, *Are "Book Bans" Unconstitutional? Reflections on Public School Libraries and the Limits of Law,* 76 Stan. L. Rev. 1675 (2024) ......................................... 9

David Gutman, "Mukilteo School District Removes 'To Kill a Mockingbird' From Required Reading List," *Seattle Times* (Feb. 1, 2022) ......................................................................... 19

Jenny Gross and Azi Paybarah, "San Francisco Schools Will Keep Jefferson, Lincoln and Washington Names," *N.Y. Times* (Apr. 7, 2021) ........................................................... 19

**INTEREST OF *AMICUS CURIAE*[1]**

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to their freedoms of speech, expression, and conscience—the essential qualities of liberty. Founded in 1999 as the Foundation for Individual Rights in Education, FIRE's sole focus before the expansion of its mission in 2022 was defending student and faculty rights at our nation's colleges and universities. Given its decades of experience combating campus censorship, FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE strongly opposes attempts to restrict access to information—both on- and off-campus. Informed by its unique history, FIRE has a keen interest in ensuring the censorship it fights on campus and across the country is not fostered in our public K-12 schools.

---

[1] No counsel for a party authored this brief, in whole or in part. Further, no person other than *amicus,* its counsel, and its members contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

"Access to knowledge is the superb, the supreme act of truly great civilizations," said the late American novelist and Nobel laureate Toni Morrison. "Of all the institutions that purport to do this, free libraries stand virtually alone in accomplishing this mission."[2] Libraries do this by providing the community with access to materials reflecting a broad range of perspectives—including unorthodox and unpopular viewpoints. Libraries are critical to our nation's system of limited government, which especially limits the government's authority to control ideas.

If public libraries are to fulfill their vital mission, partisan officials cannot "distort [their] usual functioning" by removing books containing disfavored views. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Just as the government "could not elect to use a broadcasting network or a college publication structure in a regime which prohibits speech necessary to the proper functioning of those systems," *id.* at 544, the First Amendment prohibits the government from subjecting a public

---

[2] Quoted in *Bartlett's Familiar Black Quotations* 338 (Retha Powers ed., Little Brown & Co., 2013). This quote is engraved at the New York Public Library. *Id.*

library's book removal decisions to political whims. This principle applies to public-school libraries, which are constitutionally sheltered from "officially prescribed orthodoxy." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) (plurality op.). The First Amendment does not prevent a school district from considering the suitability of books for its curricular aims and for its students' ages in stocking its libraries. But it does bar school officials from *removing* books on "narrowly partisan or political" grounds. *Id.* at 870 (plurality op.), 907 (Rehnquist, J., dissenting).

Here, public-school students in Elizabeth, Colorado, along with two membership organizations representing parents and authors, seek to defend our unique national commitment to freedom of expression. They challenge the Elizabeth School District's removal of 19 books—including two celebrated novels by Toni Morrison—from school libraries on expressly political grounds. Recognizing that school libraries exist to

educate, not indoctrinate, the district court correctly ordered the School District to return these books to the shelves immediately.

The School District now argues that the Speech Clause of the First Amendment places *no limits whatsoever* on its power to remove library books.[3] The Supreme Court rejected this proposition in *Pico*. 457 U.S. at 869–72 (plurality op.), 876–77 (Blackmun, J., concurring in part and in judgment), 883 (White, J., concurring in judgment), 907 (Rehnquist, J., dissenting). If courts accepted this theory today, government officials could transform school libraries into conformity factories, purging any books that do not parrot their own partisan perspectives and thereby thwarting libraries' core mission of giving students access to knowledge and ideas. Under *Pico*, they cannot, and the School District's efforts to

---

[3] The School District does allow that if it were to prevail, "it may still be possible to challenge book-removal decisions on Establishment Clause or Equal Protection Grounds." Def.-App. Br. 29 n.22.

impose a political litmus test on library books are unconstitutional. This Court should therefore affirm the district court's ruling below.

## ARGUMENT

### I. REMOVAL OF LIBRARY BOOKS IS NOT GOVERNMENT SPEECH

The School District's argument that this Court should ignore *Pico* and hold that removing library books is "government speech" misapplies the government-speech doctrine and ignores the culture-war rancor that would surely result. As the School District readily concedes, this would authorize schools to remove books *for any reason*—including to suppress disfavored ideas on partisan grounds (Def.-App. Br. 24, 27, 32, 37–38, 43–44), a result wholly at odds with *Pico*'s admonition that government officials cannot remove library books for partisan or political reasons. 457 U.S. at 870–72 (plurality op.), 907 (Rehnquist, J., dissenting).

