No. 25-1105

# In the United States Court of Appeals for the Tenth Circuit

Kristen Crookshanks, as parent and next of friend of a minor on behalf of C.C.; Mindy Smith, as parent and next of friend of a minor on behalf of E.S.; NAACP–Colorado–Montana–Wyoming State Area Conferences; and The Authors Guild,

*Plaintiffs-Appellees*,

v.

Elizabeth School District,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Colorado
Hon. Charlotte N. Sweeney
Case No. 1:24-cv-03512-CNS-STV

## APPELLANT'S REPLY BRIEF

Christopher O. Murray
Laura J. Ellis
Julian R. Ellis Jr.
First & Fourteenth PLLC
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
(719) 286-2475 (phone)
chris@first-fourteenth.com
laura@first-fourteenth.com
julian@first-fourteenth.com

Michael Francisco
First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 784-0522
michael@first-fourteenth.com

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Bryce D. Carlson
Miller Farmer Carlson Law LLC
5665 Vessey Road
Colorado Springs, Colorado 80908
(970) 744-0247 (phone)
bryce@millerfarmercarlson.com

**Oral Argument Requested**
*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

Table of contents ..................................................................................... i

Table of authorities ................................................................................. ii

I.   None of the plaintiffs made a clear showing of standing to challenge the removals of *#Pride*, *Crown*, or *It's Your World* ............... 1

II.  The school district's return of the disputed titles eliminates any ongoing violation of the plaintiffs' First Amendment rights ................ 6

III. The Court should reject Justice Brennan's *Pico* plurality opinion ..... 10

A.   A public school does not "abridge" anyone's freedom of speech by excluding or removing a book from its library ......... 10

B.   The *Pico* plurality's attempt to distinguish a library's removal decisions from its initial-acquisition decisions is nonsensical .............................................................. 14

C.   The *Pico* plurality's test for library-book removals is unclear, contradictory, and incapable of principled application ............................................................ 16

IV.  It is absurd to prohibit libraries from engaging in viewpoint discrimination when removing materials ........................................... 19

V.   A public school's library-curation decisions are government speech ................................................................................. 21

Conclusion .............................................................................................. 25

Certificate of service .............................................................................. 26

Certificate of compliance ....................................................................... 27

Certificate of electronic compliance...................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ........................................ 3

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ............................ 9

*B.C. v. Plumas Unified School District*, 192 F.3d 1260 (9th Cir. 1999) ....................... 5

*Board of Education v. Pico*, 457 U.S. 853 (1982) ............................ 12, 13, 14, 16, 17, 18

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007) .................................................. 4

*Carney v. Adams*, 592 U.S. 53 (2020) ......................................................................... 1

*Case v. Unified School District No. 233*, 908 F. Supp. 864 (D. Kan. 1995) ................. 5

*Deal v. Mercer County Board of Education*, 911 F.3d 183 (4th Cir. 2018) ................... 5

*Dobrich v. Walls*, 380 F. Supp. 2d 366 (D. Del. 2005) ................................................ 4

*Doe v. Liberty University, Inc.*, 635 F. Supp. 3d 447 (W.D. Va. 2022) ........................ 5

*Doe v. Madison School District No. 321*,
177 F.3d 789 (9th Cir. 1999) (en banc) ................................................................... 4

*Fuller ex rel. Fuller v. Decatur Public School Board of Education School
District 61*, 251 F.3d 662 (7th Cir. 2001) ............................................................... 5

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................... 22

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ............................................................................... 22

*Heimberger v. School District of City of Saginaw*,
881 F.2d 242 (6th Cir. 1989) ................................................................................... 5

*Kaltenbach v. Hilliard City Schools*,
730 F. Supp. 3d 699 (S.D. Ohio 2024) ................................................................... 4

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) ..................................... 22

*Lane v. Franks*, 573 U.S. 228 (2014) ......................................................................... 22

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) .................................................... 2

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc) ... 11, 12, 21, 22, 23, 24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................. 1

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003) ........................................ 1

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .......................................................... 21

*Murthy v. Missouri*, 603 U.S. 43 (2024) ................................................................... 1, 4

*Parents for Privacy v. Dallas School District No. 2*,
326 F. Supp. 3d 1075 (D. Or. 2018) ........................................................................ 5

*Parents Involved in Community Schools v. Seattle School District No. 1*,
551 U.S. 701 (2007) ................................................................................................ 2, 3

*PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005) ......................................................... 24

*Raak Law v. Gast*, 686 F. Supp. 3d 774 (S.D. Iowa 2023) ........................................ 2

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) ................................................................................................ 11

*Rust v. Sullivan*, 500 U.S. 173 (1991) ....................................................................... 11

*Sadeghi v. INS*, 40 F.3d 1139 (10th Cir. 1994) ......................................................... 13

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ............................................................. 2

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) .......................................... 22, 23, 24

*Stanley v. Georgia*, 394 U.S. 557 (1969) ................................................................. 6, 11

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ........................................... 9

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) ........................... 8

*United States v. Concentrated Phosphate Export Ass'n*,
393 U.S. 199 (1968) ................................................................................................ 6