The School District conspicuously ignores the three factors the Supreme Court has considered in identifying government speech. *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–10 (2015). As explained below, each of these three factors supports holding that schools

*do not* engage in government speech when they target library books for removal. This is the conclusion that has been reached by virtually every federal court to have ruled on this issue. *See, e.g., GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667–668 (8th Cir. 2024); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024); *but cf. Little v. Llano Cnty., Tex.,* 138 F.4th 834 (5th Cir. 2025) (holding selection and removal of books in a public, non-school library is government speech).

Classifying the removal of library books as government speech would also pour kerosene on the culture war by allowing officials *of all political persuasions* to cleanse school libraries of books they regard as problematic or offensive. Changes in partisan control of public schools could result in whipsaw changes to library catalogues, as incoming officials excise materials added by their predecessors. Because this would threaten the core purpose and functioning of school libraries, authorizing officials to remove books based on their alleged political unsuitability is unconstitutional. *Velasquez*, 531 U.S. at 543 (when government "uses or attempts to regulate a particular medium," the First Amendment does

not allow it "to suppress speech inherent in the nature of the medium" or to "distort [the medium's] usual functioning").

### A. Each of the *Shurtleff* factors weighs decisively against holding that library book removal is government speech.

The First Amendment bars public officials from stripping libraries of books on narrowly partisan grounds because libraries are repositories of information, not vehicles for government expression. When the state speaks for itself, the First Amendment does not constrain the resulting "government speech." *E.g., Shurtleff*, 596 U.S. at 251–52; *Walker*, 576 U.S. at 207–8; *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009); *Rust v. Sullivan*, 500 U.S. 173, 193–94 (1991). For example, a mayor can make speeches and issue statements reflecting the values and priorities of his administration. *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1168–72 (10th Cir. 2021) (mayor's statement denouncing "hate speech" was government speech and therefore did not infringe plaintiff's First Amendment rights).[4]

---

[4] Justice Breyer, a baseball fan, observed wryly in *Shurtleff* that the government-speech doctrine allows the City of Boston to "congratulate
(continued...)

To determine if the government-speech doctrine applies, courts must consider the three factors evaluated in *Shurtleff* and *Walker*: "(1) whether the forum has historically been used for government speech; (2) whether the public would interpret the speech as being conveyed by the government; and (3) whether the government has maintained control over the speech." *VDARE Found.*, 11 F.4th at 1170 (citing *Walker*, 576 U.S. at 209–10); *see also Colorado v. Griswold,* 99 F.4th 1234, 1239–42 (10th Cir. 2024) (citing *Shurtleff*, 596 U.S. at 252). Each of these three *Shurtleff* factors weighs decisively against holding that school officials engage in government speech when they target library books for removal on partisan or political grounds.

First, school library collections have not historically been vehicles for communicating any particular government message. Instead, they have been used to expose students to the multiple—often diametrically opposed—ideas and points of view expressed by the books' authors and publishers. School libraries are not like "the compulsory environment of

_____

the Red Sox on a victory" without "simultaneously transmit[ting] the views of disappointed Yankees fans." 596 U.S. at 252–53.

the classroom," where school officials control the curriculum. *Pico*, 457 U.S. at 869 (plurality op.). Rather, they have traditionally been places where "student[s] can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Id.* at 869 (quotation omitted); *see also Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) (contrasting "the removal of an optional book from the school library," which is not government speech, with "the selection of a textbook for use in the classroom"). As one scholar has noted, if the courts were to treat library books as government speech, "any distinction between school libraries and the curricular arena would be obliterated."[5]

Second, the public cannot reasonably believe a school district has endorsed the message of each and every book in its libraries. Libraries house literally thousands of diverse, often opposing, points of view on, for example, the proper form of government, such as Thomas Hobbes's *Leviathan*, John Stuart Mill's *On Liberty*, and Karl Marx's *Communist*

---

[5] Catherine J. Ross, *Are "Book Bans" Unconstitutional? Reflections on Public School Libraries and the Limits of Law,* 76 Stan. L. Rev. 1675, 1714 (2024).