*United States v. SCRAP*, 412 U.S. 669 (1973) ........................................................... 8

*Winebarger v. Pennsylvania Higher Education Assistance Agency*,
411 F. Supp. 3d 1070 (C.D. Cal. 2019) ................................................................... 2

## Other Authorities

Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative
Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992) ...................................... 18

I.   **NONE OF THE PLAINTIFFS MADE A CLEAR SHOWING OF STANDING TO CHALLENGE THE REMOVALS OF *#PRIDE*, *CROWN*, OR *IT'S YOUR WORLD***

Plaintiffs who seek a preliminary injunction must make a "clear showing" that they will "likely" establish Article III standing. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024). The plaintiffs claim that E.S.[1] and the NAACP have standing to challenge the removal of library books from Elizabeth Middle School,[2] but neither plaintiff made the "clear showing" needed to support a preliminary injunction.[3]

A litigant's standing is determined by the world that existed when the complaint was filed. *See Carney v. Adams*, 592 U.S. 53, 60 (2020). When the plaintiffs sued on December 18, 2024, E.S. was a four year old attending preschool at Running Creek Elementary. App. Vol. 1 at 18. E.S. had not even started kindergarten and was more than six years away from attending middle school. So E.S. was not suffering an "actual or imminent"[4] injury from the removal of the middle-school library books.

The plaintiffs have no answer to *McConnell v. FEC*, 540 U.S. 93 (2003), which denied standing to a senator who challenged the constitutionality of a campaign-finance law that would not affect him until six years after he sued:

---

1. E.S.'s claims have been brought by his next friend Mindy Smith. For simplicity, we will refer to E.S. rather than Ms. Smith when discussing these claims.

2. Appellees' Br. 25–28.

3. The plaintiffs do not contend that C.C. or The Authors Guild have standing to challenge the middle-school book removals.

4. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> Because Senator McConnell's current term does not expire until 2009, the earliest day he could be affected by § 305 is 45 days before the Republican primary election in 2008. This alleged injury in fact is too remote temporally to satisfy Article III standing.

*Id.* at 226.[5] E.S.'s alleged injury is likewise "too remote temporally," as he will not begin middle school until six years and eight months after the filing of his complaint. *Id.*; *see also Shays v. FEC*, 414 F.3d 76, 92 (D.C. Cir. 2005) ("[T]he [Supreme] Court … relied entirely on lack of immediacy in finding the McConnell plaintiffs' injury insufficient for standing"); *LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011) ("[T]the more than four-year gap … sank Senator Mitch McConnell's standing"); *Raak Law v. Gast*, 686 F. Supp. 3d 774, 779 (S.D. Iowa 2023) ("An injury that would occur in six years … is insufficient" to establish standing.); *Winebarger v. Pennsylvania Higher Education Assistance Agency*, 411 F. Supp. 3d 1070, 1087 (C.D. Cal. 2019) (injury does not confer standing when it is "years away from materializing").

The plaintiffs suggest that *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), gave parents of elementary-school children standing to challenge a high school's admissions policies.[6] *Parents Involved* did nothing of the sort. It conferred standing on a single membership organization that comprised parents of *both* elementary and middle-school

---

5.  Senator McConnell filed his original complaint on March 27, 2002. The 2008 Republican primary took place on May 20, 2008, so his alleged injury would not occur until April 5, 2008—45 days before May 20, 2008, and six years and nine days after the filing of his lawsuit.

6.  Appellees' Br. 26.

students—some of whom would imminently seek admission to the high schools that were using racially discriminatory selection policies. *See id.* at 718 ("The group's members have children in the district's elementary, middle, and high schools"). If the plaintiff in *Parents Involved* had consisted only of parents of second graders (or other students at least six years away from applying to high school), then the Supreme Court would have denied standing under *McConnell*.

The NAACP also failed to make a "clear showing" of standing to challenge the middle-school book removals. Portia Scott's declaration does not claim that any NAACP member has children who attend (or will imminently attend) Elizabeth Middle School, and the plaintiffs' attempt to cure this deficiency by introducing new facts in their appellate brief is improper. *Compare* Appellees' Br. 21 n.8 ("Plaintiffs' counsel has learned that the NAACP has at least one member with a child who attends Elizabeth Middle School"), *with Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58, n.16 (1970) (it is "[m]anifestly" improper for appellate courts to consider facts that do not appear "in the record of the proceedings below").[7]

---

7.    We are not arguing that the NAACP must "identify specific members whose children attend the middle school." Appellees' Br. 27. The plaintiffs merely need evidence in the record showing that the NAACP has a member with children who attend (or will imminently attend) Elizabeth Middle School. That member need not be named or identified at this stage of the proceedings.