*Manifesto*. A public library can include the Bible and the Quran without being perceived as endorsing either or—incoherently—both.[6]

As Justice Alito has emphasized, the government-speech doctrine has no application when the speech at issue "express[es] contradictory views." *Matal v. Tam*, 582 U.S. 218, 236 (2017); *see also Shurtleff*, 596 U.S. at 272–73 (Alito, J., concurring) (flags flown from city flagpole that "reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message of a single speaker" were not government speech). The School District disclaims the idea that the contents of *individual library books* are government speech, and proposes instead that its "*curation decisions* are the speech of the library." Def.-App. Br. 30–31 (emphasis added). But the Supreme Court rejected a similar argument in *Shurtleff*, in which Boston argued unsuccessfully its

_____

[6] A search of the Elizabeth High School online library catalogue shows that it currently includes *The Communist Manifesto, Mein Kampf,* the Book of Mormon, *Animal Farm,* Plato's *Republic,* collections of work by Sigmund Freud and Friedrich Nietzsche, *Brave New World,* several Ayn Rand novels, C.S. Lewis's Christian apologia *The Screwtape Letters*, and *The Autobiography of Malcolm X.* We can safely assume that the School District does not endorse all the (conflicting) views in each.

power to approve or deny private use of a city hall flagpole meant those decisions were a form of state expression. 531 U.S. at 256–59.

Third, and finally, the School District has provided no basis to conclude school officials have traditionally exercised their control over libraries to restrict the "content and meaning" of books to government-approved messages. *See, e.g., Shurtleff*, 596 U.S. at 256 (no government speech where city had approval authority over private use of flagpole, but had not used this power to limit flags to those espousing "city-approved values or views"). Since *Pico* was decided over four decades ago, school districts have been prohibited from removing library books on political grounds, 457 U.S. at 870 (plurality op.), 907 (Rehnquist, J., dissenting), which obviously constrains their ability to extract books that conflict with government-approved values. The third *Shurtleff* factor, like the first and second, therefore cuts decisively against holding that the School District engaged in government speech when it targeted certain library books for removal for partisan reasons.

Instead of addressing the government-speech factors analyzed in *Shurtleff*, the School District argues the district court should have heeded

the Supreme Court's correct observation in *Moody v. NetChoice, LLC* that "presenting a curated compilation of speech originally created by others" is an "expressive activity" protected by the First Amendment. 603 U.S. 707, 728 (2024). Def.-App. Br. 27–29. The School District argues that if this is the case, removal of library books by school officials is a form of expressive activity by the state—in other words, government speech. *Id.*

But while *NetChoice* makes clear that editorial curation is speech, this does not mean the government speaks through the contents of its libraries. As the district court correctly noted, *NetChoice* had nothing to do with government speech. App. Vol. 2 at 537 (citing *NetChoice*, 603 U.S. at 717). Instead, "it concerned states' power to control whether and how third-party social-media posts are presented to other users"—in sum, whether the challenged state laws amounted to censorship. *Id.* When the government censors speech, it violates the "fundamental aim of the First Amendment" that "the public has access to a wide range of views." *NetChoice*, 603 U.S. at 741.[7] *NetChoice* thus operates to *reject* the School

---

[7] The First Amendment achieves this vital objective "by preventing *the government* from 'tilt[ing] public debate in a preferred direction,'" and

(continued...)

District's argument that government "curation" of private speech is necessarily government speech; to the contrary, *NetChoice* emphasizes that "government efforts to alter an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Id.* at 717. To interpret it as authorizing censorship and limiting the application of the First Amendment, as the School District does, gets the opinion completely backwards.

The Supreme Court has recognized in various contexts that when the government creates an institution whose core purpose is to facilitate activity protected by the First Amendment—here, a school library, which facilitates access to ideas and information—it cannot "speak" through that entity to communicate only state-approved messages by restricting expression of, or access to, competing viewpoints. *Velazquez,* 531 U.S. at 543.[8] For school libraries—chartered to enlighten students by offering a

---

"not by licensing the government to stop *private actors* from speaking as they wish and preferring some views over others." *NetChoice,* 603 U.S. at 741 (quoting *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 578–79 (2011)).