The plaintiffs rely on NAACP members who have withdrawn their children from the Elizabeth School District,[8] but these members have no more standing to seek injunctive relief than the parents of students who have graduated or moved to another school district.[9] The school district may have inflicted *past* injury on these NAACP members if it goaded them into withdrawing their children from its schools,[10] but past injuries do not confer standing to seek a preliminary injunction. *See Murthy*, 603 U.S. at 62–74; *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)); *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007) ("Each plaintiff must have standing to seek each form of relief in each claim."). And a family that quits the school district in response to its policies has no ongoing stake in the library protocols of a school that they no longer attend. *See Dobrich v. Walls*, 380 F. Supp. 2d 366, 371–73 (D. Del. 2005) ("Plaintiffs Mona and Alexander Dobrich allege that as a direct result of the policies and practices of the … School District, they decided to leave the School District. . . . Therefore, the Court concludes that Plaintiffs … do not have standing to maintain their claims for … declaratory and injunctive relief."); *Kaltenbach v. Hilliard City Schools*, 730 F. Supp. 3d 699, 705 (S.D. Ohio 2024) ("D.S. has removed her child from the District

---

8. Appellees' Br. 26 ("'[S]ome NAACP members removed their children from Elizabeth schools because of the District's decision to remove [library] books" (quoting App. Vol. 1 at 85–86 (¶ 9)).

9. *See Doe v. Madison School District No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc) ("A student's graduation moots claims for declaratory and injunctive relief.").

10. *See Dobrich v. Walls*, 380 F. Supp. 2d 366, 373 (D. Del. 2005).

and, thus, there is no risk that the Policies will cause any future injuries (or effects of any kind) to D.S. or her child. As a result, D.S. lacks standing to seek prospective relief."); *Case v. Unified School District No. 233*, 908 F. Supp. 864, 873 (D. Kan. 1995) (former students and their parents lack standing to enjoin a school's library-book removals because they "no longer have a cognizable interest in the case or controversy and their injuries would not be redressed by the return of the book to the libraries.").[11] *Deal v. Mercer County Board of Education*, 911 F.3d 183 (4th Cir. 2018), is inapposite because the plaintiff in that case identified specific ongoing injuries that would be redressed by enjoining the alleged Establishment Clause violations. *See id.* at 188–90. There is no evidence in the record showing that NAACP members are suffering ongoing injuries, or that those injuries will be redressed by the sought-after preliminary injunction.

---

11. *See also B.C. v. Plumas Unified School District*, 192 F.3d 1260, 1264 (9th Cir. 1999) (former student with no plans to re-enroll lacks standing to seek injunction against his former school); *Fuller ex rel. Fuller v. Decatur Public School Board of Education School District 61*, 251 F.3d 662, 665 (7th Cir. 2001) (student who voluntarily withdraws lacks standing to seek injunctive relief against his former school); *Heimberger v. School District of City of Saginaw*, 881 F.2d 242, 247 (6th Cir. 1989) (Wellford, J., concurring) ("Clearly, neither [students] nor their parents have standing … to seek equitable relief that would apply to a school they no longer attend."); *Doe v. Liberty University, Inc.*, 635 F. Supp. 3d 447, 454 (W.D. Va. 2022) ("Plaintiff lacks standing to seek … injunctive relief because she no longer attends Liberty and has no stated intent to return."); *Parents for Privacy v. Dallas School District No. 2*, 326 F. Supp. 3d 1075, 1110 (D. Or. 2018) (parents of former student lack standing to seek injunction over school's transgender policies).

For the same reasons, the plaintiffs failed to make a "clear showing" of irreparable harm from the middle-school library book removals. E.S. is more than six years away from middle school, and the plaintiffs presented no evidence that NAACP members or their children can access the Elizabeth Middle School library. So there is no conceivable basis for ordering the return of *#Pride*, *Crown*, or *It's Your World* at the preliminary-injunction stage.

## II. The School District's Return Of The Disputed Titles Eliminates Any Ongoing Violation Of The Plaintiffs' First Amendment Rights

The plaintiffs falsely claim that the school district is attempting to "moot" the case by returning the disputed titles to the libraries and allowing the plaintiffs and their members to access those books upon request. *See* Appellees' Br. 28–30. None of this moots the plaintiffs' claims. C.C. and E.S. are still suffering Article III injury (although a very minor one) because these books remain absent from the library shelves. But this injury does not violate their First Amendment rights to "receive information and ideas"[12] because they can *still* access and check out the formerly removed books simply by asking a school librarian for them.[13]

---

12.  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

13.  The voluntary-cessation doctrine is irrelevant because the school district did not restore the disputed titles to the shelves, as the plaintiffs are demanding. *See United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave (t)he defendant … free to return to his old ways.").