[8] For example, if the government elects to fund a public broadcasting station, the First Amendment requires that it be operated free of state interference with its established purpose. *Ark. Educ. Television Comm'n*

(continued...)

wide spectrum of views, free of censorship—this means political victors don't get to remove books just because they hold temporary positions of power. Granting politicians authority to censor disfavored viewpoints in this manner in the name of transmitting "government speech" would unconstitutionally "distort [libraries'] usual functioning." *Id.; see also Pico,* 457 U.S. at 869 (plurality op.) (district's assertion that it must have "*unfettered* discretion to 'transmit community values'" by removing books "overlooks the unique role of the school library").

## B.  One man's "garbage" is another's "gold."

The School District candidly admits that construing its library-book removals as government speech would authorize the School District to

---

*v. Forbes*, 523 U.S. 666, 672–73 (1998) (recognizing that the purpose of such stations is to exercise "the widest journalistic freedom consistent with their public responsibilities" (quotation omitted)); *see also FCC v. League of Women Voters of Calif.*, 468 U.S. 364, 395 (1984) (public broadcasters cannot be prohibited from running editorials); *Community-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1105–09 (D.C. Cir. 1978) (*en banc*) (government regulators cannot oversee and interfere with public broadcasters' programming choices). Similar principles apply to state interference with school yearbooks, *Kincaid v. Gibson*, 236 F.3d 342, 355 (6th Cir. 2001) (*en banc*), and campus newspapers, *Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983).

engage in explicit viewpoint discrimination. Def.-App. Br. 27. Indeed, the School District suggests such discrimination is essential to the proper functioning of a school library: "Libraries and librarians must separate 'the gold from the garbage,' and the 'garbage' will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, as well as viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities." *Id.*

To be sure, "local school boards have a substantial legitimate role to play in the determination of school library content." *Pico,* 457 U.S. at 869 (plurality op.). In addition, librarians necessarily evaluate content in deciding which materials to acquire. *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 208 (2003). The First Amendment does not bar a school district from considering the suitability of books for its curricular aims and students' ages in stocking its libraries; certainly it does not require that public schools acquire *The Anarchist Cookbook*, which contains recipes for explosive devices and illicit drugs, or *Hustler* magazine. *See, e.g., Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 775–76 (8th Cir. 1982).

Yet there is an important distinction between a school district's discretion to *acquire* books and its decision to *remove* materials already acquired based on objections to viewpoint. "A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material" for acquisition. *Am. Libr. Ass'n,* 539 U.S. at 208; *see also id.* at 236 (Souter, J., dissenting) ("there is only so much money and so much shelf space, and the necessity to choose some material and reject the rest justifies the effort to be selective" in acquiring books). But a library's "traditional role" *also* implicates First Amendment principles that limit book removal. *Pico*, 457 U.S. at 871–72 ("we are concerned … with the suppression of ideas, [and] our holding today affects only the discretion to *remove* books").

Construing the removal of library books—that is, censorship—as a form of government speech would render the First Amendment totally silent in this area—even where, as here, school officials explicitly seek to restrict students' access to disapproved views. As discussed in more detail in Section II, below, a majority of the Supreme Court agreed in *Pico* that this is unconstitutional.

Writing for a three-justice plurality, Justice Brennan observed that:

> If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students. … The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our constitution does not permit the official suppression of *ideas*.

457 U.S. at 870–71. Justice Rehnquist, writing for himself and two other justices in dissent, "cheerfully conceded" this point. *Id.* at 907. Justices Blackmun and White each issued concurring opinions in which they, too, made clear the First Amendment restricts the reasons for which schools may remove library books. *Id.* at 879 (Blackmun, J., concurring in part and in judgment) ("school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them"), 883 (White, J., concurring in judgment).

Abandoning this principle would be a recipe for endless fights in communities around the country. The United States is a highly diverse and pluralistic society. In this case, an avowedly partisan school board removed books that conflicted with its own political values. App. Vol. 2 at 544–49. Obviously, though, many school officials have *different* partisan

commitments, and perceive *different* books as "disreputable." Americans hold a wide range of strong views on all manner of domestic and global issues. In recent years, cities and states across the country have seen heated disputes over such topics as the Armenian Genocide,[9] Japanese imperialism,[10] and the Cuban Revolution.[11]

Currently, there is a limit on the extent to which such battles can extend into public school libraries. But this would change if the removal of books were wholly immune from First Amendment scrutiny. In some districts, school officials might cull books that are perceived as offensive to religious or ethnic minorities, such as Salman Rushdie's *The Satanic Verses,* William Shakespeare's *The Merchant of Venice*, or Harper Lee's

---

[9] *See, e.g., Griswold v. Driscoll*, 616 F.3d 53 (1st Cir. 2010) (distinguishing *Pico*, and holding state education officials did not infringe the First Amendment by revising a curriculum guide in response to pressure from Armenian groups).