The Speech Clause does not empower students to demand that school libraries keep particular books in a student's preferred locations. The plaintiffs complain that the school district's arrangement requires students to ask a librarian before obtaining one of the disputed titles,[14] but they do not explain how that violates their constitutional rights. Library patrons must often ask librarians for assistance, such as when books have been misplaced or are hard to find or need to be acquired through interlibrary loan. None of that violates an individual's First Amendment right to "receive information and ideas," and students do not get to sue their school for damages under 42 U.S.C. § 1983 whenever they need to ask a librarian for assistance in obtaining a book. The plaintiffs also bemoan the fact that they must "verify their identity"[15] with the school librarian before accessing the disputed books. But students must *always* "verify their identity" when checking out school-library books, as the library needs to track these students to ensure the timely return of its materials.[16] It is untenable for the plaintiffs to claim that these "burdens" violate a student's constitutional rights—even though they indisputably inflict Article III injury. *See United States v. SCRAP*, 412 U.S. 669, 689

---

14. Appellees' Br. 30.

15. *Id.*

16. Many schools also require students to scan their identification when entering the library.

n.14 (1973)  ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)).[17]

Justices Kennedy's and Breyer's concurrences in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), also make clear that "small" or insignificant burdens on a library patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (Breyer, J., concurring in the judgment) (upholding restriction given the "comparatively small burden that the Act imposes upon the library patron"). The plaintiffs do not even attempt to argue that the "burdens" that the school district's arrangement imposes on C.C. and E.S. are greater than the burdens imposed by the Children's Internet Protection Act, which requires adult users to ask a librarian to unblock filtered internet content before access to that material is allowed.

The plaintiffs also complain that the school district's arrangement will require children of NAACP members to disclose their parents' membership before they can access the formerly removed books. *See* Appellees' Br. 31.

---

17.  The plaintiffs falsely claim that C.C. and E.S. "must identify themselves as Plaintiffs in ongoing litigation against the District." Appellees' Br. 31. The school district knows who C.C. and E.S. are and has directed its librarians to allow them access to the formerly removed books. C.C. and E.S. need to disclose only their identities and nothing more to access those titles.

But this does not violate anyone's constitutional rights unless the students or parents would face a risk of reprisals if their NAACP membership were revealed to school officials. *See Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 607 (2021) ("Because NAACP members *faced a risk of reprisals* if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest 'sufficient to justify the deterrent effect' of disclosure—we concluded that the State's demand violated the First Amendment." (emphasis added) (citations omitted)). There is no evidence or reason to believe that any student or parent will face retaliation for belonging to the NAACP. More importantly, the NAACP will *have* to disclose its members who attend or have children in the Elizabeth School District to establish organizational standing. *See Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009) ("[P]laintiffs claiming an organizational standing [must] identify members who have suffered the requisite harm"). The school district is also entitled to this information in discovery, and once it gets the names of the affected NAACP members it will instruct its librarians to allow those individuals (or their children) to access the disputed titles upon request. So there will be no need for any student to disclose anyone's affiliation with the NAACP once the affected members are revealed in this litigation.

The plaintiffs also claim that the school district's arrangement violates the First Amendment rights of The Authors Guild,[18] but no court has ever

---

18.   *See* Appellees' Br. 32–33.

held that authors have a constitutional right to prevent libraries from removing or limiting access to their books. The Speech Clause protects an author's right to distribute his work to *willing* recipients. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963). It does not empower authors to force government-owned libraries to purchase or maintain their books, and it does not allow authors to sue libraries that choose to allocate their limited shelf space toward other works.

## III. THE COURT SHOULD REJECT JUSTICE BRENNAN'S *PICO* PLURALITY OPINION

The plaintiffs admit that Justice Brennan's *Pico* plurality opinion is nonbinding but ask the Court to adopt it anyway. *See* Appellees' Br. 33–42. The Court should decline for several reasons. First, a public school does not "abridge" anyone's freedom of speech by removing books from its library. Second, it is nonsensical to adopt the *Pico* plurality's claim that the Speech Clause limits a library's prerogative to remove existing books from its collection, yet imposes no restrictions on a library's ability to exclude books by refusing to purchase them. Third, the "test" proposed in the *Pico* plurality is unclear, contradictory, and incapable of principled application.

### A.    A Public School Does Not "Abridge" Anyone's Freedom Of Speech By Excluding Or Removing A Book From Its Library

The Speech Clause prohibits only laws that "abridge" the freedom of speech. It does not require the government to subsidize or affirmatively assist a person's efforts to obtain or access books. *See Rust v. Sullivan*, 500 U.S. 173,

200 (1991) ("[T]he Government may choose not to subsidize speech"); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The Speech Clause, like nearly every provision in the Bill of Rights, protects negative and not positive rights. *See* Appellants' Opening Br. 17–19. It protects citizens from government interference in their efforts to acquire reading materials, but it does not allow private citizens to conscript the resources of government or demand that the government provide or maintain books for them at taxpayer expense. *See Little v. Llano County*, 138 F.4th 834, 868 (5th Cir. 2025) (en banc) (Ho, J., concurring) ("Plaintiffs have a First Amendment right to read books. They don't have a First Amendment right to force a public library to provide them.").

It is especially untenable to extend the "right to receive information and ideas"[19] to a library's curation decisions. Governments are not even required to provide libraries or library books. And libraries *must* exclude books from their collections because shelf space is limited. Libraries must also continually remove books to make room for new materials. So students and library patrons who disagree with a book-removal decision should be thanking their school districts or municipal governments for providing the library and offering the removed book during its shelf life, not suing them for rescinding a gratuity that they had no obligation to provide in the first place.

---

19.  *Stanley*, 394 U.S. at 564.