[10] *See, e.g., Gingery v. City of Glendale,* 831 F.3d 1222 (9th Cir. 2016) (affirming dismissal of complaint challenging city monument to Korean "comfort women" enslaved by the Imperial Japanese military).

[11] *See, e.g., ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.,* 557 F.3d 1177 (11th Cir. 2009) (finding school board's removal of library book on Cuba did not infringe the First Amendment where removal decision was not motivated by viewpoint but rather factual inaccuracies).

*To Kill a Mockingbird.*[12] In others, officials might remove materials that extol the virtues of Founding Fathers who held slaves, including George Washington and Thomas Jefferson[13]—or, alternatively, books critical of such figures. In the abstract, it is easy to say that certain viewpoints are "garbage" that can be excised from school libraries without cost. But this leaves open *which* views are "garbage"—and who decides for all of us.

A culture war over such questions in America's libraries will not end with one side declaring victory followed by a lasting peace. The conflict will continue endlessly, so long as partisans believe they can impose their own orthodoxy by removing books they dislike. Accepting the School District's invitation to construe the library as a place in which

---

[12] Although Lee intended *To Kill a Mockingbird* to critique racism, some have said in recent years that the novel is offensive because it includes racial slurs and a problematic "white savior" character. *See, e.g.*, David Gutman, "Mukilteo School District Removes 'To Kill a Mockingbird' From Required Reading List," *Seattle Times* (Feb. 1, 2022).

[13] This is not a wild hypothetical. In 2021, the San Francisco Board of Education briefly sought to rename public schools honoring Washington, Jefferson, and Abraham Lincoln. Jenny Gross and Azi Paybarah, "San Francisco Schools Will Keep Jefferson, Lincoln and Washington Names," *N.Y. Times* (Apr. 7, 2021). It is certainly conceivable a district would decide books lauding these figures are racist and harmful to students and should therefore be removed from library shelves.

the government "speaks" through "curation"—*i.e.*, censorship—would let slip the dogs of war by allowing precisely the kind of tit-for-tat politicized removals that the Supreme Court warned against in *Pico*.

## II. THE FIRST AMENDMENT FORBIDS REMOVAL OF SCHOOL LIBRARY BOOKS ON PARTISAN GROUNDS

The School District misreads *Pico* in arguing it can remove library books for any reason even if its "curation decisions" *are not* government speech. Def.-App. Br. 32. In fact, *contra* the School District, a majority of justices in *Pico* agreed school officials cannot remove library books for narrowly partisan or political reasons. Yet that is precisely what the School District did here. As the district court clearly explained, App. Vol. 2 at 544–49, and as outlined below, emails among School District officials show they were motivated by partisan concerns and political ideology in selecting books for removal.

### A. Under *Pico,* courts must consider the "reasons" why books were removed.

At its core, *Pico* reflects one of the ways the First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Doe v. City of Albuquerque*, 667 F.3d

1111, 1118–19 (10th Cir. 2012). In his plurality opinion, Justice Brennan applied this principle in concluding school officials' authority to remove books "must be exercised 'consistent with fundamental constitutional safeguards.'" *Pico,* 457 U.S. at 866–68 (plurality op.) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969)). Although the government has no obligation to establish public libraries, a school district that chooses to do so "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)); *see also id.* at 457 U.S. at 879–80 (Blackmun, J., concurring).

The School District argues the plurality opinion in *Pico* "has no status as law" because Justice Brennan spoke for just three justices, Def.-App. Br. 45–46, but this cramped view does not accurately characterize the decision. It is true that when no single rationale garners five or more votes, lower courts must follow the opinion of the justice who "concurred in the judgment[ ] on the narrowest grounds." *Marks v. United States,*

430 U.S. 188, 193 (1977) (quotations omitted). And it is also correct that, in *Pico*, this opinion belonged to Justice White, who concurred but did not join the plurality. 457 U.S. at 883–84. However, the School District is wrong to say this Court can ignore *Pico* on the ground that Justice White's "controlling opinion" is purportedly "entirely agnostic on whether the First Amendment imposes *any* constraints on book-removal decisions made by public-school libraries …." Def.-App. Br. 47–48.