Neither the *Pico* plurality nor the plaintiffs have even attempted to ex-
plain how a library-book removal can "abridge" the freedom of speech when
it is nothing more than the withdrawal of a government subsidy that was pro-
vided as an act of grace. Justice Brennan's paean to the school library[20] ig-
nores the fact that the Speech Clause imposes no obligation on the govern-
ment to provide these libraries, let alone subsidize or assist a person's effort
to obtain a desired book. *See Little*, 138 F.4th at 845 ("It is one thing to tell
the *government* it cannot stop *you* from receiving a book. . . . It is another
thing for *you* to tell the *government* which books it must keep in the library.
The First Amendment does not give you the right to demand that."). The
*Pico* dissenters pointed out that the Speech Clause confers no right to gov-
ernment assistance in accessing reading materials,[21] but Justice Brennan
chose to ignore the dissenters' argument rather than respond to it.

The plaintiffs, for their part, do not deny that the Speech Clause and
*Stanley* protect only negative and not positive rights. They also do not deny
that a school district has no constitutional obligation to provide a library or
include any particular book in its library collection. *See* Appellees' Br. 50
(disavowing interpretations of the Speech Clause that would require the "ad-

---

20. *See Pico*, 457 U.S. at 868 (plurality) ("A school library, no less than any
    other public library, is 'a place dedicated to quiet, to knowledge, and to
    beauty.'" (citation omitted)).

21. *See Pico*, 457 U.S. at 888 (Burger, C.J., dissenting) ("[T]he 'right to re-
    ceive information and ideas' ... does not carry with it the concomitant
    right to have those ideas affirmatively provided at a particular place by
    the government." (citing *Stanley*, 394 U.S. at 564)).

dition of books to the library shelves"). So the plaintiffs cannot escape the conclusion that the removal of a school-library book is the withdrawal of a government subsidy rather than the "abridgement" of a baseline constitutional entitlement.[22]

Finally, the plaintiffs insinuate that three of the *Pico* dissenters "'cheerfully conceded'" that the Speech Clause limits a library's authority to remove books. *See* Appellees' Br. 1, 48 (quoting *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting)). They did nothing of the sort. All four *Pico* dissenters joined Chief Justice Burger's dissent, which emphatically rejects any Speech Clause limits on a library's book-removal prerogatives. *See id.* at 889 (Burger, C.J., dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide con-

---

22. The plaintiffs falsely claim that we "waived" any argument that the Speech Clause is inapplicable to library-book removals. *See* Appellees' Br. 47–48. Our district-court brief asked the court to reject the *Pico* plurality opinion on the ground that the Speech Clause has nothing to say about a library's curation decisions. *See* Br. in Opp. to Prelim. Inj., ECF No. 25, at 19 ("A three-justice plurality in *Pico* tried to invent a new First Amendment right for students in schools—a 'right to receive' information in their school library, even when that information remains available elsewhere, and even when the school district does nothing to impede a student's efforts to obtain the desired information from other sources."); *id.* at 16 ("[Justice White's] controlling opinion in *Pico* remains entirely agnostic on whether the First Amendment imposes *any* constraints on book-removal decisions made by public-school libraries . . . ."). And regardless of what was said in the district court, the school district can *still* raise this argument in reply to rebut the plaintiffs' claim that the *Pico* plurality correctly interpreted the Speech Clause. *See Sadeghi v. INS*, 40 F.3d 1139, 1143 (10th Cir. 1994).

tinuing access to certain books."). Then-Justice Rehnquist's dissent assumed
for the sake of argument that *some* constitutional provision (not necessarily
the Speech Clause) would limit library-removals in the extreme hypotheticals
described in the plurality opinion, but he made clear that the Court *should not
rule* on those hypotheticals until they were actually presented. *See id.* at 908
(Rehnquist, J., dissenting) ("I would save for another day—feeling quite con-
fident that that day will not arrive—the extreme examples posed in Justice
Brennan's opinion."). The dissenters did not join or approve *any* portion of
Justice Brennan's plurality opinion.

### B.    The *Pico* Plurality's Attempt To Distinguish A Library's Removal Decisions From Its Initial-Acquisition Decisions Is Nonsensical

Neither the *Pico* plurality nor the plaintiffs claim that the Speech Clause
is implicated when a library refuses to add materials to its collection. *See Pico*,
457 U.S. at 871–72 (plurality) ("[N]othing in our decision today affects in
any way the discretion of a local school board to choose books to *add* to the
libraries of their schools. . . . [O]ur holding today affects only the discretion
to *remove* books."); Appellees' Br. 50. This attempt to distinguish removals
from additions is untenable and the Court should reject it.

Our opening brief observed that a school library that refuses to add *The
Bluest Eye* imposes a *greater* injury on students who wish to access the book
than a school district that removes *The Bluest Eye* after adding it to its librar-
ies. *See* Appellants' Opening Br. 36–37. That is because the latter school dis-

trict provided at least *some* access to the disputed book while the former school district provided no access at all. *See id*. The plaintiffs do not deny this, yet their only response is to point out that Justice Brennan distinguished library-book additions from library-book removals in his *Pico* plurality opinion. *See* Appellees' Br. 50 ("The *Pico* plurality explicitly limited its holding to book removals as the only issue[] presented, as should this Court."). That is not an argument, and it begs the question by assuming the correctness of the *Pico* plurality opinion—the very issue to be decided by this Court.