Justice White voted to affirm the Second Circuit's ruling that the district court erred in granting summary judgment for the school district. In doing so, he agreed the Second Circuit had identified a material issue of fact—namely, "the unresolved factual issue" of "the *reason or reasons* underlying the school board's removal of the books." 457 U.S. at 883 (emphasis added). He simply felt it was premature for the Supreme Court to establish a comprehensive legal standard before the record was fully developed. *Id.*

If, as the School District claims here, Justice White's concurrence was "entirely agnostic on whether the First Amendment imposes *any* constraints on [school library] book-removal decisions," the *reasons* for

the removals would have been irrelevant. Justice White's concurring opinion in *Pico* makes sense *only* if he believed that the school district's reasoning would, in fact, determine the legality of its conduct.[14] A justice who thought the First Amendment might impose no limits on the power of school officials to remove library books—the School Board's position here—would not have voted to affirm the Second Circuit.[15]

In light of Justice White's concurrence, courts must consider at a minimum the "reasons" public schools remove books from their libraries. *Pico*, 457 U.S. at 883 (White, J., concurring). To apply this standard, federal courts consistently rely on the plurality opinion in *Pico*. *See, e.g., PEN Am. Ctr.*, 711 F. Supp. 3d at 1331; *Virden v. Crawford Cnty., Ark.*,

---

[14] Justice White allowed that "if … the District Court concludes after a trial that the books were removed for their vulgarity, there may be no appeal." *Pico*, 457 U.S. at 883. But this implies *other* motivations—*e.g.*, based on ideology—are constitutionally impermissible.

[15] The Second Circuit's opinion in *Pico* emphasized there was "evidence that the [removal] decisions made were based on defendants' moral or political beliefs," giving rise to an inference that the school district had acted "not in the interests of the children's well-being, but rather for the purpose of establishing [its own] views as the correct and orthodox ones for all purposes in the particular community." *Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404, 417 (2d Cir. 1980).

No. 2:23-CV-2071, 2023 WL 5944154, at *5 (W.D. Ark. Sept. 12, 2024); *Fayetteville Pub. Libr. v. Crawford Cnty., Ark.,* 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995); *see also Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995), *overruled by Llano Cnty.,* 138 F.4th at 837.[16]

Moreover, as noted above, even the three *Pico* dissenters "cheerfully concede[d]" a school district's "discretion to determine the content of their school libraries … may not be exercised in a narrowly partisan or political manner." 457 U.S. at 907 (Rehnquist, J., dissenting). This means an almost unanimous Supreme Court—the three plurality justices, along with Justices Blackmun and White concurring in the judgment, plus three dissenters—rejected the School Board's contention here that "a

---

[16] Conversely, the erroneous view in *Llano County* that Justice White's concurrence "said nothing about the First Amendment," 138 F.4th at 843, is among the reasons the Fifth Circuit decided that case wrongly. It erred in rejecting *Pico* wholesale and overruling *Campbell* to hold "[a] plaintiff may not invoke [the right to receive information] to challenge a library's decisions about which books to buy, which books to keep, or which books to remove." *Id.* at 837.

school library's book removals are categorically immune from scrutiny under the Speech Clause." Def.-App. Br. 32. *See Fayetteville Pub. Libr.*, 684 F. Supp. 3d at 909 ("[t]he majority of justices in *Pico* agreed that the state's censorship power could not be exercised 'in a narrowly partisan or political manner'—*even in a school library setting*") (quoting *Pico*, 457 U.S. at 870 (plurality op.)); *Virden*, 2023 WL 5944154, at *5 ("[t]he dispute between the justices which prevented a majority … in *Pico* was not over whether the right to access information existed at all, but rather over how it should be balanced against the unique pedagogical and disciplinary concerns … in a public-school environment").