It is also easy to evade a rule that limits library-book removals while leaving school officials with a free hand to exclude materials at the acquisition stage. Suppose that this Court were to affirm the preliminary injunction and adopt the *Pico* plurality opinion as the law of the Tenth Circuit. In response, a student checks out one or more of the 19 disputed titles and then loses or damages the books (either by accident or at the direction of a parent who opposes their presence in the library). Then the school-board members refuse to purchase replacement copies, for the same reasons that they voted to remove those titles from their libraries. None of that will violate (or even implicate) the *Pico* plurality opinion because the school district is refusing to add books to its libraries. So adopting the *Pico* plurality opinion will create a farcical regime in which a school district can refuse to buy replacement copies if the books that it wants to remove get damaged or lost, and then leave it to library vigilantes (who are not subject to the First Amendment) to deep-six the unwanted materials.

As Justice O'Connor observed in *Pico*:

> If the school board can … determine initially what books to pur-
> chase for the school library, it surely can decide which books to
> discontinue or remove from the school library so long as it does
> not also interfere with the right of students to read the material
> and to discuss it.

*Pico*, 457 U.S. at 921 (O'Connor, J., dissenting). Justice O'Connor is correct,
and Justice Brennan and the plaintiffs are wrong. If the Elizabeth School Dis-
trict can exclude the 19 disputed titles from its libraries at the acquisition
stage, then it can remove those books if it regrets or wants to undo its previ-
ous decision to add those books to its library collection.

### C.    The *Pico* Plurality's Test For Library-Book Removals Is Unclear, Contradictory, And Incapable Of Principled Application

The *Pico* plurality opinion contains no fewer than three formulations of
its test for distinguishing constitutionally permissible library-book removals
from constitutionally impermissible ones.

The first formulation appears on page 870:

> Petitioners rightly possess significant discretion to determine
> the content of their school libraries. But that discretion may not
> be exercised in a narrowly partisan or political manner.

*Pico*, 457 U.S. at 870 (plurality). So "partisan" and "political" book removals
are acceptable (according to Justice Brennan) as long as they do not enter the
realm of "narrowly" partisan or political book removals. How a court is sup-
posed to distinguish a "narrowly" partisan or political book removal from a
merely "partisan" or "political" decision is anyone's guess.

16

The second formulation appears on page 871:

> [W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

*Id.* at 871 (plurality) (footnote omitted). In a footnote, Justice Brennan elaborated on the meaning of "decisive factor":

> By "decisive factor" we mean a "substantial factor" in the absence of which the opposite decision would have been reached.

*Id.* at 871 n.32 (plurality).

The third formulation appears on page 872:

> [W]e hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

*Id.* at 872 (plurality) (citation omitted).

If this Court adopts the *Pico* plurality opinion as the law of the Tenth Circuit, it will need to decide which of these three formulations represents the proper test for determining when a library-book removal violates the Speech Clause. They are all different. Under the third test, a school district can defeat a Speech Clause claim by showing that it was motivated (even in part) by any reason other than mere "dislike" of the "ideas" contained in the book. A school district can also defeat a Speech Clause claim by refuting accusations

that it was seeking to prescribe orthodoxy, even when its sole motivation for removing the book was dislike of its ideas. That is a far cry from the second test, which asks whether the school officials intended to "deny" students "access" to the ideas in the removed books, and whether that intent was the but-for cause of the book-removal decision.

There are many other problems with the *Pico* plurality opinion. It acknowledges that the Speech Clause allows schools to remove library books that are "pervasively vulgar" or that lack "educational suitability." *Pico*, 457 U.S. at 871 (plurality). But book removals based on vulgarity or lack of "educational suitability" will reflect a "dislike" or "disagreement" with the vulgar or educationally unsuitable "ideas" in those books. They will also reflect a desire to "prescribe" orthodoxy by excluding materials deemed vulgar or educationally unsuitable. Justice Brennan made no attempt to reconcile these caveats with the tests that appear elsewhere in his opinion.

Finally, the *Pico* plurality opinion requires judges to become mind readers and divine the subjective motivations and thought processes of school officials. But the Elizabeth School District has five different school board members, each of whom has their own unique thoughts, and each of whom will have their own reasons for supporting removal of the disputed books. It is impossible to attribute a singular "intent" to a collective entity. *See* Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992). And in many situations it is impossible for a court to determine the intentions or motivations of librarians or school

officials that remove library materials. A school board can simply vote to remove library books without discussion, and a librarian can remove books without documenting her reasons. In these situations, a court can do nothing more than guess about what the relevant motivations might have been.