## B. The School District violated the First Amendment by removing books on partisan grounds.

The district court correctly concluded that "*Pico* remains a useful starting point in determining the constitutionality of the District's book-removal decision." App. Vol. 1 at 543. Following the *Pico* plurality, courts should consider "[i]f petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision." *Pico*, 457 U.S. at 871 (plurality op.). And here, the district court found statements

and actions of the School District's board revealed it removed books based on partisan commitments to suppress viewpoints with which the board did not agree or perceived some in the community would reject. App. Vol. 2 at 544–48; *see also* App.-Pl. Br. 12–14.

This is most apparent in various emails sent by then-school board director Heather Booth. In one email, while paying lip service to keeping politics out of the "classroom," Booth wrote: "it's equally important to remember that our commitment to conservative values was a key aspect of our campaign." App. Vol. 1 at 115. She reminded other board members that "[w]e all ran on a platform that promised to uphold these values in our district, reflecting the majority sentiment of our community," and "[i]t's crucial that as we navigate these discussions [around our agenda], we remain mindful of the promises we made and the values we pledged to support." *Id.* Specifically, "conservative values are exactly what we are and plan to continue to bring into the district." *Id.*[17]

---

[17] In the same email chain, another school board member wrote: "We were very vocal about getting a superintendent and legal representative with conservative values so technically, to say [we will] keep [those values] out of our schools would be confusing." App. Vol. 1 at 114.

Separately, Booth assured a distressed alumna of Elizabeth public schools that "[a]s an elected official committed to conservative values for our children, I feel a strong obligation to honor the promises made during my campaign." *Id.* at 119. Booth continued: "It is our responsibility to respect these concerns and uphold our campaign commitments to the majority." *Id.*

When the school board voted on which books to remove from the library, Booth continued along these lines. After another board member expressed hesitation about removing a novel featuring a lesbian main character because "the story was overall a good one of empowerment for black students," Booth responded: "LGBTQ is only regarding sexual preference which doesn't belong in any school," and "our constituents will not be happy about us returning any of these books." *Id.* at 124–25. The other member then joined Booth in voting for removal. *Id.*

These exchanges show the board intended to remove books that did not align with its political ideology, and a decisive factor in its decisions was concern with satisfying constituents' political preferences. But the fact that board members found certain books politically distasteful, or

believed some in the community would, did not entitle the School District to purge them. Suppression of access to books because they do not align with politicians' "conservative values"—or, for that matter, any other set of political beliefs—is exactly the type of action against which the First Amendment protects. *See Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 51 (10th Cir. 2013) ("district officials are 'not at liberty to suppress or punish speech simply because they disagree with it, or because it takes a political or social viewpoint different from … that subscribed to by the majority'" (quoting *Bystrom By & Through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 755 (8th Cir. 1987))). Rather, the "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials …." *Pico*, 457 U.S. at 882 (Blackmun, J., concurring) (quoting *Barnette*, 319 U.S. at 638). It is clear on the record here that the School District removed school library books in a partisan and political fashion—a transparent violation of the First Amendment. *Pico,* 457 U.S. at 870–71 (plurality op.), 907 (Rehnquist, J., dissenting).

## CONCLUSION

The core mission of public-school libraries—to make a broad range of perspectives and ideas available to students—is protected by the First Amendment bar against government officials censoring disfavored views, including by removing library books on partisan grounds. Because the School District violated this important constitutional mandate, the Court should affirm the ruling of the district court below.

DATED this 24th day of June, 2025.

/s/ *Taylor Washburn*
TAYLOR WASHBURN
EMILY WILLIAMS
BALLARD SPAHR LLP
1301 Second Avenue, Suite 2800
Seattle, Washington 98101
Telephone: (206) 223-7000
washburnt@ballardspahr.com
williamsea@ballardspahr.com

*Attorneys for* Amicus Curiae
*Foundation for Individual*
*Rights and Expression*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMIT**

1.     This document complies with the word limit stated in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 4,766 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. 32(a)(6), because it has been prepared in Microsoft Word using a 14-point proportionally spaced typeface, Century Schoolbook.

DATED this 24th day of June, 2025.

/s/ *Taylor Washburn*
TAYLOR WASHBURN
BALLARD SPAHR LLP

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2025, the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the Court's CM/ECF system, which will send a notification to the attorneys of record in this matter.

/s/ *Taylor Washburn*
TAYLOR WASHBURN
BALLARD SPAHR LLP