## IV. It Is Absurd To Prohibit Libraries From Engaging In Viewpoint Discrimination When Removing Materials

The plaintiffs' brief is unclear on the standard that they believe should apply to library-book removals. As best we can tell, the plaintiffs are arguing that the Speech Clause allows school officials to engage in content discrimination but not viewpoint discrimination when removing library books. *See* Appellees' Br. 22, 33. But the plaintiffs muddle their argument by claiming that the Speech Clause permits only "legitimate" content discrimination[23] and forbids only "invidious" viewpoint discrimination,[24] and they never bother to explain or define these invented categories. Every Elizabeth School Board member attested that they voted to remove the 19 disputed titles because they contained sexually explicit, violent, or age-inappropriate content, as well as filthy and profane language,[25] so the plaintiffs need to tell this Court whether that constitutes "legitimate" or "non-legitimate" content discrimination. *See* Appellees' Br. 35 (acknowledging that school districts

---

23. *See* Appellees' Br. 38 ("No one is arguing that ESD may not make *legitimate* content-based book removal decisions." (emphasis added).

24. *See* Appellees' Br. 2, 22, 33, 36.

25. *See* App. Vol. 1 at 209 (¶ 28) (Olsen); *id.* at 229 (¶ 31) (Powell); *id.* at 246 (¶ 23) (Waller); *id.* at 262 (¶ 24) (Calahan).

have "'broad discretion to make content-based judgments'" when removing library books (citation omitted)). The plaintiffs' willingness to acknowledge that school districts may engage in content discrimination when removing library books is a welcome concession and a notable departure from the district court's opinion, but they need to make clear whether content discrimination is categorically permissible in library-weeding decisions. If not, they must describe and explain the categories of content discrimination that violate the Speech Clause.

The district court, by contrast, did not hedge its prohibition against viewpoint discrimination in any way, holding that the Speech Clause prohibits school officials from engaging in *any* type of viewpoint discrimination when removing library materials. *See* App. Vol. 2 at 555. That stance is untenable because libraries are supposed to weed books that espouse racism, sexism, anti-Semitism, Holocaust denial, quackery, or junk science.[26] Indeed, library weeding manuals instruct librarians to engage in viewpoint discrimination of this very sort when curating their collections:

> [T]he American Library Association (ALA) advises librarians to remove "items reflecting stereotypes or outdated thinking; items that do not reflect diversity or inclusion; [and] items that promote cultural misrepresentation." Rebecca Vnuk, *The Weeding Handbook: A Shelf-By-Shelf Guide*, 6 (ALA Editions, 2d ed. 2022). The same handbook proclaims it is "basic collection maintenance" to remove racist books . . . . Whatever else one

---

26. And school libraries, in particular, are supposed to remove books that advocate or promote activities harmful to minors, such as tobacco, alcohol, or drug use, pedophilia and pederasty, and other deviant behaviors.

might think of the advice in these guides, it is unmistakably *viewpoint* discrimination.

*Little*, 138 F.4th at 848. The plaintiffs do not deny any of this, yet they insist that the Court should impose a no-viewpoint-discrimination rule on every government-owned library in the Tenth Circuit. But it is absurd to claim that the Speech Clause categorically prohibits viewpoint discrimination when removing library materials, as libraries are supposed to remove and exclude books with disreputable and discredited viewpoints. *See id.* at 859 ("A library can have books on Jewish history without including the Nazi perspective.").[27]

## V.    A Public School's Library-Curation Decisions Are Government Speech

*NetChoice* holds that curating decisions are "speech" that belongs to the curator. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). If the government tried to ban a private library from weeding or excluding the 19 disputed titles from its collection, it would violate the library's rights under the Speech Clause. *See id.* The plaintiffs do not deny any of this.

It follows that the curation decisions of a government-owned library are government speech. The following syllogism explains:

---

27.   The plaintiffs' claim that we have "waived any argument that forum analysis and its attendant prohibition on viewpoint discrimination does not apply" is false. *See* Appellees' Br. 36–37 n.12. Our district-court brief specifically argued that library-curation decisions are government speech to which forum analysis is inapplicable. *See* Br. in Opp. to Prelim. Inj., ECF No. 25, at 13–17.

Premise No. 1:    Curating decisions are "speech." *See NetChoice*.

Premise No. 2:    All speech is either private speech or government speech.[28]

Premise No. 3:    A public school's library-curation decisions cannot be private speech because the school officials act in their capacity as government employees when selecting or weeding school-library materials.[29]

Conclusion:      A public school's library-curation decisions must therefore be government speech.

The plaintiffs cannot escape this conclusion unless they contest and disprove at least one of three premises listed above. But all three of the premises are irrefutable, and the plaintiffs do not try to rebut any of them.

Instead, the plaintiffs try to get around *NetChoice* by invoking the *Shurtleff* factors,[30] but a *Shurtleff* analysis must focus on the curation decisions and not the library materials. *Compare GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (citation omitted)), *with Little*, 138 F.4th at 864 (plurality) ("[T]he Eighth Circuit misunderstood the

---

28.  *See Kennedy v. Bremerton School District*, 597 U.S. 507, 529 (2022) ("Mr. Kennedy has demonstrated that his speech was private speech, not government speech"); *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) (describing "[t]he boundary between government speech and private expression").

29.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006); *Lane v. Franks*, 573 U.S. 228 (2014) ("[The] critical question … is whether the speech at issue is itself ordinarily within the scope of an employee's duties.").

30.  Appellees' Br. 44–46.

government 'speech' at issue. It is not the words of the library books them-selves. . . . A library that includes *Mein Kampf* on its shelves is not proclaim-ing 'Heil Hitler!' Rather, the government speaks through its *selection* of which books to put on the shelves and which books to exclude." (citations and some internal quotation marks omitted)). No one is claiming that library books themselves become "government speech" when stored in a public li-brary, and curated materials do not become the speech of the curator. The library's selection and removal decisions are the only relevant expression in the government-speech inquiry. *See id.*

The first *Shurtleff* factor concerns "the history of the expression at is-sue,"[31] but curation decisions at government-owned libraries have always been the prerogative of government employees and officials rather than pri-vate citizens. *See Little*, 138 F.4th at 861–63 (plurality). The second *Shurtleff* factor involves "the public's likely perception as to who (the government or a private person) is speaking,"[32] but it is inconceivable that any member of the public would perceive a public school's library-curation decisions as private rather than governmental speech. *See Little*, 138 F.4th at 864–65 (plurality). Even the plaintiffs acknowledge that the school district was acting "under color" of state law when it removed the 19 disputed titles,[33] so it is hard to see how they can simultaneously argue that the public would perceive the

---

31.  *Shurtleff*, 596 U.S. at 252.

32.  *Shurtleff*, 596 U.S. at 252.

33.  App. Vol. 1 at 55–59.

school district's curation decisions as those of a private citizen rather than the government.

The third *Shurtleff* factor considers "the extent to which the government has actively shaped or controlled the expression."[34] But a public school's library-curation decisions will *always* be shaped and controlled by the school-district officials who manage or oversee the library. The Elizabeth School District does not outsource its curation decisions to private contractors, and it does not invite non-governmental actors to weed its library materials. The content of a public school's library collection is shaped and controlled entirely by agents of the government.

The plaintiffs falsely claim that the Elizabeth School District "did not actively shape or control the removal of books from its libraries" until recently. *See* Appellees' Br. 45 (citing App. Vol. 1 at 170 (¶ 12)). The school district and its employees *always* shaped and controlled their book-removal decisions; they merely lacked a "uniform approach" to weeding until the school district adopted its protocols. App. Vol. 1 at 170 (¶ 12).[35]

---

34. *Shurtleff*, 596 U.S. at 252.

35. The plaintiffs' claim that "[e]very court to have considered the government speech doctrine in this context has rejected it" is false. Appellees' Br. 43. The D.C. Circuit endorsed the government-speech argument in *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.") And the en banc Fifth Circuit did not "reject" the government-speech argument; it split 7-7 on the issue with three judges refusing to weigh in. *See Little*, 138 F.4th at 835 n.†.

## CONCLUSION

The preliminary injunction should be vacated and the case remanded.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

CHRISTOPHER O. MURRAY
LAURA J. ELLIS
JULIAN R. ELLIS JR.
First & Fourteenth PLLC
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
(719) 286-2475 (phone)
chris@first-fourteenth.com
laura@first-fourteenth.com
julian@first-fourteenth.com

MICHAEL FRANCISCO
First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 784-0522
michael@first-fourteenth.com

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

BRYCE D. CARLSON
Miller Farmer Carlson Law LLC
5665 Vessey Road
Colorado Springs, Colorado 80908
(970) 744-0247 (phone)
bryce@millerfarmercarlson.com

Dated: July 7, 2025

*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on July 7, 2025, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Tenth Circuit and served through CM/ECF upon:

Timothy R. Macdonald
Sara R. Neel
Laura Moraff
American Civil Liberties Union Foundation of Colorado
303 East 17th Avenue, Suite 350
Denver, Colorado 80203
(720) 402-3151
tmacdonald@aclu-co.org
sneel@aclu-co.org
lmoraff@aclu-co.org

Craig R. May
Thomas C. Dec
Celyn D. Whitt
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
(303) 244-1862 (phone)
(303) 244-1879 (fax)
may@wtotrial.com
dec@wtotrial.com
whitt@wtotrial.com

*Counsel for Plaintiffs-Appellees*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendant-Appellant*

26

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.  This motion complies with the type-volume limitation of Fed. R. App.
    P. 27(d)(2) because it contains 6,499 words, excluding the parts of the
    brief exempted by Fed. R. App. P. 32(f).

2.  This motion complies with the typeface and type-style requirements
    of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6)
    because it uses Equity Text B 14-point type face throughout, and Equi-
    ty Text B is a proportionally spaced typeface that includes serifs.


 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL

Dated: July 7, 2025
*Counsel for Defendant-Appellant*

# CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on July 7, 2025, this brief was transmitted to the Clerk of the United States Court of Appeals for the Tenth Circuit, through the court's CM/ECF document filing system.

Counsel further certifies that: (1) required privacy redactions have been made, 10th Cir. R. 25.5; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Defendant-Appellant*

28